REDACTED VERSION

JUDGE RAMOS

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ANTHEM, INC.<br><br>          Plaintiff,<br><br>vs.<br><br>EXPRESS SCRIPTS, INC.<br><br>          Defendant. | **16 CV 2048**<br><br>Civil Action No. ____<br><br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Anthem, Inc. ("Anthem"), for its complaint against Defendant Express Scripts, Inc. ("ESI"), alleges as follows:

## INTRODUCTION

1.       Plaintiff Anthem is one of the nation's leading health benefits companies with more than 38 million members enrolled in its family of health plans.  Anthem's affiliated health plans offer administrative services only ("ASO") services to self-funded employer groups, fully insured plans to employer groups and individuals, Medicare Advantage plans, Medicare Part D prescription benefit plans, and Medicaid managed care plans.  Defendant ESI provides pharmacy benefit management ("PBM") services, including network-pharmacy claims processing, home delivery pharmacy services, specialty pharmacy benefit management, benefit-design consultation, drug-utilization review, formulary management, and medical and drug data analysis services to manage prescription drug plans for health insurers, self-funded employers, the public sector, and government entity clients.  ESI also competes with Anthem plans in the marketplace

to manage ASO employer group prescription drug benefit plans, and Medicare Part D prescription benefit plans.

2.     Anthem and ESI are parties to an Agreement (defined at paragraph 12 below) under which ESI serves as the exclusive provider of PBM services for health insurance plans administered and/or insured by Anthem's affiliated health plans for a ten year period from 2009 through 2019, unless terminated earlier.   It takes time to transition PBM services, so the Agreement also requires ESI to provide post-termination services for up to one year following termination of the Agreement.  ESI has repeatedly and pervasively breached the Agreement and continues to breach the Agreement.  ESI's breaches can be divided into two main categories.

### 1.     The Pricing Breach

3.     The first breach category relates to pricing.  The cost of drugs is a key driver in the health insurance industry, and changes over time.  Given the Agreement's ten year term, it was critical to ensure that ESI's pricing over time to Anthem was competitive in the marketplace. Consequently, Section 5.6 of the Agreement contains a "Periodic Pricing Review" provision that provides for repricing every ███████ "to ensure that [Anthem] is receiving competitive benchmark pricing."  ESI's current pricing to Anthem over the remaining term of the Agreement now exceeds competitive benchmark pricing by approximately $13 billion, plus an additional approximately $1.8 billion through the post-termination transition period.

4.     ESI has materially breached its obligation under Section 5.6 of the Agreement "to negotiate in good faith" in order "to ensure that [Anthem] is receiving competitive benchmark pricing" effective ████████████ (the "Pricing Breach").  ESI has (i) deliberately delayed the repricing process for months, (ii) refused to negotiate, let alone in good faith, over Anthem's pricing proposals for competitive benchmark pricing, (iii) refused to negotiate at all over Anthem's proposals for pricing in excess of competitive benchmark pricing, (iv) expressly

repudiated its contractual obligations to reprice to "ensure Anthem receives competitive benchmark pricing" and (v) failed to offer anything remotely close to competitive benchmark pricing, as required. ESI seeks to compete unfairly against Anthem by continuing to charge inflated prices to Anthem, which allows ESI to undercut Anthem's prices when competing for ASO employer group business and Medicare Part D prescription benefit plans.

5.      ESI's Pricing Breach totally undermines the underlying purpose and value of the Agreement to Anthem, and has resulted in massive damages to Anthem and an obscene profit windfall to ESI. Additionally, ESI's excessive pricing has caused, and will continue to cause, Anthem to lose existing business and not gain new business, resulting in further damages.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████

### 2.      The Operational Breaches

6.      The second breach category relates to ESI's operational performance. Section 3.1(a) of the Agreement requires that ESI perform services under the Agreement "in a prudent and expert manner in accordance with this Agreement and all Laws." ESI has materially breached, and continues to breach, its obligation to perform material operational duties in a "prudent and expert manner," as required, due to ESI's systems defects, chronic failure to devote sufficient resources to the work, inadequate training of ESI's personnel, inordinately high employee turnover, and lack of required expertise (the "Operational Breaches"). Many of the Operational Breaches stem from ESI's imprudent and inexpert conduct in transitioning to a new system that was inadequately tested and implemented. Additionally, ESI's Operational Breaches with respect to Anthem's government-sector Medicare Part D plans have violated the regulations of the Centers for Medicare & Medicaid Services ("CMS") and placed Anthem at significant risk

of enforcement actions, among other material negative consequences.  ESI's Operational Breaches have caused hundreds of millions of dollars of damages to date, and are causing additional damages going forward.

## THE PARTIES

7.  Plaintiff Anthem, Inc. is an Indiana corporation with its principal place of business at 120 Monument Circle, Indianapolis, IN 46204.

8.  Defendant ESI is a Delaware corporation with principal place of business at One Express Way, St. Louis, Missouri, 63121.

## JURISDICTION AND VENUE

9.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.

10.  ESI transacts business in New York and has consented to personal jurisdiction and venue in this Court under Section 16.2 of the Agreement, which provides that "[a]ny dispute arising out of or related in any manner to this Agreement shall be referred exclusively to the United States District Court for the Southern District of New York."

## FACTUAL BACKGROUND

**A.**     **The Agreement**

11.  A critical key to success for health insurers is to provide effective and affordable pharmacy/drug related services and administration for its members.  Health insurers depend on PBMs for such pricing and administration, and Anthem contracted with ESI to provide these critical services.

12.  Specifically, Anthem and ESI are parties to the Amended Restated Pharmacy Benefit Management Services Agreement, dated as of January 1, 2012, by and among Anthem,

Inc. (formerly known as WellPoint, Inc.),[1] on behalf of itself and its Designated Affiliates[2], and

Express Scripts, Inc., on behalf of itself and its subsidiaries and Affiliates, as amended (the

"Agreement").

13.     Pursuant to the Agreement, ESI serves as Anthem's exclusive provider of PBM

services for Anthem-administered health insurance plans for a ten year period from 2009 through

2019, unless terminated earlier.  ESI is obligated under the Agreement to ensure, among other

things, (1) the performance of its services in compliance with all applicable laws and regulations,

including the requirements of CMS and state regulators, (2) accurate and timely pharmacy

benefits administration and proper medication distribution, and (3) market competitive pricing.

**B.     The Repricing Provision**

14.     Repricing provisions are common in long term agreements, including service or

supply contracts, as here, where the market pricing for the underlying products and services

fluctuates.  These provisions allow contracting parties to enter into long term contractual

relationships by ensuring that the pricing schedules in the contracts will be reviewed periodically

and adjusted to reflect prevailing market conditions.

15.     Here, the Agreement has a ten year term, so Anthem needed a repricing provision,

which is contained in Section 5.6 of the Agreement:

> **5.6 Periodic Pricing Review**.  [Anthem] or a third party consultant retained by
> [Anthem] will conduct a market analysis every ▌▌▌▌▌▌▌ during the Term of
> this Agreement to ensure that [Anthem] is receiving competitive benchmark
> pricing.  In the event [Anthem] or its third party consultant determines that such
> pricing terms are not competitive, [Anthem] shall have the ability to propose
> renegotiated pricing terms to PBM and [Anthem] and PBM agrees to negotiate in

---

[1] WellPoint, Inc. changed its corporate name to Anthem, Inc. in December, 2012; accordingly, references to "WellPoint" in this Complaint, in the Agreement or otherwise mean Anthem.

[2] "Designated Affiliate" is defined in the Agreement as an affiliate of Anthem that receives services from ESI pursuant to the Agreement.  All capitalized terms used herein which are defined in the Agreement and not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

good faith over the proposed new pricing terms.  Notwithstanding the foregoing, to be effective any new pricing terms must be agreed to by PBM in writing.

16.     Thus, every ██████ Anthem or a third party consultant retained by Anthem conducts a market analysis "to ensure that [Anthem] is receiving competitive benchmark pricing."  If Anthem or its third party consultant determines that the pricing terms under the Agreement are no longer market competitive, then Anthem proposes new pricing terms "to ensure that [Anthem] is receiving competitive benchmark pricing," and ESI is obligated to negotiate in "good faith over the proposed new pricing terms."

## C.     ESI Breached Its Obligation To Negotiate In Good Faith To Ensure Competitive Benchmark Pricing Under Section 5.6

17.     The first repricing was to be effective on ██████████, at the ████████ anniversary of the Agreement.[3]  Those negotiations took approximately a year.  The length of such negotiations unfairly resulted in Anthem paying above market pricing for almost an extra year.  Thus, the parties learned that, to comply with the Agreement, negotiations needed to start well in advance of the ██████ anniversary date.  ESI specifically admitted that negotiations needed to start in advance of the ██████ anniversary date to ensure that the required competitive pricing was timely made available to Anthem and its members every ████████, as provided for under the Agreement.  For example, ESI's top executive in charge of the Anthem relationship – Matt Totterdale, ESI's VP & GM (Anthem Division) – sent an e-mail to Anthem, on August 15, 2014, that unambiguously acknowledged the timing of the next market check and the importance of initiating and pursuing the process on an earlier time period to allow for a timely outcome:

---

[3] The Agreement amended Anthem and ESI's Pharmacy Benefit Management Services Agreement dated as of December 1, 2009.

REDACTED VERSION

Periodic Pricing Review:

- Occurs every ████████. ***The next rate effective date is*** ███ however I am aware that your conversation with Tim [Wentworth] indicated that we may move to a more strategic tie of an extension with new pricing, and we should work to build a timeline that envisions that

- ***Just for historical perspective this took nearly a year last time so I think it is good that we start sooner rather than later***. (emphasis added)

### 1.   Anthem Invokes Section 5.6 Of The Agreement

18.     Pursuant to Section 5.6 of the Agreement, in early-2015, Anthem engaged Health Strategy, LLC ("Health Strategy"), a highly experienced third party consultant to conduct a market analysis "to ensure that [Anthem] is receiving competitive benchmark pricing" under the Agreement.

19.     Health Strategy conducted a comprehensive market analysis, which revealed that the current pricing terms in the Agreement were not competitive benchmark pricing.  Based on Health Strategy's analysis, ESI's current pricing to Anthem exceeded competitive benchmark pricing by more than $3 billion annually, and $13 billion over the remaining term of the Agreement, plus approximately $1.8 billion during the post-termination transition period.  Near the end of 2015, Health Strategy refreshed its analysis of market data and concluded that competitive benchmark pricing had decreased even further.

20.     Other independent market information also demonstrates that ESI's current pricing is some $13 billion in excess of market pricing for the remaining term of the Agreement, plus approximately $1.8 billion during the post-termination transition period.  Indeed, Anthem has been offered pricing in the marketplace that is approximately $13 billion lower than ESI's pricing over the remaining term of the Agreement, plus approximately $1.8 billion during the post-termination transition period.  ESI's pricing to Anthem is even further out-of-market

because the Agreement contains other terms that are less favorable to Anthem than what is available in the marketplace.

21.     Notably, ESI has never denied that its pricing is more than $13 billion in excess of competitive benchmark pricing over the remaining term of the Agreement, plus approximately $1.8 billion during the post-termination transition period.  In fact, on information and belief, ESI's more recent contract pricing and pricing proposals to its other current and prospective customers will also demonstrate that its pricing to Anthem is approximately $13 billion in excess of market prices over the remaining term of the Agreement, plus approximately $1.8 billion during the post-termination transition period.

**2.     ESI Fails To Negotiate In Good Faith With Anthem As Required Under Section 5.6 Of The Agreement To Ensure Anthem Receives Competitive Benchmark Pricing**

22.     On March 18, 2015, Anthem timely notified ESI that it had conducted a market analysis under Section 5.6 and determined that the pricing terms contained in the Agreement were not remotely competitive.  In accordance with Section 5.6, Anthem shared with ESI specific new pricing terms for competitive benchmark pricing and requested that ESI provide Anthem, no later than March 30, 2015: (i) ESI's confirmation that the pricing terms proposed by Anthem constituted competitive market pricing, or (ii) the alternative pricing terms that ESI in good faith proposed as competitive benchmark pricing.

23.     ESI did not dispute that the pricing terms proposed by Anthem constituted competitive benchmark pricing and did not propose any other pricing terms.  Rather, ESI breached the Agreement by repudiating its obligation to engage in good faith negotiations for competitive benchmark pricing and failed to engage in any negotiation for competitive benchmark pricing, much less good faith negotiations.  ESI's refusal to engage in good faith

negotiations, as required under Section 5.6 of the Agreement, constitutes a material breach of a material term of the Agreement.

### 3. Anthem Provided ESI Notice Of Its Breach

24. In light of ESI's utter refusal to negotiate, on April 1, 2015, Anthem provided ESI with formal notice of a breach under Section 6.2(a) of the Agreement. Pursuant to Section 6.2(a), ESI had ▮▮▮▮ to cure its breach. (*i.e.,* by ▮▮▮▮▮▮▮).

### 4. ESI Failed To Cure Its Pricing Breach Within The Contractually Mandated ▮▮▮ Cure Period

25. During the ▮▮▮ cure period, ESI continued expressly to repudiate its obligations under Section 5.6, including by claiming that it did not have to negotiate over Anthem's pricing proposal or for competitive benchmark pricing, and that it had a veto right over any negotiations. ESI failed to negotiate at all, let alone in good faith, with respect to the pricing terms proposed by Anthem or for competitive benchmark pricing.

### 5. ESI Failed To Cure The Pricing Breach After The Cure Period

26. Notwithstanding ESI's failure to negotiate in good faith during the ▮▮▮ cure period (ending on ▮▮▮▮▮), Anthem continued to try to negotiate in good faith with ESI for competitive benchmark pricing. ESI continued to breach Section 5.6 of the Agreement by, among other things, expressly repudiating its contractual obligation to negotiate over the pricing terms proposed by Anthem or for competitive benchmark pricing, by refusing to negotiate at all, let alone in good faith, over the pricing terms proposed by Anthem or for competitive benchmark pricing, by failing to agree in writing to new pricing terms, and by failing to make any proposal for competitive benchmark pricing.

27. On June 22, 2015, long after the cure period had expired, and nearly three months after Anthem had first delivered its pricing proposal, ESI contacted Anthem. ESI did not dispute

that Anthem's proposal constituted competitive benchmark pricing. Nonetheless, ESI rejected, and refused to negotiate over, Anthem's pricing terms. Moreover, ESI failed to make any proposal for competitive benchmark pricing, as Anthem requested.

28.     For the next months, ESI continued to refuse to engage in negotiations with respect to Anthem's proposal for competitive benchmark pricing. Anthem and ESI then met on September 15, 2015. Again, ESI did not dispute that Anthem's proposal constituted competitive benchmark pricing, but again ESI refused to negotiate over Anthem's proposal.

**6.      Despite ESI's Continuing Breach Of Section 5.6, Anthem
Continued To Invite ESI To Negotiate In Good Faith For
Competitive Benchmark Pricing**

29.     On October 2, 2015, ESI contacted Anthem, but again refused to negotiate over Anthem's proposal for competitive benchmark pricing.

30.     On October 8, 2015, Anthem sent an e-mail to ESI stating that ESI has a contractual obligation to ensure that Anthem is receiving competitive benchmark pricing and that Anthem would be happy to speak to ESI to negotiate for such pricing.

31.     On October 19, 2015, Timothy Wentworth, now President of ESI, asked Anthem for a meeting. Mr. Wentworth, however, indicated he wanted to discuss matters unrelated to competitive benchmark pricing, rather than negotiate in good faith over Anthem's proposal for competitive benchmark pricing.

32.     On October 27, 2015, Anthem contacted ESI and, among other things, agreed to meet. Anthem asked ESI for a meeting time. ESI ignored Anthem.

33.     On November 5, 2015, Anthem again contacted ESI to inquire about the meeting, but ESI would not meet.

34.     On November 11, 2015, Anthem again reached out to Mr. Wentworth of ESI in an effort to engage ESI in negotiations. Anthem again asked that ESI meet to negotiate for

competitive benchmark pricing.  ESI again failed to meet or negotiate, let alone in good faith.  In fact, ESI responded that it did not believe it was "appropriate" for Mr. Wentworth to be involved in these critical pricing discussions, even though Mr. Wentworth had been a key ESI representative with respect to the pricing issue.

35.     On November 23, 2015, Anthem sent another e-mail asking ESI to meet to negotiate Anthem's pricing proposal for competitive benchmark pricing.  ESI again did not meet with Anthem or otherwise engage in good faith negotiations with respect to Anthem's pricing proposal or for competitive benchmark pricing.

36.     Despite ESI's continuing failure to negotiate in good faith or to make any proposal for competitive benchmark pricing, on December 2, 2015, Anthem sent a revised pricing proposal to ESI:

> Attached please find a revised proposal for competitive benchmark pricing, pursuant to Section 5.6 of the Agreement.  As you know, on 3/18/2015 Anthem proposed pricing terms based on a market analysis of competitive benchmark pricing conducted by it and a third-party consultant, Health Strategies, LLC, which determined that the current pricing terms of the Agreement were not even close to competitive.  Months have elapsed, but ESI has refused to negotiate for competitive benchmark pricing, as required under Section 5.6 of the Agreement.  Given the lapse of time, Health Strategies has now updated its analysis, and has determined that competitive benchmark pricing has decreased since 3/18/2015.  Nonetheless, in the hopes of getting ESI to engage in meaningful negotiations, our revised proposal provides for pricing that is higher than as originally proposed and, therefore, favors ESI.  We remain available to discuss pricing with ESI.  Please let me know when you are available to meet.  We look forward to a favorable consideration of this revised proposal.

> Thank you.

37.     ESI did not respond.  On December 14, 2015, Anthem emailed ESI again:

> It has been as many as 19 full days now, and we still have not heard back from ESI as to either communication.

> We would appreciate it if you could at least write back with answers to the following questions:

1.    Is ESI willing to reconsider its position that it is not required to offer Anthem competitive benchmark pricing?

2.    Is ESI willing to reconsider its position that it has the right to veto competitive benchmark pricing to Anthem?

3.    Will ESI accept the pricing terms set forth in Anthem's revised proposal of December 2? We are ready, willing and able to respond to any inquiries you have about our competitive benchmark pricing proposal.

4.    Has ESI agreed to provide, or offered to provide, pricing terms to any other customer or potential customer on terms consistent with those that Anthem is requesting? Obviously, the pricing that ESI is offering to Anthem's competitors is important, but ESI still has not provided us any such information.

Tim [Wentworth], the year is quickly slipping away. We are available to meet with ESI before the holidays, and we look forward to a favorable consideration of our revised proposal for competitive benchmark pricing. As we have mentioned before, Anthem is determined to continue our efforts to engage ESI in meaningful negotiations for competitive benchmark pricing, and we continue to believe that a meeting among the decision-makers can help. Please let me know whether ESI is willing to meet to discuss Anthem's competitive benchmark pricing proposal. Thank you.

38.    On December 15, 2015, ESI again repudiated the Agreement by responding that it was maintaining its position that it was not obligated to negotiate over Anthem's pricing proposal for competitive benchmark pricing, and could simply veto any negotiation. ESI also continued its refusal to disclose the pricing terms it was offering in the market to its other current or prospective customers, on information and belief because such information would demonstrate ESI's bad faith. ESI also failed to meet with Anthem. ESI stated that it would wait another two weeks before responding to the December 2 proposal.

39.    On December 17, 2015, Anthem responded, in part, by asking ESI to please provide a response sooner, noting that the ESI already had nine months to consider the pricing issue and certainly must know its intentions.

40.    ESI waited six days and then responded, by letter dated December 23, 2015, that it was now going to delay further, rather than respond sooner.

41.     On January 7, 2016, after 9 p.m., ESI forwarded a proposal, in bad faith, that would reduce pricing by only $1 billion, a mere 8% of what Anthem is entitled to receive under the Agreement.[4]  Thus, ESI delayed over another month only to propose pricing that was some $12 billion in excess of competitive benchmark pricing, or less than 8% of the reduction necessary to constitute competitive benchmark pricing, and was inflated by more than another $1 billion for the post-termination transition period.  In fact, as to Medicaid pricing, ESI proposed to increase its pricing from its already excessive pricing under the Agreement today.   In other words, at the very time that ESI was supposed to be reducing its pricing, ESI proposed an increase in that pricing.

42.     On January 13, 2016, Anthem responded by, among other things, advising ESI that, for a limited time, it would be willing to accept less than competitive benchmark pricing to resolve the issue:

> ESI's excessive pricing is harming Anthem and its customers.  Consequently, Anthem needs to resolve this matter quickly.   In the interest of getting to a resolution, Anthem is prepared to accept something less than competitive benchmark pricing, as reflected in Anthem's proposal, in derogation of its contract rights, but obviously will not accept ESI's grossly inflated pricing proposal. Please provide Anthem with a reasonable proposal that at least approaches the competitive benchmark pricing provided for in the Agreement. Please be advised that Anthem's willingness to accept less than competitive benchmark pricing as reflected in its proposal is limited in time, so ESI needs to move quickly.

Anthem yet again asked ESI to meet.

43.     ESI did not respond.  Despite ESI's refusal to negotiate, on January 22, 2016, Anthem itself communicated a third proposal which was less than competitive benchmark pricing.  Anthem proposed a price reduction of only $11 billion over the remaining term of the

---

[4] ESI had previously indicated a willingness to provide a larger price reduction, though one that was also patently insufficient, but that proposal was improperly conditioned on an extension of the Agreement and Anthem's release of claims against ESI.  So, notably, ESI, in reducing its offer, did the opposite of negotiating, and instead moved the parties farther from a resolution.

REDACTED VERSION

Agreement, which was $2 billion less than what Anthem is entitled to under the Agreement and could receive by moving to a new PBM vendor. In other words, Anthem proposed to accept pricing that was $2 billion in excess of competitive benchmark pricing, and inflated further for the post-termination transition period, to resolve the dispute short of litigation. Anthem again asked ESI to meet to negotiate.

44.     On January 26, 2016, ESI maintained its position that ESI was not obligated to provide competitive benchmark pricing. ESI also continued its refusal to disclose the pricing terms it was offering in the market to its other current and prospective customers.

45.     On February 3, 2016, Anthem traveled to St. Louis in order to have an opportunity, at last, to meet with Mr. Wentworth, the President of ESI. The trip was a complete waste. ESI refused to engage in good faith negotiations with respect to the pricing terms proposed by Anthem for competitive benchmark pricing or otherwise. ESI again repudiated the Agreement by improperly stating that ESI was not obligated to negotiate at all over the pricing terms proposed by Anthem for competitive benchmark pricing or otherwise. Nonetheless, Anthem made yet another proposal, this time proposing pricing that reduced value to Anthem by another $1.4 billion. Specifically, Anthem offered to accept a pricing reduction of only $9.7 billion, over term, which was $3.4 billion less than what Anthem was entitled to receive and could receive from another PBM vendor during the remaining term of the Agreement, plus additional amounts during the post-termination transition period. In other words, Anthem proposed to pay ESI $3.4 billion in excess of competitive benchmark pricing, plus additional amounts during the post-termination transition period, to expeditiously resolve the dispute without litigation.

46.     On February 5, 2016, Anthem submitted in writing the proposal discussed at the

February 3, 2016 meeting with ESI:

> As you know, Anthem has now spent almost one year trying to engage ESI in negotiations for competitive benchmark pricing, but ESI has refused to do so. Consequently, Anthem and its members are paying inflated prices to ESI, which is unsustainable.  Obviously, Anthem should not have to bid against itself, but delay is inflicting substantial harm on Anthem and improperly enriching ESI.  So, as I told you at our meeting, in yet another effort to get ESI to engage, and notwithstanding its right to lower pricing**, Anthem proposes the pricing reflected on Exhibit A hereto, which is $3.4 billion more than competitive benchmark pricing available to Anthem in the marketplace**.  In other words, Anthem is prepared to overpay ESI by approximately $3.4 billion in an effort to get ESI to provide repricing, as it is required to do (at much lower amounts) under Section 5.6 of the Agreement.  Anthem's willingness to accept pricing in excess of competitive benchmark pricing is limited in time, so we urge ESI to move quickly with respect to Anthem's proposal.  Otherwise, Anthem reserves all rights, including the right to the full amount of the pricing reduction necessary to achieve competitive benchmark pricing.
>
> We have tried to avoid stating the obvious problem that ESI, as a competitor of Anthem's, is inflating Anthem's prices so that it can then undercut Anthem's prices.  We ask ESI to reconsider that approach.
>
> Providing Anthem with market pricing, as you presumably provide to other customers and potential customers, would be very beneficial to ESI.  Accepting Anthem's proposal to pay ESI $3.4 billion more than market pricing would provide ESI an extraordinary windfall.  Anthem cannot continue under ESI's current pricing, so please respond to Anthem's proposal by next week.  Anthem is again ready, willing and able to meet with ESI to negotiate in good faith.  Thank you.

47.     On February 12, 2016, ESI responded with a proposal that did not reduce pricing

by a single dollar from ESI's January 7, 2016 proposal.  ESI maintained its proposal for pricing

that was $12 billion in excess of competitive benchmark pricing, plus more than another $1

billion for the post-termination transition period.  ESI again refused to provide pricing

information regarding its current and prospective customers.

48.     ESI also proposed nominally reduced prices for products and services on

formularies and networks that Anthem and its customers do not use.  So, rather than offering

repricing on the products and services actually purchased by Anthem and its customers, as required, ESI offered lower pricing on products and services that Anthem and its customers do not purchase, which is not a good faith negotiation.  Additionally, the pricing offered for the formularies and networks was grossly in excess of competitive benchmark pricing and, therefore, also breached Section 5.6 of the Agreement.  Anthem explained that it was not interested in the formularies and narrower networks that Anthem and its customers do not use.

49.     Notwithstanding ESI's refusal to negotiate in good faith over the pricing terms proposed by Anthem for competitive benchmark pricing or otherwise, Anthem met with ESI on February 18, 2016.  At that meeting, ESI again repudiated the Agreement by stating that it was not obligated to negotiate in good faith over the pricing terms proposed by Anthem for competitive benchmark pricing or otherwise.  Indeed, ESI refused to negotiate at all, leaving Anthem to either take or leave ESI's patently inadequate proposal for pricing $12 billion in excess of competitive benchmark pricing.  ESI's "take it or leave it" proposal constituted yet another breach of its obligation to negotiate in good faith.

50.     Anthem then tried to get ESI's Chief Executive Officer, George Paz, to negotiate. Joseph Swedish, Anthem's Chief Executive Officer, traveled to Chicago on March 1, 2016 to meet with Mr. Paz.  ESI again refused to negotiate in good faith or at all over the pricing terms proposed by Anthem or for competitive benchmark pricing.  ESI also failed to make a proposal for competitive benchmark pricing of its own.  And ESI again refused to share any market data or pricing information for its current and prospective customers.  ESI stated that it would make a revised proposal.  The week after the March 1 meeting, ESI stated that it would send the proposal by March 11, 2016.  No proposal was sent by that date.  Instead, ESI responded that its proposal would be delayed.

51.     On March 17, 2016, more than two weeks after the March 1, 2016 meeting of Anthem and ESI's CEOs, ESI sent a letter to Anthem.  ESI, however, did not submit a revised proposal.  ESI instead merely recycled its insufficient February 12, 2016 proposal.  ESI made Anthem wait seventeen days for a new proposal that did not reduce pricing by a single dollar from ESI's previous proposal.  In other words, ESI maintained its proposal for pricing that was approximately $12 billion in excess of competitive benchmark pricing during the remaining term of the Agreement, plus more than $1 billion for the post-termination transition period.  ESI again refused to provide market data or pricing information regarding its current and prospective customers.

**D.      ESI Has Breached Material Terms Of The Agreement
         Governing Its Performance Of PBM Services**

52.     Pursuant to Section 3.1(a) of the Agreement, ESI agreed that it would perform the PBM Services set forth in the Agreement "in a prudent and expert manner in accordance with the Agreement and all Laws."   ESI has breached the Agreement by not performing its key responsibilities in a "prudent and expert manner," by failing to adhere to applicable laws, including crucial CMS requirements, and by failing to comply with material terms of the Agreement.  ESI's Operational Breaches are pervasive and attributable to systemic defects in ESI's IT infrastructure, a chronic failure to devote sufficient resources to its obligations, inadequate training of its personnel, inordinately high employee turnover, and a lack of necessary expertise.  ESI's Operational Breaches stem, in large part, from ESI's imprudent and inexpert conduct in transitioning to a new system that was inadequately tested and implemented.  ESI's Operational Breaches have caused Anthem well over $150 million in damages and have required Anthem to devote substantial time and resources attempting to correct and mitigate the numerous problems and errors caused by ESI.

53.    On February 16, 2015, Anthem sent ESI a notice of material breach which detailed ESI's Operational Breaches pursuant to Section 6.2(a) and Section 7.2 of Exhibit I of the Agreement.  (A copy of the Breach Notice is attached hereto as Exhibit 1)  ESI was required to cure those breaches within ███████ (*i.e.*, ████████████). ESI failed to cure any of the Operational Breaches because ESI has not compensated Anthem for any of the resulting damages.  Additionally, ESI failed otherwise to cure many of the Operational Breaches within the cure period or thereafter.

**1.    ESI Fails To Apply The Correct Criteria
In Processing Requests For Prior Authorization**

54.    Under the Agreement, ESI is obligated to review prior authorization requests for certain prescription drugs in accordance with coverage, formulary and clinical guidelines ("Defined Criteria").[5]  ESI continued to repudiate the Agreement by failing correctly to apply the Defined Criteria to determine whether the drug should be authorized or requires further action (*e.g.*, review by Anthem medical personnel) within specified timeframes.  ESI has failed to apply the Defined Criteria accurately or timely, as required under the Agreement.[6]

---

[5] ████████████████████████████████████████████████████████████████████████

[6] The provisions of the Agreement breached include Section 3.11, Exhibit G, Schedule G-2 and portions of Exhibits I and J. ████████████████████████████████████████████████████████████████████████

55.     ESI's failures are largely due to its implementation of an inadequately-tested new computer software program known as "C360," as part of a larger new system known as "Foundation 14." ESI implemented C360 on September 1, 2013 for a portion of Anthem's business, and on January 1, 2014 for the remainder. ESI acknowledged that the migration to C360 created a host of problems, but ESI falsely claimed that it remedied its failures to accurately and timely apply the Defined Criteria within the ███ cure period. ████████

████████████████████████████████████████████

████████████████████ ████

56.     Anthem reviewed ESI's application of Defined Criteria in 150 cases, selected on a random basis, during the period of April 1, 2015 through April 14, 2015, and found that ESI applied the wrong Defined Criteria in an astounding 23% of cases (35 of 150). Further, ESI incorrectly approved the request in 15% of the cases (23 of 150). Anthem also found other highly significant, recurring errors in ESI's application of Defined Criteria. For example, ESI representatives repeatedly answered key questions incorrectly, such as stating that alternative drugs have been tried by the member when there was no evidence of the drug having been tried and failed, or stating that the member had been on the drug for 6 months when there were no paid claims.

57.     Subsequently, Anthem reviewed an additional 232 cases processed by ESI during this April 1-14, 2015 period. This expanded review confirmed the findings from the previous review. Specifically, for the entire set of 382 cases reviewed:

- Anthem identified 95 errors by ESI, including some cases involving multiple errors.

[7] ████████████████████████████████████████████
████████████████████████████████████████████
████

- One case was built for the wrong drug.

- In 10% of cases (39 of 382), ESI applied the wrong Defined Criteria for the given request, and ESI incorrectly approved the request in 13% of the cases (50 of 382).

    - 20 out of the 39 did not meet criteria and should have been sent to Anthem for review.

- In 44 cases, the ESI employee processing the request entered the wrong answer for the question into ESI's system.

    - 30 out of the 44 did not meet criteria and should have been sent to Anthem for review.

- For 11 cases, ESI also made errors in the approval information that it entered into the system (*e.g.*, ESI loaded for three times per day when an Anthem Medical Director only approved for two times per day, or ESI approved for one year when criteria allowed for three months).

58.    Since January 2014, ESI has acknowledged the need to correct the "APS" (Auto-Product Select) functionality in C360, so that ESI's computer system could correctly identify the Defined Criteria for the ESI employee reviewing the request, as required – functionality that had existed before ESI's defective implementation of C360.[8]  Despite having had some 26 months to correct these defects amid repeated requests from Anthem, ESI has failed to do so.  Instead, ESI has repeatedly missed various target dates for implementing necessary fixes.  ESI has continued to delay the necessary system corrections, and has not provided any date by which it will complete the required work.

59.    ESI's failures go to the heart of what ESI is required to do in "managing" pharmacy benefits for Anthem under the Agreement in a "prudent and expert manner" and have resulted in member/customer abrasion.  Among other errors caused by ESI's systems and



inadequately trained personnel, ESI has incorrectly approved many high-cost drugs at alarming rates, resulting in substantial damages to Anthem exceeding $100 million.

   2.   **ESI Has Breached Its Obligations Under Exhibit I Regarding Prescription Drug Event (PDE) File Submission, Processing, Management And Reporting, And Member Cost Sharing Reconciliation**

   60.   CMS requires sponsors of Medicare Part D prescription drug plans, such as Anthem, to submit to CMS a data file containing specified information with respect to each claim for a prescription drug paid by the sponsor under the given plan.  This data is known as "prescription drug event" or "PDE" data.[9]  Failure to submit PDE files in accordance with CMS requirements may result in financial losses to Anthem as part of CMS's financial reconciliation with Part D plan sponsors, and may also result in CMS compliance actions, among other potential adverse consequences.

   61.   Sections 3.2(a)(ii) and 3.21 of the Agreement and Section 4.0 of Exhibit I to the Agreement are material terms of the Agreement and require ESI to perform its Medicare Part D functions in accordance with Medicare regulations and CMS instructions.  Additionally, Exhibit I to the Agreement includes the following requirements specific to ESI's PDE-related services:

- ESI is "responsible for collecting, creating and submitting PDE files to CMS containing claims data as required by CMS in the format and timeframe specified by CMS." (Section 4.11)

- 

---

[9] CMS utilizes PDE files for conducting financial calculations with respect to subsidies payable to Part D plan sponsors and for other purposes.

- ESI is "responsible for receiving the PDE response files from CMS, processing the PDE response file, resolving any [ESI] owned errors, and resubmitting impacted records with resolved errors to CMS for acceptance within ▇▇▇ of receipt."[10]  (Section 4.11.3)

- "[Where ESI] is made aware of Member overpayment due to incorrect Cost Share, [ESI] shall promptly refund the amount of the overpayment to the Covered Individual or the Covered Individual's designee." (Section 4.11.7)

- ESI must ensure that PDE systems and processes are designed, modified, and tested well in advance of the effective date of changes initiated by CMS or [ESI].  (Section 4.11.9)

62.    Section 4.11 of Exhibit I of the Agreement is a material term of the Agreement. ESI has breached, and continues to breach, Section 4.11 of Exhibit I of the Agreement by failing to comply with contractual obligations and CMS requirements concerning the submission, processing, management, and reporting of PDE files, as well as those relating to member cost share reconciliation.  ESI's breaches resulted in high volumes of PDE rejections, incorrect calculations being utilized by CMS for financial reconciliations, delays in responding to CMS inquiries and audits, and compliance risk for non-adherence to CMS's PDE timeliness rules.

63.    ESI's breaches are partly due to ESI's failure to build a functional system that has the capacity to reprocess claims consistently, issue correct refunds to or collect from members, and resubmit accurate PDE records in accordance with CMS mandates.  ESI's failure to comply with these requirements has been ongoing for over three years.  ESI failed to implement CMS required guidance by the January 1, 2014 effective date.  It took ESI 15 months to implement the code, resulting in incorrect claim processing and ESI's inability to accurately bill Anthem's self-funded clients.  Anthem recently lost one of these accounts as a result of ESI's breaches.  ESI's system and processes for resolving incorrect PDE records and correcting its billing to Anthem plan members are riddled with errors.  These systemic failures and human errors by ESI create

---

[10] Additionally, there is a more lenient CMS standard, to which ESI is also subject, requiring that PDEs be submitted within ▇▇▇ of the adjudication date, and that PDEs rejected by CMS be resolved and re-submitted within ▇▇▇ following receipt of rejected record status from CMS. ESI has also routinely failed to comply with these requirements, and continues to do so, in breach of its obligations under the Agreement.

further exposure for CMS enforcement actions, financial losses, and member abrasion, among other adverse consequences.

64.     In April 2012, Anthem issued a corrective action plan to ESI, identified by the parties as CAP#104, based on ESI's failure to perform required PDE management functions.  To date, this corrective action plan, CAP#104, remains open.

65.     The final date for PDE submissions and corrections for calendar year 2014 was June 30, 2015.  Under 42 C.F.R. §§ 423.505(k)(3) and (5), Medicare Part D plan sponsors such as Anthem are required to submit an attestation to CMS in which they certify, among other things, that the PDE data submitted are accurate and complete.  ESI identified 19 issues as exceptions to this attestation, effectively admitting that it has failed accurately to complete all required claim adjustments and submit and correct the PDE data in accordance with CMS requirements and the Agreement.  ESI has failed to resolve all impacted PDE records that were disclosed in its 2014 attestation.

66.     Other recent examples illustrate how ESI's inadequate monitoring and controls continue to put Anthem at notable risk with CMS:

- On May 13, 2015, ESI reported that it failed to submit four CMS required PDE deletions due to human error.  Significantly, ESI had previously communicated on May 4, 2015 that all records had been successfully submitted and deleted.

- On May 20, 2015, Anthem discovered ESI failed to take action required by CMS (deletion of PDE records) on an overpayment issue for 1,024 PDE records for calendar year 2013.

- On July 29, 2015, CMS contacted Anthem's Medicare Compliance Officer about 49 PDEs previously deleted per CMS' request that were resubmitted to CMS by ESI.  Initial ESI research discovered that ESI had erroneously resubmitted a total of 309 PDE records and that ESI had failed to detect or failed to prevent the resubmission to CMS from occurring.  On November 25, 2015, ESI notified Anthem that the impact was greater than previously disclosed, and there were a total of 556 records which had been deleted and subsequently resubmitted.

- On November 3, 2015, CMS sent a Final Notification to Anthem's Medicare Compliance Officer about six PDE records previously deleted pursuant to CMS's request that were resubmitted to CMS by ESI. Once again, ESI failed to detect or prevent the resubmission to CMS.

67.    ESI also continues to breach its obligations relating to the timely and accurate adjustment of erroneous claims payments to Anthem plan members. CMS requires that this be done within ███████ of receipt of complete information regarding claims adjustment, and the Agreement contains additional obligations (*e.g.*, in Section 4.11.7 of Exhibit I). ESI's adjustments have been not only untimely, they create new errors. Errors in ESI's systems frequently result in members being issued incorrect collection notices for amounts that such members do not in fact owe – often for very large sums. Then, when ESI discovers these errors, it issues a check to the member in the amount of the overcharge – whether or not the member actually paid the amount erroneously billed by ESI.

68.    In March 2015, after ESI's system generated a high volume of member refunds and collections, Anthem requested that member cost share reconciliation issues be promptly addressed. In May 2015, ESI provided an assessment that acknowledged a key concern regarding its adjustment process is the fact that ESI employs a "Decentralized Process with up to 7 cross functional handoffs and dependencies, with no accountability of the CMS required ███ ███ window." Despite this acknowledgement, ESI to date has failed to provide any follow up documentation or information to cure to this problem.

69.    ESI's failure to satisfy its contractual obligations places Anthem at risk for CMS enforcement actions. ESI's breaches have further harmed Anthem by causing member abrasion and dissatisfaction.

**3.      ESI Has Breached Material Terms In Exhibit I Related To Medicare Part D Prior Authorization Turnaround Times ("TATs") And Independent Review Entity ("IRE") Submissions**

70.      ESI breached material terms of the Agreement, including obligations under Sections 4.0, 4.1, 4.1.1, 4.1.2 and 4.1.3 of Exhibit I to the Agreement, by failing to satisfy CMS mandated turnaround times ("TATs") with respect to processing Medicare Part D claims.  These terms are material and require, among other things, that ESI (i) expeditiously investigate and review submitted claims for eligibility and what amount, if any, is payable, (ii) provide notification as to the disposition of such claims, and (iii) request such further information as is needed to complete the claim.

71.      CMS' Medicare Part D rules require "coverage determinations" to be processed within specified timeframes, and upon any failure to do so, the applicable case must be automatically forwarded to a CMS-designated Independent Review Entity ("IRE") for determination.  ESI's failure to adhere to the required TATs for Medicare Part D Delegated Functions has resulted, and continues to result, in failures to satisfy CMS requirements for processing of coverage determinations within required timeframes and, consequently, in the submission of many cases to the IRE.

72.      In 2013, before ESI implemented its Foundation 14/C360 system, ESI had only 5 IRE submissions.  In 2014, after ESI implemented its Foundation 14/C360 system, ESI had 802 IRE submissions.  ESI's poor performance with regard to IRE submissions resulted in Anthem being identified as a poor performing organization or "outlier" in CMS's "Key Indicators Report" with respect to this metric for every quarter of 2014.  Since 2015, there have been 163 IRE referrals caused by ESI delays.

73.      Non-compliance with CMS requirements places Anthem at risk of enforcement actions, many of which carry negative financial and/or reputational consequences to Anthem's

business.  Additionally, failure to meet required TATs can result in delays in Anthem plan members receiving their medication on a timely basis, which CMS correctly views as among the most serious violations of its regulations and grounds for enforcement actions.

74.     As a result of ESI's inadequate TAT performance, on February 4, 2014, Anthem issued a corrective action plan (CAP #123) for ESI's failure to process and provide notification of coverage determinations within the time periods required by CMS.  Pursuant to CAP #123, the parties agreed that ESI must achieve a downward trend for no more than three consecutive months before ESI is at zero IRE auto-forwards (tied to the original root cause or other systemic quality issues) and once the goal of zero cases is met, it is maintained for an additional two consecutive months.

75.     In 2015 and 2016, there were 163 IRE referrals due to ESI's failure to satisfy its TAT obligations under the CMS requirement.  91 of those IRE referrals resulted from ESI's failure to process Direct Member Reimbursement ("DMR") claims in accordance with CMS requirements.  ESI failed to: (i) provide denial notices to members for denied reimbursement requests; (ii) review or issue determinations on prior authorizations for reimbursement requests; (iii) backdate prior authorizations to allow reimbursement; and (iv) finalize prior authorizations within required TATs.  The following table represents the 2015 and 2016 IRE count, including those resulting from the DMR issue identified above.

**2015/2016 IRE Count**

| Summary of Auto-Forwarded IREs 2015 | |
|---|---|
| Month | Total |
| December 2015 | 7 |
| November 2015 | 2 |
| October 2015 | 7 |
| September 2015 | 4 |
| August 2015 | 4 |
| July 2015 | 8 |

| June 2015 | 0 |
|---|---|
| May 2015 | 91 |
| April 2015 | 6 |
| March 2015 | 6 |
| February 2015 | 9 |
| January 2015 | 8 |
| **2015 YTD** | **152** |

| Summary of Auto-Forwarded IREs 2016 | |
|---|---|
| **Month** | **Total** |
| March 2016 | 4 |
| February 2016 | 6 |
| January 2016 | 1 |
| **2016 YTD** | **11** |
| **TOTAL 2015 AND 2016** | **163** |

*Numbers based on date TAT confirmed

76.    Additionally, ESI has failed to cure its breaches of its obligation to forward cases to the IRE within 24 hours, as required under the Part D rules.  During 2015, only 7 cases were sent within the 24 hour timeframe required by CMS, whereas ESI failed to satisfy the requirement 152 times.

77.    ESI has reported that it takes on average 6 days from the expiration of the timeframe for the case to be forwarded.  Consequently, a member may not have access to needed prescribed medication during this improper delay.

**4.    ESI Failed To Correct The "Super PA" Defect In Its Claims Processing System Within The Cure Period, And Has Not Reimbursed Anthem For Amounts Owed As A Result Of Claims Erroneously Approved By ESI Due To Such Defect**

78.    One of the defects in ESI's claims processing system is the "Super PA."  The Super PA is a system design error which resulted in an approval based on one benefit requirement that ignored or overrode other limitations on coverage, resulting in drug claims being incorrectly approved by ESI's system.  ESI failed to correct the Super PA breach for more than a year before Anthem served its notice of breach on February 16, 2015.  The Super PA

defect still was not cured as of ████████, the end of ESI's ████ cure period.  ESI does not dispute that it failed to correct the Super PA defect within the ████ cure period, nor the fact that its breach resulted in many claims being incorrectly approved by ESI in violation of its obligations under the Agreement.

79.     ESI's uncured Super PA breaches have caused damages in excess of $58 million. ESI has not cured its Super PA breaches because it has not compensated Anthem for damages resulting from such breaches.

**5.     ESI Has Breached Its Obligations To Address
And Rectify WRIT Log Issues In A Timely Manner**

80.     Under the Agreement, the parties jointly established a database named the WellPoint Rx Issues Tracking System, or "WRIT," to track and monitor issues relating to ESI's performance of PBM services for each of Anthem's lines of business.  ESI is required to research and resolve issues placed in the WRIT log.

81.     Using the "WRIT" tool, Anthem submitted numerous issues to ESI relating to ESI's failure to perform its obligations relating to Anthem's Medicare Part D plans that ESI is required to resolve, but has failed to do so in a timely manner.  As of February 20, 2016, 51 of these issues remain open, including 1 issue that has been open and remains unresolved for over a year, and 19 which have been open for more than 90 days.

**TABLE 4:  Total WRIT Log Open Issues Count as of February 20, 2016**

| Medicare Part D Aged Issue Count as of February 20, 2016 | | |
|---|---|---|
| Issue | 0-90 Days Open | 91+ Days Open |
| Accumulator | 4 | 3 |
| ACR | | 2 |
| Adjustments | 4 | 1 |
| Benefit Design | 1 | 1 |
| Claims Processing | 4 | 1 |
| Client Billing | 1 | |

| Medicare Part D Aged Issue Count as of February 20, 2016 | | | | |
|---|---|---|---|---|
| Issue | 0-90 Days Open | 91+ Days Open | | |
| CMS Guidance | | 1 | | |
| Collections | 1 | | | |
| Copay | 1 | | | |
| Eligibility | 4 | | | |
| Encounter Files | | 1 | | |
| General Audit | 1 | | | |
| PDE | 3 | 5 | | |
| Pricing Issues | 3 | 1 | | |
| Prior Authorization | 1 | 1 | | |
| Reporting | 2 | | | |
| Transition | 1 | 2 | | |
| Web Issues | 1 | | | |
| **Total** | **32** | **19** | **Grand Total** | |
| | | | **51** | |

82.   One hundred fifty-six new issues were opened between April 17 and December 31, 2015.  Since January 1, 2016, 24 new issues were opened, with 3 issues requiring disclosure to CMS.  Accordingly, ESI continues to breach the Agreement at alarming rates as a result of ESI's flawed and ineffective systems and processes for Medicare Part D.

**E.    Anthem Has A Present And Independent Right To Terminate The Agreement Under Exhibit I As A Result Of ESI's Unsatisfactory Performance Of Medicare Part D Services**

83.   Pursuant to Section 7.2 of Exhibit I, Anthem delegated to ESI its responsibility under its Medicare Part D contract with CMS to provide the services set forth in the Agreement to Medicare Part D Covered Individuals.  Section 7.2 of Exhibit I is a material term of the Agreement and provides that "[Anthem] may revoke this delegation, including, if applicable, the delegated responsibility to meet CMS reporting requirements, and thereby terminate the Agreement if CMS or [Anthem] determines that [ESI] has not performed satisfactorily."  Section

7.2 of Exhibit I does not require that Anthem establish an ongoing uncured breach prior to termination.

84.     Anthem's right to "terminate the Agreement" derives from the regulatory requirement under 42 C.F.R. § 423.505(i)(4)(ii), which provides that "[i]f any of the Part D plan sponsors' activities or responsibilities under its contract with CMS is delegated to other parties, [the contract with the other party] must either provide for revocation of the delegation activities and reporting responsibilities described in paragraph (i)(4)(i) of this section or specify other remedies in instances when CMS or the Part D plan sponsor determine that the parties have not performed satisfactorily."   Thus, the parties agreed that such revocation by Anthem under Section 7.2 shall be deemed consistent with the termination rights outlined in the Agreement.

85.     Anthem has determined that ESI's performance with respect to the delegated Medicare Part D functions has been unsatisfactory.  The reasons for this determination include both the ESI failures set forth in paragraphs 52 to 82, and the following:

- Per CMS regulations, plans have ▆▆▆▆ to issue either an approval and check or denial of a reimbursement decision.  If the plan does not provide notice of the "decision" or payment within those ▆▆▆▆, the requests are considered untimely.  ESI changed its processing systems with respect to appeals and redeterminations, without Anthem's knowledge, which introduced defects.  As a result of ESI's defective system changes, ESI failed to comply with CMS regulations to provide an approval and check or notice of denial to members within ▆▆▆▆ of the reimbursement decision in breach of the Agreement.

- ESI's failure to review claims for fraud in accordance with CMS requirements.  Anthem was notified of ESI's failure from a CMS audit finding and corrective action plan.

- ESI's failure to build coverage determinations based on eligibility timelines, requiring Anthem notification to CMS on September 22, 2014.

- ESI's failure to contact members for the consent required for mail order prescriptions, requiring Anthem notification to CMS on November 10, 2014.

- ESI's failure to fill mail order prescriptions on a timely basis due to ESI's new inventory system, requiring Anthem notification to CMS on November 20, 2014.

- ESI's unscheduled C360 system outage for approximately 24 hours due to ESI operator errors and design deficiencies, requiring Anthem notification to CMS on December 18, 2014.

86.     On February 16, 2015, Anthem notified ESI that its performance of such obligations has not been satisfactory and that Anthem consequently has the present right to terminate the Agreement on that basis.

87.     Since the February 16, 2015 notice letter, ESI's performance has continued to be unsatisfactory.  New ESI failures/issues include the following:

- **Direct Member Reimbursement ("DMR")**:  As part of a mock audit conducted by Anthem, Anthem discovered that ESI did not have an automated process for DMR claims (also referred to as "paper claims"), and that ESI's process lacked adequate internal controls and could fail in various ways.  Most notably, Part D Plan members who had received approvals of drugs subject to prior authorization were denied reimbursement inappropriately, did not receive the CMS-required notice of the Plan's decision on their reimbursement request, and were not given CMS-required appeal rights.  Anthem disclosed this issue to CMS on May 21, 2015, and ESI agreed to an Anthem corrective action plan on August 26, 2015.  This issue caused 91 referrals to the IRE.  ESI has refused to cooperate with Anthem's requests for information regarding other risks that ESI's deficient DMR processes might pose to Anthem and Anthem plan members.

- **Plan Limit Authorization ("PLA") Indicator**:  Anthem commercial and Medicare members were impacted by a faulty ESI project release on June 18, 2015 that resulted in a coding error in the eligibility database.  This database houses the PLA indicator, and due to the coding defect, the PLA indicator was set at "0" instead of "Y" resulting in claim rejections at the point of sale for over 1,500 Medicare claims, which negatively impacted 1,458 unique Medicare members' access to care.  Anthem disclosed ESI's failure to CMS on August 3, 2015.

- **Daily Cost Share ("DCS") List Errors**:  The DCS list is a list of drugs for which a Part D plan member's cost sharing amount (*e.g.*, copay) must be prorated based upon the actual number of pills dispensed when less than a one-month supply.  In February 2015, ESI identified three drugs which had been incorrectly included on the DCS list dating back to January 2014, resulting in incorrect calculations of member cost-sharing from January 2014 through January 2015.  Further, in May 2015, ESI disclosed to Anthem that it had erroneously entered the wrong effective date into its system when attempting to correct an earlier DCS list error (certain drug codes which had been erroneously excluded when implementing DCS logic for January 1, 2014), resulting in 37,524 members paying a higher copayment than they should have at the point of sale, over the time period of January 1, 2014 through August 7, 2014.  ESI failed to notify Anthem of these issues on a timely basis.  Anthem disclosed these issues to CMS on June 10, 2015, with necessary follow-up disclosures on June 11, June 17, June 18, June 30 and July 27.

- **Further DCS Errors**:  In October 2015, ESI identified another error related to the DCS issues noted above.  As part of the original payment adjustment process for these issues, ESI erroneously removed all members previously adjusted, instead of only those that were adjusted after the correction to the DCS list was put in place.  This resulted in over 53,000 Medicare Part D Plan members requiring a further adjustment to the cost sharing amounts that they paid.  Anthem notified CMS of this additional issue on October 15, 2015.

- **NPI ("National Provider Identifier") Adjudication Changes**: On January 1, 2016, ESI identified a coding defect that had been implemented that day to edit prescriber taxonomy codes at the point of sale.  ESI replaced the reject 71 value, indicating a prescriber's taxonomy was invalid, with reject 777.  They also replaced the corresponding submission clarification code override (SCC) 99 with the new NCPDP value 52 to permit the pharmacy to override rejections if the prescriber had authority to prescribe.  When making this change, ESI misclassified a general taxonomy code, resulting in erroneous claim rejections for a 777 (prescriber not valid) at the point of sale.  A total of 309 members were impacted.  Anthem notified CMS of this error on January 1, 2016.

  On January 27, 2016, ESI advised Anthem that approximately 299,000 prescribers were end-dated in its internal databases, resulting in erroneous rejections for members at the point of sale.  The erroneous rejections were the result of two prescriber data jobs running concurrently in ESI's systems. The batch jobs were required to run in a scheduled sequence to prevent disruption of data availability. The schedule was not followed, resulting in concurrent loads that end-dated the referenced prescriber records. This error impacted 5,849 claims, representing 3,956 members.  Anthem notified CMS of this error on February 2, 2016.

  On February 3, 2016, ESI advised Anthem an additional 5,287 prescribers were end-dated in its internal databases, resulting in erroneous rejections for members at the point of sale.  The erroneous rejections were the result of a sorting issue during file processing for prescribers with taxonomies with multiple timelines on the CMS file.  Updates for these records were subsequently applied out of sequence in ESI's system, and ultimately caused the prescribers to be end-dated in error. This error impacted 675 claims, representing 622 unique members.  Anthem notified CMS of this error on February 8, 2016.

88.     These issues are illustrative of ESI's consistently unsatisfactory performance of its responsibilities under Exhibit I of the Agreement and reflect ESI's overarching failure to build, test and implement systems that have the capacity to comply with the Agreement and regulatory requirements.

REDACTED VERSION

## COUNT I

### (Breach Of Contract – Pricing Breach)

89.     Anthem incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

90.     The Agreement is a valid, binding, and enforceable contract.

91.     Anthem has complied in all material respects with its obligations under the Agreement.

92.     Section 5.6 of the Agreement provides a mechanism for repricing every ▇▇▇ ▇▇▇ "to ensure that [Anthem] is receiving competitive benchmark pricing."  Anthem was entitled to competitive benchmark pricing effective ▇▇▇▇▇▇▇.

93.     Anthem and an expert third-party consultant conducted market analyses that demonstrated that ESI's pricing terms are grossly uncompetitive.  On March 18, 2015, Anthem notified ESI of the marketing analysis and proposed competitive benchmark pricing.  ESI was required to negotiate in good faith over the proposed new pricing terms "to ensure that [Anthem] is receiving competitive benchmark pricing" effective ▇▇▇▇▇▇▇.  ESI never disputed that Anthem's initial proposals were for competitive benchmark pricing, and its subsequent proposals were for pricing in excess of competitive benchmark pricing.

94.     ESI breached the Agreement by expressly repudiating its obligations under Section 5.6 of the Agreement, by delaying for months, by refusing to meet with Anthem to negotiate over Anthem's proposed pricing terms or for competitive benchmark pricing, by refusing to negotiate in good faith or at all over Anthem's proposed pricing terms or for competitive benchmark pricing, by failing to make any proposal for competitive benchmark pricing, by failing to agree in writing to new pricing terms, and by failing to provide competitive

benchmark pricing effective ███████████ or thereafter.  ESI's Pricing Breach totally undermines the value of the Agreement to Anthem.

95.     ESI is trying to compete unfairly by providing excessive pricing to Anthem that ESI can undercut in the marketplace.

96.     ESI has frustrated Anthem's ability to realize the fruits of the Agreement, which also breaches the implied covenant of good faith and fair dealing.

97.     As a direct and proximate result of ESI's Pricing Breach, Anthem is paying massively excessive prices to ESI, which is also causing Anthem to lose customers and not gain new customers.   ESI has directly and proximately caused damages in an amount to be determined at trial, but approximately $13 billion for the time period of ███████████ through the remaining term of the Agreement, and $1.8 billion for the post-termination transition period.

## COUNT II

**(Declaratory Judgment – ESI Is Required To Provide Competitive Benchmark Pricing)**

98.     Anthem incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

99.     An actual controversy has arisen and exists between the parties regarding the Pricing Breach and Defendant ESI's failure to negotiate in good faith over Anthem's proposed pricing terms to ensure that Anthem is receiving competitive benchmark pricing under Section 5.6 of the Agreement.  ESI disputes its breaches and Anthem's rights.  The controversy is of sufficient immediacy and reality to warrant declaratory relief under 28 U.S.C. § 2201.

100.    Plaintiff Anthem seeks a declaration that (i) ESI has breached its obligation to negotiate in good faith and to agree to new pricing terms in writing under Section 5.6 of the

Agreement, (ii) ESI is required to provide competitive benchmark pricing to Anthem at the prices set forth in Anthem's March 18, 2015 proposal or in such other amounts as Anthem establishes at trial for the remaining term of the Agreement, subject to Anthem's Periodic Price Review right in ███, and for the post-termination transition period, and (iii) Anthem is entitled to damages measured as the difference between ESI's pricing and competitive benchmark pricing, plus all other damages caused by ESI's breaches, including the loss of business, the failure to gain new business, ████████████████████████████████████ ███████.

## COUNT III

### (Breach of Contract – Operational Breaches)

101.   Anthem incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

102.   The Agreement is a valid, binding, and enforceable contract.

103.   Anthem has complied in all material respects with its obligations under the Agreement.

104.   ESI has breached, and continues to breach, its obligations to perform numerous material terms of the Agreement, including its duty to perform PBM services in a prudent and expert manner and in accordance with applicable law. ESI breaches are pervasive and attributable to systemic defects in its IT infrastructure, a chronic failure to devote sufficient resources to its obligations, inadequate training of its personnel, inordinately high employee turnover, and a lack of expertise.

105.   ESI's performance of many of its key responsibilities has not been prudent or expert, has failed to adhere to applicable laws, including CMS requirements, and has failed to

comply with specific, material terms of the Agreement.  Among other things, ESI has failed to (i) apply correct criteria in processing requests for prior authorization, (ii) satisfy its obligations concerning PDE file submission, processing, management, and reporting and member cost share reconciliation, (iii) satisfy its obligations concerning TATs for processing Medicare Part D Prior Authorization Requests and the associated submission of cases to the Medicare Part D IDE, (iv) timely correct the Super PA defects in its claims processing system and reimburse Anthem for claims incorrectly approved by ESI, and (v) address and correct the WRIT Log issues in a timely manner.

106.    Anthem provided ESI with notice of the breaches, in accordance with Section 6.2(a) and Section 7.2 of Exhibit I of the Agreement.  ESI failed to cure the Operational Breaches within the ▓▓▓▓ cure period.  ESI has also failed to compensate Anthem for any of the Operational Breaches, so they remain uncured.  Additionally, numerous breaches of material terms still remain, many months later, and new breaches continue to occur.

107.    As a direct and proximate result of ESI's Operational Breaches, Anthem has been damaged in an amount to be proven at trial, but not less than $150 million.

## COUNT IV

### (Declaratory Judgment — Anthem Can Terminate The Agreement)

108.    Anthem incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

109.    Section 6.2(a) of the Agreement provides, in pertinent part, as follows:

Subject to Section 16.5, either Party may terminate this Agreement if the other Party fails to comply with a material term of this Agreement and such failure is not cured within ▓▓▓▓▓▓' written notice to the other Party.

110.    Sections 3.1, 3.2, 3.11, 3.21, 5.6, Exhibit G, Schedule G-2, Exhibit I, and Exhibit J are material terms of the Agreement.

111.    ESI has failed to comply with those material terms of the Agreement.

112.    Anthem provided ESI notice of the Pricing Breach by Notice on April 1, 2015. Anthem provided ESI notice of the Operational Breaches by Notice on February 16, 2015.

113.    ESI failed to cure the Pricing Breach and all of the Operational Breaches by the end of the ███ cure periods provided in the Agreement, and has also failed to cure its breaches after the cure period.

114.    Section 16.5 of the Agreement provides that "[n]either party shall exercise any termination right under Section 6.2(a)" unless the parties engage in a three-step dispute resolution process.  The first step is a meeting of the parties' Joint Pharmacy Operating Committee or "JPOC," which has 15 days to attempt to resolve the dispute; the second step is a meeting of the parties' Presidents, who also have 15 days to attempt to resolve the dispute; and the third step is mediation.

115.    Anthem complied with each of the three steps of the dispute resolution process required under Section 16.5 of the Agreement.  The JPOC met on March 6, 2015 and April 15, 2015 and did not resolve the dispute within 15 days or thereafter.  The parties' Presidents met on May 27, 2015 and did not resolve the dispute within 15 days or thereafter.  Anthem and ESI paid the Honorable John P. DiBlasi, a former New York Supreme Court Justice, to mediate ESI's breaches on November 9, 2015.  The mediation terminated without resolution.

116.    While Anthem's rights to "exercise" its termination rights under Section 6.2(a) are "subject to" satisfaction of the dispute resolution procedures, Section 16.5 does not extend ESI's ███ cure period.  Instead, Section 6.2(a) provides that "either Party may terminate this Agreement if the other Party fails to comply with a material term of this Agreement and such failure is not cured within ███████' written notice to the other Party."

117.    Anthem has additional termination rights under Section 7.2 of Exhibit I to the Agreement, in which Anthem delegated to ESI its responsibility under its Medicare Part D contract with CMS to provide the services set forth in the Agreement to Medicare Part D Covered Individuals.  Section 7.2 provides that "[Anthem] may revoke this delegation, including, if applicable, the delegated responsibility to meet CMS reporting requirements, and thereby terminate the Agreement if CMS or [Anthem] determines that [ESI] has not performed satisfactorily."  Section 7.2 does not require that Anthem establish an ongoing uncured breach in order to terminate.   The Dispute Resolution Provision contained in Section 16.5 of the Agreement applies only with respect to termination rights "under Section 6.2(a)," not under Exhibit I, Section 7.2.

118.    Anthem has determined that ESI's performance with respect to the delegated Medicare Part D functions has been unsatisfactory.  The reasons for Anthem's determination include the deficiencies set forth at paragraphs 52 to 88 above.

119.    By Notice dated February 16, 2015, Anthem notified ESI that its performance of the delegated Medicare Part D obligations has not been satisfactory and that Anthem consequently has the present right to terminate the Agreement on that additional basis.  ESI has disputed Anthem's termination rights.

120.    An actual controversy has arisen and exists between the parties regarding the Agreement and Anthem's right to terminate the Agreement.  The controversy is of sufficient immediacy and reality to warrant declaratory relief under 28 U.S.C. § 2201.

121.    Anthem seeks a declaration that Anthem is entitled to terminate the Agreement pursuant to Section 6.2(a) and Section 16.5 of the Agreement, and under Section 7.2 of Exhibit I of the Agreement.

## COUNT V

**(Declaratory Judgment – ESI Is Required To Provide Post-Termination Services, At Competitive Benchmark Pricing, For One Year Following Any Termination By Anthem)**

122.    Anthem incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

123.    Section 6.4 (a) of the Agreement provides that "[i]n the event [Anthem] elects to extend the performance of the Agreement for up to twelve (12) months beyond the termination or expiration of this Agreement for purposes of facilitating the transfer of services from PBM to another vendor, both [Anthem] and PBM shall continue to perform all of their respective obligations in accordance with this Agreement during this period…." ESI is required to provide such post-termination services regardless of the reason for termination.

124.    The provision of post-termination services by ESI is critical to Anthem's ongoing business and the provision of medication to insured members.  A failure by ESI to provide post-termination services will cause irreparable harm.

125.    An actual controversy has arisen and exists between the parties regarding whether ESI is required under the Agreement to provide post-termination services, at competitive benchmark pricing, for one year following any termination by Anthem.  The controversy is of sufficient immediacy and reality to warrant declaratory relief under 28 U.S.C. § 2201.

126.    Plaintiff Anthem seeks a declaration that ESI is required under the Agreement to provide post-termination services, at competitive benchmark pricing, for one year following any termination by Anthem.  Anthem further seeks specific performance of such post-termination services by ESI, at competitive benchmark pricing, in the event that Anthem terminates the Agreement.

REDACTED VERSION

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Anthem respectfully requests that this Court enter judgment in favor of Anthem:

A. On Count I, against ESI for breach of contract in an amount to be determined at trial, but approximately (i) $13 billion for the time period of ██████████ through the remaining term of the Agreement, and (ii) $1.8 billion through the post-termination transition period;

B. On Count II, declaring that ESI (i) breached its obligation to negotiate in good faith and to agree in writing to new pricing terms under Section 5.6 of the Agreement, (ii) is required to provide competitive benchmark pricing to Anthem through the term of the Agreement, subject to Anthem's Periodic Price Review rights in ████ and (iii) is required to pay damages measured as the difference between ESI's pricing and competitive benchmark pricing, plus all other damages resulting from ESI's Pricing Breach, including for lost business, for Anthem's failure to gain new business, ████████ ████████████████████████████████████████;

C. On Count III, against ESI for breach of contract in an amount to be determined at trial, but not less than $150 million;

D. On Count IV, declaring that ESI has breached the Agreement and that Anthem can terminate the Agreement based on such breaches or because Anthem has determined that ESI's performance with respect to the delegated Medicare Part D functions has been unsatisfactory;

E. On Count V, declaring that ESI is required to provide post-termination services, at competitive benchmark pricing, for one year following any termination of the Agreement by Anthem;

F. Awarding prejudgment and post judgment interest at the rates allowed by law;

G. Awarding attorneys' fees and costs; and

H. Providing such other and further relief as this Court may deem just and proper.


DATED:        March 21, 2016

REDACTED VERSION

WHITE & CASE LLP

*/s/ Glenn M. Kurtz*
Glenn M. Kurtz
Claudine Columbres
Robert Tiedemann
1155 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 819-8200

*Attorneys for Plaintiff Anthem, Inc.*