**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| ANTHEM, INC., | Civil Action No. 16 Civ. 2048 |
|                 Plaintiff and Counter-Defendant, | **ANSWER AND COUNTERCLAIMS** |
|    -against- | <u>**JURY TRIAL DEMANDED**</u> |
| EXPRESS SCRIPTS, INC., | |
|                 Defendant and Counter-Plaintiff. | |

Defendant Express Scripts, Inc. ("ESI"), by and through its undersigned attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, answers, upon knowledge as to itself and its own acts, and otherwise upon information and belief, the Complaint of Plaintiff Anthem, Inc. ("Anthem"), as follows:

<u>**INTRODUCTION**</u>

1.      ESI is a leading provider of pharmacy benefit management ("PBM") services.  In 2009, Anthem decided to divest its struggling in-house PBM, NextRx, which had been sanctioned by the Centers for Medicare & Medicaid Services ("CMS"), Anthem's federal regulator, for a "longstanding and persistent failure to comply" with federal regulations that "posed a serious threat to the health and safety of Medicare beneficiaries."  Following a competitive bidding process through which other PBMs competed for Anthem's NextRx business, Anthem chose ESI as the winning bidder.  As discussed further below, ESI agreed to help Anthem right the ship by acquiring NextRx and entering into an agreement to provide Anthem and its millions of members with PBM services on an exclusive basis for the next ten years (the "PBM Agreement").  *See infra* ¶¶ 161-163.  As a result of ESI's dedicated and diligent

provision of PBM services since 2009, Anthem's PBM regulatory problems have become a thing of the past.

2.     At the time ESI acquired NextRx and entered into the PBM Agreement, it presented Anthem with a range of alternatives for structuring the transaction.  At one end of the spectrum, ESI would pay less money upfront but offer lower pricing for ESI's services over the 10 year life of the PBM Agreement.  At the other end of the spectrum, ESI would pay significantly more upfront, but would charge higher pricing for ESI's services during the 10 year life of the PBM Agreement.  Anthem—which had limited access to liquidity in 2009—ultimately prioritized the receipt of upfront cash over lower pricing for ESI's services.  Specifically, Anthem elected to receive $4.675 billion upfront in lieu of lower pricing during the life of the PBM Agreement.  Although Anthem could have passed this upfront money through to its members—in the form of reduced drug pricing—instead, Anthem used the upfront payment to repurchase its stock, which applied upward pressure to Anthem's stock price, thereby enriching Anthem's shareholders and management (who held substantial stock options).

3.     Having chosen billions of dollars in upfront cash over more favorable long-term pricing for its clients and members for ESI's services, Anthem—under the control of new management—is now improperly attempting to re-write the PBM Agreement; erroneously claiming that it has a right to $13 billion in reduced pricing over the remaining four year term of the PBM Agreement.  This is simply not true.  Anthem's claim ignores (a) the fact that Anthem elected to receive higher pricing over the course of the contract in exchange for $4.675 billion in upfront cash; (b) the plain terms of the PBM Agreement, which do not entitle Anthem to any new pricing concessions; and (c) the present state of the market for services in which Anthem competes.

4.     Under the plain terms of the PBM Agreement, Anthem has, at most, a contractual right every ███████ to conduct a market analysis to evaluate whether it believes it is receiving what the contract, without definition, refers to as "competitive benchmark pricing."  If Anthem genuinely believes in good faith that the pricing it is receiving from ESI is not competitive, then the PBM Agreement provides only that Anthem has the ability to propose "renegotiated pricing terms" to ESI.  Following Anthem's submission of "proposed new pricing terms," ESI's sole obligation is to negotiate over those proposed terms in good faith.  ESI, however, is not required to agree to Anthem's proposed new pricing terms, and the PBM Agreement makes clear that ESI must agree in writing before any proposed new pricing terms can be effective.

5.     Contrary to the baseless allegations in Anthem's Complaint, ESI has fully satisfied its obligation to negotiate in good faith over Anthem's "proposed new pricing terms." Indeed—as explained more fully in ESI's counterclaims below—it is Anthem, not ESI, that has failed to negotiate in good faith.

6.     From the outset of negotiations in October 2014, when Anthem's right to trigger the periodic pricing review process had not yet ripened, Anthem took positions regarding the parties' rights and obligations—including but not limited to Anthem's erroneous claim that ESI is obligated to provide Anthem with "competitive benchmark pricing"—that were inconsistent with the plain terms of the PBM Agreement.  As discussed further below, Anthem's positions were also wholly at odds with the manner in which it conducted the first periodic pricing review ███████, during which Anthem explicitly recognized that ESI's sole obligation was to negotiate in good faith over Anthem's "proposed new pricing terms," and that ESI was not obligated to provide Anthem with any new pricing concessions.  *See infra* ¶¶ 171-173, 180-182. Indeed, as late as November 2014, Anthem's General Counsel acknowledged that ESI has the

ultimate right under the PBM Agreement not to agree to any alternative pricing proposed by Anthem.

7.     More fundamentally, there is simply no way to justify Anthem's $13 billion demand based on changes in the market for PBM services during the 11 month period between November 2013—when the first periodic pricing review concluded—and October 2014, when Anthem first made such a demand.  Tellingly, Anthem refused to provide ESI with any of the market information or data that allegedly supported its $13 billion demand, a stark departure from both industry practice and Anthem's own behavior during the first periodic pricing review, when Anthem acted in good faith and readily provided ESI with the information and data underlying its pricing proposal.

8.     Even more significantly, as discussed further below, at the same time that Anthem was demanding $13 billion from ESI, Anthem personnel—including Anthem's Chief Executive Officer and Chief Financial Officer—were telling the investing public that Anthem actually expected to receive less than one quarter of that amount (between $2 billion and $2.8 billion) in additional pricing concessions from ESI.  *See infra* ¶¶ 189-194.  The massive disconnect between Anthem's public disclosures—which presumably reflected an accurate view of Anthem's true expectations—and Anthem's demand to ESI highlights the extent to which Anthem was not negotiating in good faith.

9.     Notwithstanding Anthem's conduct—and despite the fact that Anthem's contractual right to trigger the periodic pricing review process had not yet ripened—ESI was committed to negotiating in good faith in an effort to satisfy its largest commercial client.  To this end—although it had no obligation to do so under the PBM Agreement—ESI made five separate counter-proposals to Anthem between June 2015 and March 2016.  Each of these

counter-proposals offered substantial pricing concessions that were well within the range of what Anthem publicly told the market it expected to receive.  Additionally—consistent with standard industry practice—each counter-proposal also offered Anthem billions of dollars in additional value if Anthem modernized its outdated benefit plans in line with prevailing industry trends. Many insurance plans have implemented modern benefit designs—such as using narrower pharmacy networks and more restrictive formularies to capture bigger rebates from pharmaceutical companies and more discounted pharmacy pricing—to obtain better pricing and be more competitive in the market place.  Anthem, however, rejected out-of-hand all of these counter-proposals and refused to engage in any good faith negotiations.  In so doing, Anthem made clear its fundamentally unreasonable position that it expected to realize massive cost savings while at the same time refusing to modernize its benefit plans in a manner that would make those savings commercially viable and make Anthem more competitive in the marketplace.

10.     Most troubling of all, in a misguided attempt to generate negotiating leverage over ESI, Anthem began to allege, concurrent with the parties' pricing negotiations, that isolated operational issues relating to ESI's PBM services constituted material breaches of the PBM Agreement that gave Anthem the right to terminate the contract.  Nothing could be further from the truth.  ESI has substantially performed under every—and is not in material breach of any— provision of the PBM Agreement.  ESI has consistently provided Anthem with the highest level of PBM services.  Indeed, Anthem's Chief Executive Officer, Joe Swedish, told ESI's Chief Executive Officer, George Paz, on March 1, 2016, that the isolated operational issues alleged in the Complaint were no longer a concern to Anthem.

11.     Notwithstanding this admission that Anthem is not concerned about the quality of services ESI is providing, Anthem has pled operational breach claims in the context of this

litigation in another transparent attempt to re-write the terms of the PBM Agreement and force ESI to provide an additional $13 billion in pricing concessions to which Anthem is not entitled. Anthem's operational breach claims are meritless.

12.     As a threshold matter, Anthem's claim that ESI has been in material breach of the PBM Agreement since February 2015—and that such breach puts Anthem at material risk of sanctions by the federal regulator, CMS—is belied by Anthem's good standing with CMS. Indeed, Anthem's Medicare Part D "star rating"—which CMS uses to measure Medicare beneficiaries' experience with prescription drug services—actually improved over this period. Moreover, Anthem has received no sanctions or civil monetary penalties from CMS with respect to the PBM services provided by ESI, in stark contrast to many of Anthem's competitors— including Cigna,[1] which Anthem is in the process of acquiring—who have recently been sanctioned or otherwise penalized by CMS for failures associated with PBM services.[2]

13.     Although ESI strives for operational perfection, isolated operational issues inevitably arise from the sheer volume of claims and transactions processed by ESI for Anthem each year; the complex and convoluted nature of Anthem's plans as well as Anthem's multiple custom requirements that deviate from standard processes ESI follows for the vast majority of its other clients; and the constantly evolving nature of the PBM regulatory landscape.  By way of

---

[1]     On January 22, 2016, Cigna filed a Form 8-K disclosure with the Securities and Exchange Commission disclosing that CMS had imposed immediate sanctions suspending the enrollment of, and marketing to, new customers of all Cigna Medicare Advantage and standalone PDP—prescription drug plan—contracts.  The filing noted that the sanctions were due to deficiencies discovered with Cigna's operations of its Parts C and D appeals and grievances, Part D formulary, and benefit administration and compliance programs.

[2]     On March 7, 2016, CMS identified twelve health plans or prescription drug plans upon which CMS had imposed civil monetary penalties for failures to comply with Medicare requirements, along with the identity of the PBM service provider supporting each of the plans. The PBMs identified include CVS/Caremark and OptumRx.  None of ESI's clients were on this list.

context, in 2015 ESI adjudicated more than **175 million** claims for Anthem across all of its various lines of businesses.  Those businesses consist of more than 130,000 fully-insured and administrative-services only groups, 490 Medicare groups, 1600 Medicaid groups and approximately 650 products in the newly created Public Exchanges.  ESI supports Anthem's business in over 24 states, and services more than 15 million individual members.

14.     In light of the massive scope and volume of the PBM services provided by ESI, the PBM Agreement—like many long term services contracts—recognizes that isolated operational issues will arise from time-to-time.  Specifically, the PBM Agreement sets forth ▮ separate "Performance Guarantees" ("PGs") that cover almost every facet of the PBM services provided by ESI.  Each PG provides that ESI will deliver a certain level of performance with respect to a specified service area on a monthly, quarterly or annual basis.  The majority of PGs specify a monetary "Penalty" that must be paid by ESI to Anthem if ESI fails to meet the specified level of service.  For example, one PG requires ESI to pay Anthem ▮▮▮ for each month in which ESI fails to meet a ▮ performance threshold.

15.     Significantly, Anthem makes no reference to the PGs in its Complaint despite the fact that many of the alleged operational breaches cited therein fall within the scope of specified PGs in the extensively negotiated PBM Agreement.  Anthem's silence on this point is likely due to the fact that ESI satisfied virtually all of these PGs in the period following February 2015 (after Anthem gave notice of the alleged breaches).  Obviously, an operational issue that did not even cause ESI to miss a PG could not give Anthem the right to terminate the entire PBM Agreement.

16.     For example, Anthem claims that it has the right to terminate the PBM Agreement because ESI breached its obligation to submit and manage prescription drug event ("PDE")

records in accordance with CMS mandates, which Anthem alleges "put [it] at notable risk with CMS." *See* Cmplt. ¶¶ 60-69.  In support of this claim, Anthem points to four alleged examples of ESI's failure to properly manage PDEs that affected a grand total of 1,590 PDE records in 2015.  *See id.* ¶ 66.  Anthem fails to mention, however, that the 1,590 PDE records cited in its Complaint make up less than 0.005% of the more than ***27.7 million*** PDEs that ESI submitted on Anthem's behalf in 2015.  Moreover, Anthem also fails to mention that ESI achieved a PDE acceptance rate of ***99.96%*** in 2015, ███████████████████████████████

████████████).

17.     Even assuming an isolated operational issue did cause ESI to miss a PG target, Anthem would still have no right to terminate the PBM Agreement.  In the event ESI misses a PG target, the PBM Agreement specifies a monetary Penalty that ESI is required to pay Anthem; it does not provide that Anthem has the right to terminate the entire PBM Agreement.  In 2015, ESI paid Anthem only $1.75 million in PG Penalties (out of a potential Penalty pool of more than ███████████) on a multi-billion dollar contract.  This minimal payment is further evidence of the industry leading services ESI has provided to Anthem.  There is simply no way that Penalties amounting to less than $2 million could be emblematic of operational issues so severe as to permit Anthem to terminate a long-term, multi-billion dollar contract.

18.     Anthem also makes a number of allegations concerning ESI's handling of requests by plan members for coverage for particular restricted-coverage drugs—referred to as "prior authorization" or "PA" requests—for both commercial and Medicare Part D plans.  *See* Cmplt. ¶¶ 54-59.  As an initial matter, Anthem once again raises isolated examples of alleged operational issues, while failing to provide the necessary context: ESI responded to approximately 1.5 million PA requests on Anthem's behalf in 2015—*i.e.*, nearly 30,000 *per*

*week*.  Moreover, Anthem also fails to mention that:

- ESI satisfied the PG concerning ██ ███████ ████████ ██ ██████ ████████████████████████████████████████—during the second, third and fourth quarters of 2015;

- ESI satisfied the PG concerning ████████████████ ████████████████████████—during the second, third and fourth quarters of 2015; and

- ESI satisfied the PG concerning ██ ████████ ███████ ██ ██████ ██████████████████████████████—during the second quarter of 2015, and fell narrowly short of that mark in the third and fourth quarters of 2015 (97.77% and 95.25%, respectively), with the result that ESI paid Anthem $100,000 in Penalties.

19.    The notion that Anthem has the right to terminate the entire ten-year PBM Agreement because, following the delivery of Anthem's purported breach notice, ESI narrowly missed a single PG concerning the administration of PA requests—which resulted in total Penalties of only $100,000—is simply ludicrous.

20.    In another instance, Anthem alleges that it is entitled to terminate the PBM Agreement because ESI has failed to respond to PA requests related to Medicare Part D plans in the required "turnaround times."  *See* Cmplt. ¶¶ 70-77.  In support of this claim, Anthem alleges that ESI failed to comply with CMS-mandated turnaround times in relation to 152 PA requests in 2015.  Anthem fails to mention, however, that ESI responded to more than 242,000 Medicare Part D PA requests in 2015.  Therefore, taken in context, Anthem is alleging that it has the right to terminate the PBM Agreement because ESI failed to satisfy CMS-mandated turnaround times in relation to 0.06% of Medicare Part D PA requests.  Once again, this is ludicrous.

21.    In summary, having elected to take $4.675 billion in cash upfront in lieu of lower pricing over the life of the PBM Agreement, and having benefited from ESI's industry leading PBM services over the past six years, Anthem is now seeking to leverage its size and market-dominating presence to rewrite the PBM Agreement in order to force ESI to provide an

additional $13 billion dollars in pricing concessions to which Anthem is not entitled.  ESI has fully complied with its obligation to negotiate with Anthem in good faith over its pricing proposal, and is under no obligation to agree to Anthem's unreasonable demands, which undermine the very essence of the PBM Agreement.  Knowing this, Anthem has falsely accused ESI of materially breaching the operational requirements of the PBM Agreement in a transparent attempt to pressure ESI into agreeing to its pricing demands.  Anthem is entitled to none of the relief it seeks in this lawsuit, and judgment should be entered for ESI on its counterclaims.

## SPECIFIC RESPONSES

22.     ESI admits the allegations in the first, second, and third sentences of paragraph 1 of the Complaint.  ESI denies the allegations in the fourth sentence of paragraph 1 of the Complaint.

23.      ESI denies the allegations in the first and second sentences of paragraph 2 of the Complaint, and respectfully refers the Court to the PBM Agreement for an accurate description of its terms.  The allegations in the third and fourth sentences of paragraph 2 of the Complaint state a legal conclusion which does not require a response.  To the extent a response is required, ESI denies the allegations in the third and fourth sentences of paragraph 2 of the Complaint.

24.     ESI denies the allegations in the first sentence of paragraph 3 of the Complaint. The allegations in the second sentence of paragraph 3 of the Complaint are too vague to be answered, and, on that basis, ESI denies those allegations.  ESI denies the allegations in the third sentence of paragraph 3 of the Complaint.  ESI denies the allegations in the fourth sentence of paragraph 3 of the Complaint, and respectfully refers the Court to the PBM Agreement for an accurate description of its terms.  ESI denies the allegations in the fifth sentence of paragraph 3 of the Complaint.

25.     The allegations in the first sentence of paragraph 4 of the Complaint state a legal conclusion which does not require a response.  To the extent a response is required, ESI denies the allegations in the first sentence of paragraph 4 of the Complaint and respectfully refers the Court to the PBM Agreement for an accurate description of the terms thereof.  ESI denies the allegations in the second and third sentences of paragraph 4 of the Complaint.

26.     ESI denies the allegations in first and second sentences in paragraph 5 of the Complaint.  ESI denies the allegations in the third sentence of paragraph 5 of the Complaint, and respectfully refers the Court to the PBM Agreement for an accurate description of its terms.  ESI denies the allegations in the fourth sentence of paragraph 5 of the Complaint.

27.     ESI denies the allegations in the first sentence of paragraph 6 of the Complaint.  ESI denies the allegations in the second sentence of paragraph 6 of the Complaint, and respectfully refers the Court to the PBM Agreement for an accurate description of its terms.  The allegations in the third sentence of paragraph 6 of the Complaint state a legal conclusion which does not require a response.  To the extent a response is required, ESI denies the allegations in the third sentence of paragraph 6 of the Complaint.  ESI denies the allegations in the fourth, fifth, and sixth sentences of paragraph 6 of the Complaint.

28.     ESI lacks sufficient knowledge to either admit or deny the allegations in paragraph 7 of the Complaint and, on that basis, denies those allegations.

29.     ESI admits the allegations in paragraph 8 of the Complaint.

30.     The allegations in paragraph 9 of the Complaint state a legal conclusion which does not require a response.

31.     ESI denies the allegations in paragraph 10 of the Complaint, and respectfully refers the Court to the PBM Agreement for an accurate description of its terms.

32.     With respect to the second sentence of paragraph 11 of the Complaint, ESI admits that it is a party to the PBM Agreement, and respectfully refers the Court to the PBM Agreement for an accurate description of its terms.  The allegations in paragraph 11 of the Complaint are otherwise too vague to be answered, and, on that basis, ESI denies those allegations.

33.     With respect to the allegations in paragraph 12 of the Complaint, ESI admits that it is a party to the PBM Agreement, and respectfully refers the Court to the PBM Agreement for an accurate description of its terms.

34.     ESI denies the allegations in paragraph 13 of the Complaint, and respectfully refers the Court to the PBM Agreement for an accurate description of its terms.

35.     ESI lacks sufficient knowledge to either admit or deny the allegations in paragraph 14 of the Complaint and, on that basis, denies those allegations.

36.     With respect to the allegations in paragraph 15 of the Complaint, ESI admits the PBM Agreement has a ten-year term.  ESI otherwise denies the allegations in paragraph 15 of the Complaint, and respectfully refers the Court to the PBM Agreement for an accurate description of its terms.

37.      ESI denies the allegations in paragraph 16 of the Complaint, and respectfully refers the Court to the PBM Agreement for an accurate description of its terms.

38.     ESI denies the allegations in the first sentence of paragraph 17 of the Complaint and respectfully refers the Court to the PBM Agreement for an accurate description of its terms.  ESI denies the allegations in the second, third, fourth and fifth sentences of paragraph 17 of the Complaint.  Without admitting the accuracy of the quoted language in the sixth sentence of paragraph 17 of the Complaint, ESI admits that the stated quote appeared in the stated reference source, rejects Anthem's attempt to use this quote out of context, and respectfully refers the

Court to the contents of said reference source.

39.     ESI lacks sufficient knowledge to either admit or deny the allegations in paragraph 18 of the Complaint and, on that basis, denies those allegations.

40.     ESI lacks sufficient knowledge to either admit or deny the allegations in paragraph 19 of the Complaint and, on that basis, denies those allegations.

41.     ESI lacks sufficient knowledge to either admit or deny the allegations in paragraph 20 of the Complaint and, on that basis, denies those allegations.

42.     ESI denies the allegations in paragraph 21 of the Complaint.

43.     ESI denies the allegations in paragraph 22 of the Complaint, and respectfully refers the Court to Anthem's March 18, 2015 letter for an accurate description of its contents.

44.     ESI denies the allegations in the first sentence of paragraph 23 of the Complaint. The allegations in the second and third sentences of paragraph 23 of the Complaint state a legal conclusion which does not require a response.  To the extent a response is required, ESI denies the allegations in the second and third sentences of paragraph 23 of the Complaint.

45.     ESI denies the allegations in the first sentence of paragraph 24 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.  ESI denies the allegations in the second sentence of paragraph 24 of the Complaint, and respectfully refers the Court to the PBM Agreement for an accurate description of its terms.

46.     The allegations in the first sentence of paragraph 25 of the Complaint state a legal conclusion which does not require a response.  To the extent a response is required, ESI denies the allegations in the first sentence of paragraph 25 of the Complaint.  ESI denies the allegations in the second sentence of paragraph 25 of the Complaint.

47.     ESI denies the allegations in the first sentence of paragraph 26 of the Complaint.

The allegations in the second sentence of paragraph 26 of the Complaint state a legal conclusion which does not require a response.  To the extent a response is required, ESI denies the allegations in the second sentence of paragraph 26 of the Complaint.

48.     ESI denies the allegations in paragraph 27 of the Complaint, and respectfully refers the Court to the document or documents referred to therein for an accurate description of its/their terms.

49.     ESI denies the allegations in the first sentence of paragraph 28 of the Complaint. ESI admits the allegations in the second sentence of paragraph 28 of the Complaint.  ESI denies the allegations in the third sentence of paragraph 28 of the Complaint.

50.     ESI denies the allegations in paragraph 29 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.

51.     ESI denies the allegations in paragraph 30 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.

52.     ESI denies the allegations in paragraph 31 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.

53.     ESI denies the allegations in the first and second sentences of paragraph 32 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms. ESI denies the allegations in the third sentence of paragraph 32 of the Complaint.

54.     ESI denies the allegations in paragraph 33 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.

55.     ESI denies the allegations in the first and second sentences of paragraph 34 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate

description of its terms. ESI denies the allegations in the third sentence of paragraph 34 of the Complaint.  ESI denies the allegations in the fourth sentence of paragraph 34 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.

56.     ESI denies the allegations in the first sentence of paragraph 35 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.  ESI denies the allegations in the second sentence of paragraph 35 of the Complaint.

57.     Without admitting the accuracy of the quoted language in paragraph 36 of the Complaint, ESI admits that the stated quote appeared in the stated reference source, rejects Anthem's attempt to use this quote out of context, and respectfully refers the Court to the contents of said reference source.

58.     ESI denies the allegations in the first sentence of paragraph 37 of the Complaint. Without admitting the accuracy of the quoted language in the second sentence of paragraph 37 of the Complaint, ESI admits that the stated quote appeared in the stated reference source, rejects Anthem's attempt to use this quote out of context, and respectfully refers the Court to the contents of said reference source.

59.     The allegations in the first sentence of paragraph 38 of the Complaint state a legal conclusion which does not require a response.  To the extent a response is required, ESI denies the allegations in the first sentence of paragraph 38 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.  ESI denies the allegations in the second, third and fourth sentences of paragraph 38 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.

60.     ESI denies the allegations in paragraph 39 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.

61.     ESI denies the allegations in paragraph 40 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.

62.     ESI denies the allegations in paragraph 41 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.

63.     Without admitting the accuracy of the quoted language in paragraph 42 of the Complaint, ESI admits that the stated quote appeared in the stated reference source, rejects Anthem's attempt to use this quote out of context, and respectfully refers the Court to the contents of said reference source.

64.     ESI denies the allegations in the first sentence of paragraph 43 of the Complaint. ESI denies the allegations in the second, third, fourth and fifth sentences of paragraph 43 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.

65.     ESI denies the allegations in paragraph 44 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.

66.     ESI admits that Anthem met with Tim Wentworth of ESI in St. Louis on February 3, 2016, but otherwise denies the allegations in the first sentence of paragraph 45 of the Complaint. ESI denies the allegations in the second and third sentences of paragraph 45 of the Complaint.   The allegations in the fourth sentence of paragraph 45 of the Complaint state a legal conclusion which does not require a response.   To the extent a response is required, ESI denies the allegations in the fourth sentence of paragraph 45 of the Complaint.   ESI denies the allegations in the fifth, sixth and seventh sentences of paragraph 45 of the Complaint.

67.     Without admitting the accuracy of the quoted language in paragraph 46 of the Complaint, ESI admits that the stated quote appeared in the stated reference source, rejects Anthem's attempt to use this quote out of context, and respectfully refers the Court to the contents of said reference source.

68.     ESI denies the allegations in paragraph 47 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.

69.     ESI denies the allegations in paragraph 48 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.

70.     ESI admits that Anthem met with ESI on February 18, 2016, but otherwise denies the allegations in the first sentence of paragraph 49 of the Complaint.  The allegations in the second sentence of paragraph 49 of the Complaint state a legal conclusion which does not require a response.  To the extent a response is required, ESI denies the allegations in the second sentence of paragraph 49 of the Complaint.  ESI denies the allegations in the third sentence of paragraph 49 of the Complaint.  The allegations in the fourth sentence of paragraph 49 of the Complaint state a legal conclusion which does not require a response.  To the extent a response is required, ESI denies the allegations in the fourth sentence of paragraph 49 of the Complaint.

71.     ESI admits that George Paz of ESI met with Joseph Swedish of Anthem in Chicago on March 1, 2016, but otherwise denies the allegations in paragraph 50 of the Complaint.

72.     ESI denies the allegations in paragraph 51 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.

73.     ESI denies the allegations in the first sentence of paragraph 52 of the Complaint, and respectfully refers the Court to the PBM Agreement for an accurate description of its terms.

ESI denies the allegations in the remaining sentences of paragraph 52 of the Complaint.

74.    ESI denies the allegations in paragraph 53 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.

75.    ESI denies the allegations in the first sentence of paragraph 54 of the Complaint, and respectfully refers the Court to the PBM Agreement for an accurate description of its terms. ESI denies the allegations in the remaining sentences of paragraph 54 of the Complaint.

76.    ESI denies the allegations in the first sentence of paragraph 55 of the Complaint. ESI admits the allegations in the second sentence of paragraph 55 of the Complaint.  ESI denies the allegations in the third and fourth sentences of paragraph 55, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.

77.    ESI denies the allegations in paragraph 56 of the Complaint.

78.    ESI denies the allegations in paragraph 57 of the Complaint.

79.    ESI denies the allegations in paragraph 58 of the Complaint.

80.    ESI denies the allegations in paragraph 59 of the Complaint.

81.    The allegations in paragraph 60 of the Complaint state legal conclusions which do not require a response.  To the extent a response is required, ESI denies the allegations in paragraph 60 of the Complaint.

82.    ESI denies the allegations in paragraph 61 of the Complaint, and respectfully refers the Court to the PBM Agreement for an accurate description of its terms.

83.    ESI denies the allegations in paragraph 62 of the Complaint.

84.    ESI denies the allegations in paragraph 63 of the Complaint.

85.    ESI denies the allegations in paragraph 64 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.

86.     The allegations in the first and second sentences of paragraph 65 of the Complaint state legal conclusions which do not require a response.  To the extent a response is required, ESI denies the allegations in the first and second sentences of paragraph 65 of the Complaint.  ESI denies the allegations in the third and fourth sentences of paragraph 65, and respectfully refers the Court to ESI's 2014 attestation for an accurate description of its terms.

87.     ESI denies the allegations in the first bullet of paragraph 66 of the Complaint, and respectfully refers the Court to the documents referred to therein for an accurate description of their terms.  ESI lacks sufficient knowledge to either admit or deny the allegations in the second bullet of paragraph 66 of the Complaint and, on that basis, denies those allegations.  ESI lacks sufficient knowledge to either admit or deny the allegations in the first sentence of the third bullet at paragraph 66 of the Complaint and, on that basis, denies those allegations.  ESI denies the remaining allegations in the third bullet at paragraph 66 of the Complaint. ESI lacks sufficient knowledge to either admit or deny the allegations in the fourth bullet at paragraph 66 of the Complaint and, on that basis, denies those allegations.

88.     ESI denies the allegations in the first sentence of paragraph 67 of the Complaint. The allegations in the first clause of the second sentence of paragraph 67 of the Complaint state a legal conclusion which does not require a response.  ESI denies the allegations in the second clause of the second sentence of paragraph 67 of the Complaint, and respectfully refers the Court to the PBM Agreement for an accurate description of its terms.  ESI denies the remaining allegations in paragraph 67 of the Complaint.

89.     ESI denies the allegations in the first sentence of paragraph 68 of the Complaint. ESI denies the allegations in the second sentence of paragraph 68 of the Complaint, and respectfully refers the Court to ESI's May 2015 assessment for an accurate description of its

terms.  ESI denies the allegations in the third sentence of paragraph 68 of the Complaint.

90.     ESI denies the allegations in paragraph 69 of the Complaint.

91.     ESI denies the allegations in the first sentence of paragraph 70 of the Complaint, and respectfully refers the Court to the PBM Agreement for an accurate description of its terms. The allegations in the second sentence of paragraph 70 of the Complaint state a legal conclusion which does not require a response.  To the extent that a response is required, ESI denies the allegations in the second sentence of paragraph 70 of the Complaint.

92.     The first sentence of paragraph 71 of the Complaint states a legal conclusion which does not require a response.  To the extent that a response is required, ESI denies the allegations in the first sentence of paragraph 71 of the Complaint.  ESI denies the allegations in the second sentence of paragraph 71.

93.     ESI denies the allegations in paragraph 72 of the Complaint.

94.     The allegations in paragraph 73 of the Complaint are too vague to be answered, and, on that basis, ESI denies those allegations.

95.     ESI denies the allegations in paragraph 74 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.

96.     ESI denies the allegations in paragraph 75 of the Complaint, and respectfully refers the Court to the documents referred to therein for accurate descriptions of their terms.

97.     ESI denies the allegations in paragraph 76 of the Complaint.

98.     ESI denies the allegations in the first sentence of paragraph 77 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.  ESI denies the allegations in the second sentence of paragraph 77 of the Complaint.

99.     ESI denies the allegations in paragraph 78 of the Complaint.

100.     ESI denies the allegations in paragraph 79 of the Complaint.

101.     ESI denies the allegations in paragraph 80 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.

102.     ESI denies the allegations in paragraph 81 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.

103.     ESI denies the allegations in paragraph 82 of the Complaint.

104.     ESI denies the allegations in the first sentence of paragraph 83 of the Complaint, and respectfully refers the Court to the PBM Agreement for an accurate description of its terms. ESI denies the allegations in the second and third sentences of paragraph 83 of the Complaint, and in further answer (a) respectfully refers the Court to the PBM Agreement for an accurate description of its terms; and (b) says that the allegations in each of the second and third sentences of paragraph 83 of the Complaint state a legal conclusion which does not require a response.  To the extent a response is required, ESI denies the allegations in the second and third sentences of paragraph 83 of the Complaint.

105.     The allegations in paragraph 84 of the Complaint state legal conclusions which do not require a response.  To the extent a response is required, ESI denies the allegations in paragraph 84 of the Complaint.

106.     ESI lacks sufficient knowledge to either admit or deny the allegations in the first sentence of paragraph 85 of the Complaint, and, on that basis, denies those allegations.  ESI otherwise denies that its performance with respect to Medicare Part D functions has been unsatisfactory.  ESI denies the remaining allegations in paragraph 85 of the Complaint.

107.     ESI denies the allegations in paragraph 86 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.

108.    ESI:

  a. denies the allegations in the first sentence of paragraph 87 of the Complaint;

  b. denies the allegations in the second sentence and first bullet of paragraph 87 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms;

  c. lacks sufficient knowledge to either admit or deny the allegations in the second bullet in paragraph 87 of the Complaint and, on that basis, denies those allegations;

  d. denies the allegations in the third bullet in paragraph 87 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms, except that ESI lacks sufficient knowledge to either admit or deny the allegations in the final sentence of the third bullet in paragraph 87 of the Complaint and, on that basis, denies those allegations;

  e. denies the allegations in the fourth bullet in paragraph 87 of the Complaint, except that it lacks sufficient knowledge to either admit or deny the allegations in the final sentence of the fourth bullet and, on that basis, denies those allegations; and

  f. lacks sufficient knowledge to either admit or deny the allegations in the fifth bullet in paragraph 87 of the Complaint and, on that basis, denies those allegations.

109.    ESI denies the allegations in paragraph 88 of the Complaint.

110.    With respect to paragraph 89 of the Complaint, ESI re-states and re-asserts as if fully set forth herein all of its responses to each and every allegation set forth above.

111.    The allegations in paragraph 90 of the Complaint state a legal conclusion which does not require a response.  To the extent a response is required, ESI admits the allegations in paragraph 90 of the Complaint.

112.    ESI denies the allegations in paragraph 91 of the Complaint.

113.    ESI denies the allegations in paragraph 92 of the Complaint, and respectfully refers the Court to the PBM Agreement for an accurate description of its terms.

114.    ESI lacks sufficient knowledge to either admit or deny the allegations in the first sentence of paragraph 93 of the Complaint and, on that basis, denies those allegations.  ESI denies the allegations in the second sentence of paragraph 93 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.  ESI denies the allegations in the third sentence of paragraph 93 of the Complaint, and respectfully refers the Court to the PBM Agreement for an accurate description of its terms.  ESI denies the allegations in the fourth sentence of paragraph 93 of the Complaint.

115.    The allegations in paragraph 94 of the Complaint state a legal conclusion which does not require a response.  To the extent a response is required, ESI denies the allegations in paragraph 94 of the Complaint.

116.    ESI denies the allegations in paragraph 95 of the Complaint.

117.    The allegations in paragraph 96 of the Complaint state a legal conclusion which does not require a response.  To the extent a response is required, ESI denies the allegations in paragraph 96 of the Complaint.

118.    The allegations in paragraph 97 of the Complaint state a legal conclusion which

does not require a response.  To the extent a response is required, ESI denies the allegations in paragraph 97 of the Complaint.

119.     With respect to paragraph 98 of the Complaint, ESI re-states and re-asserts as if fully set forth herein all of its responses to each and every allegation set forth above.

120.     The allegations in the first sentence of paragraph 99 of the Complaint state a legal conclusion which does not require a response.  To the extent a response is required, ESI admits the allegations in the first sentence of paragraph 99 of the Complaint.  ESI admits the allegations in the second sentence of paragraph 99 of the Complaint.  The allegations in the third sentence of paragraph 99 of the Complaint state a legal conclusion which does not require a response.  To the extent a response is required, ESI denies the allegations in the third sentence of paragraph 99 of the Complaint.

121.     ESI denies the allegations in paragraph 100 of the Complaint.

122.     With respect to paragraph 101 of the Complaint, ESI re-states and re-asserts as if fully set forth herein all of its responses to each and every allegation set forth above.

123.     The allegations in paragraph 102 of the Complaint state a legal conclusion which does not require a response.  To the extent a response is required, ESI admits the allegations in paragraph 102 of the Complaint.

124.     ESI denies the allegations in paragraph 103 of the Complaint.

125.     The allegations in the first sentence of paragraph 104 of the Complaint state a legal conclusion which does not require a response.  To the extent a response is required, ESI denies the allegations in the first sentence of paragraph 104 of the Complaint.  ESI denies the allegations in the second sentence of paragraph 104 of the Complaint.

126.     ESI denies the allegations in paragraph 105 of the Complaint.

127.    ESI denies the allegations in the first sentence of paragraph 106 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.  ESI denies the allegations in the second and third sentences of paragraph 106 of the Complaint.  The allegations in the fourth sentence of paragraph 106 of the Complaint state a legal conclusion which does not require a response.  To the extent a response is required, ESI denies the allegations in the fourth sentence of paragraph 106 of the Complaint.

128.    The allegations in paragraph 107 of the Complaint state a legal conclusion which does not require a response.  To the extent a response is required, ESI denies the allegations in paragraph 107 of the Complaint.

129.    With respect to paragraph 108 of the Complaint, ESI re-states and re-asserts as if fully set forth herein all of its responses to each and every allegation set forth above.

130.    ESI denies the allegations in paragraph 109 of the Complaint, and respectfully refers the Court to the PBM Agreement for an accurate description of its terms.

131.    ESI denies the allegations in paragraph 110 of the Complaint, and respectfully refers the Court to the PBM Agreement for an accurate description of its terms.

132.    ESI denies the allegations in paragraph 111 of the Complaint.

133.    ESI denies the allegations in the first sentence of paragraph 112 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.  ESI denies the allegations in the second sentence of paragraph 112 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms.

134.    ESI denies the allegations in paragraph 113 of the Complaint.

135.    ESI denies the allegations in paragraph 114 of the Complaint, and respectfully

refers the Court to the PBM Agreement for an accurate description of its terms.

136.   ESI denies the allegations in paragraph 115 of the Complaint.

137.   ESI denies the allegations in paragraph 116 of the Complaint, and respectfully refers the Court to the PBM Agreement for an accurate description of its terms.

138.   ESI denies the allegations in paragraph 117 of the Complaint, and respectfully refers the Court to the PBM Agreement for an accurate description of its terms.

139.   ESI denies the allegations in paragraph 118 of the Complaint.

140.   ESI denies the allegations in the first sentence of paragraph 119 of the Complaint, and respectfully refers the Court to the document referred to therein for an accurate description of its terms. ESI admits the allegations in the second sentence of paragraph 119 of the Complaint.

141.   The allegations in paragraph 120 of the Complaint state a legal conclusion which does not require a response.  To the extent a response is required, ESI denies the allegations in paragraph 120 of the Complaint.

142.   ESI denies the allegations in paragraph 121 of the Complaint.

143.   With respect to paragraph 122 of the Complaint, ESI re-states and re-asserts as if fully set forth herein all of its responses to each and every allegation set forth above.

144.   ESI denies the allegations in paragraph 123 of the Complaint, and respectfully refers the Court to the PBM Agreement for an accurate description of its terms.

145.   ESI lacks sufficient knowledge to either admit or deny the allegations in the first sentence of paragraph 124 of the Complaint and, on that basis, denies those allegations.  The allegations in the second sentence of paragraph 124 of the Complaint state a legal conclusion which does not require a response.  To the extent a response is required, ESI denies the

allegations in the second sentence of paragraph 124 of the Complaint.

146.    The allegations in paragraph 125 of the Complaint state a legal conclusion which does not require a response.  To the extent a response is required, ESI denies the allegations in paragraph 125 of the Complaint.

147.    ESI denies the allegations in paragraph 126 of the Complaint.

## GENERAL DENIALS

Unless specifically admitted above, ESI denies each and every allegation in Anthem's Complaint.  ESI further denies that Anthem is entitled to judgment in its favor or for any relief, including the relief requested in paragraphs A through H of Anthem's prayer for relief.

## AFFIRMATIVE DEFENSES

Without assuming the burden of proof on any matters where that burden rests on Anthem as Plaintiff, ESI alleges the following facts upon knowledge as to itself and its own acts, and otherwise upon information and belief, and asserts the following defenses with respect to the Complaint:

## FIRST AFFIRMATIVE DEFENSE
(Failure to State a Claim)

Anthem fails to allege facts sufficient to state a claim upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE
(Unclean Hands, Estoppel, Laches and Waiver)

Anthem's claims are barred by the equitable doctrines of unclean hands, estoppel, laches and waiver.

## THIRD AFFIRMATIVE DEFENSE
(Unjust Enrichment)

Anthem's claim is barred in that any award in Anthem's favor in this action would constitute unjust enrichment.

## FOURTH AFFIRMATIVE DEFENSE
(No Breach of Contract)

Anthem's claim is barred, in whole or in part, because ESI did not breach the terms of the contract.

## FIFTH AFFIRMATIVE DEFENSE
(Breach of Contract)

Anthem's claim is barred, in whole or in part, because Anthem failed to comply with the terms of the contract, including but not limited to the mandatory dispute resolution provisions in Section 16.5 of the PBM Agreement.

## SIXTH AFFIRMATIVE DEFENSE
(Implied Covenant of Good Faith)

Anthem's claim is barred, in whole or in part, because Anthem violated the implied covenant of good faith and fair dealing.

## SEVENTH AFFIRMATIVE DEFENSE
(Failure to Disclose)

Anthem's claim is barred, in whole or in part, because Anthem failed to disclose material information necessary to comply with the terms of the contract.

## EIGHTH AFFIRMATIVE DEFENSE
(Unconscionability)

Anthem's claim is barred because any award in Anthem's favor would be unconscionable.

## RESERVATION OF ADDITIONAL AFFIRMATIVE DEFENSES

ESI gives notice that it intends to rely upon such other further defenses as may be revealed and become available during pretrial proceedings in this action and hereby reserves all rights to amend this Answer and assert all such defenses.

## COUNTERCLAIMS

ESI, by and through its undersigned attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, alleges upon knowledge as to itself and its own acts, and otherwise upon information and belief, as follows:

## NATURE OF THE ACTION

148.    ESI is regrettably forced to bring these counterclaims in order to seek redress for Anthem's repeated failures to comply with its contractual obligation to negotiate in good faith, and to confirm the proper interpretation and application of the periodic pricing review provision in the PBM Agreement.

149.    In 2009, ESI purchased Anthem's troubled in-house PBM provider, NextRx.  As part of that transaction, ESI entered into an agreement with Anthem to provide it with PBM services on an exclusive basis for the next ten years (defined above as the "PBM Agreement"). ESI presented Anthem with a range of alternatives for structuring the transaction.  At one end of the spectrum, ESI would pay less money upfront but offer lower pricing for ESI's services over the 10 year life of the PBM Agreement.  At the other end of the spectrum, ESI would pay significantly more upfront, but would charge higher pricing for ESI's services over the 10 year life of the PBM Agreement.  Anthem—which had limited access to liquidity in 2009—ultimately prioritized the receipt of upfront cash over lower pricing for ESI's services.   Specifically, Anthem elected to receive the highest available upfront cash offer—$4.675 billion upfront—in lieu of lower pricing during the life of the PBM Agreement.  Though Anthem could have applied some or all of the $4.675 billion to reduce drug pricing for its members, Anthem instead promptly used the $4.675 billion for stock buy-backs during 2009 and 2010 (which benefited Anthem's shareholders and management, as opposed to Anthem's clients and members).

150.    Despite electing to receive billions of dollars upfront in lieu of lower pricing over

the 10 year term of the PBM Agreement, Anthem is now attempting to rewrite the PBM Agreement by demanding an additional $13 billion in pricing concessions over the remaining four year life of the contract.

151.    Anthem has no right to the $13 billion in additional pricing concessions that it seeks in this litigation.  Rather, under the plain terms of the PBM Agreement, Anthem has, at most, a contractual right every ███ years to conduct a market analysis to evaluate whether it believes it is receiving what the contract, without definition, refers to as "competitive benchmark pricing."  If Anthem genuinely believes in good faith that the pricing it is receiving from ESI is not competitive, then the PBM Agreement provides only that Anthem has the ability to propose "renegotiated pricing terms" to ESI.  Following Anthem's submission of "proposed new pricing terms," ESI's sole obligation is to negotiate over those terms in good faith.  However, ESI is not required to agree to Anthem's proposed new pricing terms, and the PBM Agreement makes clear that ESI must agree to any proposed new pricing terms in writing in order to be effective.  ESI seeks a number of declaratory judgments to confirm the parties' respective rights and obligations under the PBM Agreement regarding new pricing terms, as well as the timeframe within which any such pricing terms may be proposed by Anthem.

152.    ESI also seeks judgment against Anthem for breach of contract based on Anthem's failure to negotiate in good faith over its proposed new pricing terms (as expressly required by the PBM Agreement).  Anthem has, among other things, refused to provide ESI with any of the market information or data that allegedly supports its demand for $13 billion in pricing concessions, which is unsurprising given that such an exorbitant number cannot in good faith be justified by reference to any reasonable notion of "competitive" pricing.  Indeed, Anthem has effectively conceded the unreasonableness of its demand, publicly stating on

multiple occasions that it expects to receive less than one quarter of the $13 billion in pricing concessions it seeks in this litigation. Notwithstanding these admissions, Anthem has rejected multiple pricing proposals from ESI that were well within the range of value that Anthem has publicly stated it expects to receive.

153.     Additionally, Anthem has concocted a new interpretation of the parties' rights and obligations with respect to proposed pricing that is squarely at odds with both the plain terms of the PBM Agreement and the positions taken by Anthem during the first periodic pricing review ████████, and has publicly espoused this interpretation in order to harm ESI's reputation among clients and investors. Moreover, Anthem has improperly sought to use minor isolated operational issues as leverage to force ESI to agree to Anthem's exorbitant pricing concessions. ESI has been materially damaged by Anthem's lack of good faith.

154.     ESI also seeks judgment against Anthem for breach of the implied covenant of good faith and fair dealing under the PBM Agreement. Anthem has breached the implied covenant by continually refusing to recognize the tradeoff that Anthem accepted in 2009 between upfront cash and pricing for ESI's services over the life of the PBM Agreement. ESI has been materially damaged by Anthem's breach of the implied covenant.

155.     Finally, if Anthem prevails on its erroneous claim that ESI's multi-billion dollar upfront payment had no bearing upon the pricing that ESI is obligated to provide Anthem under the PBM Agreement, ESI counterclaims in the alternative for restitution in an amount not less than $4.675 billion (plus appropriate interest thereon), on the basis that Anthem has been unjustly enriched.

**THE PARTIES**

156.     Plaintiff ESI is a Delaware corporation headquartered in St. Louis, Missouri and a

party to the PBM Agreement.  ESI's parent, Express Scripts Holding Company, which is not a

party to the PBM Agreement or to this action, trades on the NASDAQ as ESRX.

157.    Defendant Anthem is incorporated and headquartered in Indiana.  Anthem's stock

trades on the NYSE as ANTM.  Prior to December 3, 2014, Anthem's corporate name was

WellPoint, Inc. ("Wellpoint"), and it traded on the NYSE as WLP.  WellPoint was originally a

party to the PBM Agreement.  Anthem is the successor to Wellpoint, Inc. and inherited all of its

rights and obligations under the PBM Agreement.

## JURISDICTION

158.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because

ESI and Anthem are citizens of different states, and the amount in controversy exceeds $75,000.

159.    This Court has personal jurisdiction over Anthem because Anthem has agreed to

submit to jurisdiction in this Court pursuant to Section 16.2 of the PBM Agreement.  This Court

also has personal jurisdiction over Anthem because Anthem received substantial services from

ESI in New York pursuant to the PBM Agreement.

160.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and/or (c) because

a substantial part of the events underlying ESI's claim took place in New York, and because the

parties have agreed to submit to jurisdiction in this Court.

## STATEMENT OF FACTS

### A.  ESI And Anthem Entered Into A 10 Year PBM Services Agreement As Part Of ESI's Acquisition Of NextRx

161.    Prior to December 2009, Anthem used its own subsidiary, NextRx, as its PBM

services provider.  NextRx was consistently unable to meet basic standards for administering

drug benefit plans, which threatened Anthem's business.  As a result of NextRx's failings, on

January 12, 2009, CMS sanctioned Anthem by halting its "enrollment of Medicare beneficiaries"

and "all marketing activities to Medicare beneficiaries."[3]   In explaining its decision to sanction

Anthem, CMS detailed a number of problems at NextRx:

- There was a "longstanding and persistent failure to comply with CMS' requirements for the proper administration of its Medicare Advantage Prescription Drug Plans (MA-PD) and Prescription Drug Plans (PDP)" at NextRx.[4]

- NextRx's failures "posed a serious threat to the health and safety of Medicare beneficiaries."[5]

- As a result of these and other failings, individuals who relied on Anthem services through NextRx were "denied access to critical medications including, but not limited to, cardiac drugs, anti-seizure drugs . . . and drugs for asthma."[6]

- Furthermore, Anthem and NextRx failed to "follow through on its assurances to CMS that the problem was immediately and fully corrected."[7]

162.    In order to remedy these failings, and to support its business, Anthem decided to

sell NextRx.  Following a competitive bidding process with other PBMs competing for the Next

RX business, Anthem chose ESI as the winning bidder.  Anthem found a buyer in ESI that was

willing to undertake the task of righting the ship.  As Anthem explained in its 10-Q for the

second quarter of 2009, "[t]he pending sale of our PBM subsidiaries and the resulting strategic

alliance with Express Scripts will bring with it greater capabilities and resources, allowing

members to leverage more cost-effective solutions and state-of-the-art PBM services."[8]  ESI's

purchase of NextRx closed on December 1, 2009.  As part of the transaction, the parties entered

---

[3]   Letter from CMS to Krista Bowers, SVP and President, Senior Business & Consumer Marketing for Anthem, Jan. 12, 2009, at 1.

[4]   *Id.* at 2.

[5]   *Id.*

[6]   *Id.*

[7]   *Id.*

[8]   Anthem Form 10-Q for Q2 2009 (Oct. 28, 2009) at 38.

into the PBM Agreement, under which ESI was to provide PBM services to Anthem on an exclusive basis for the next ten years.

163.    In contrast with the difficulties and sanctions Anthem experienced while using NextRx as its PBM services provider, Anthem's PBM services have improved substantially since ESI became its PBM provider.  Anthem has also substantially increased the membership in its plans since 2009, adding hundreds of thousands of new members during 2014 alone.  And since the December 2009 closing of the parties' transaction, Anthem's stock price has risen nearly 150%, outperforming the S&P 500 by more than 50%.  None of this would have been possible without ESI's PBM services.

**B.  Anthem Elected To Take Billions Of Dollars From ESI Upfront, In Lieu Of Better Pricing For PBM Services Over The Life Of The PBM Agreement**

164.    When the parties negotiated the NextRx transaction, ESI presented Anthem with a range of options for structuring the transaction.  At one end of the spectrum, ESI would pay less money upfront but offer lower pricing for ESI's services over the 10 year life of the PBM Agreement.  At the other end of the spectrum, ESI would pay significantly more upfront, but would charge higher pricing for ESI's services over the 10 year life of the PBM Agreement.

165.    Anthem—which had limited access to liquidity in 2009—ultimately prioritized the receipt of upfront cash over lower pricing for ESI's services.  Specifically, Anthem elected to receive $4.675 billion upfront in lieu of lower pricing during the 10 year term of the PBM Agreement.  Though Anthem could have passed some or all of this upfront money on to its clients and members in the form of reduced drug pricing, instead, Anthem used the upfront payment to fund stock buybacks in 2009 and 2010 "during the low watermark" of Anthem's stock price, applying upward pressure on Anthem's stock price, and thereby enriching Anthem's

stockholders and management (who had substantial stock options).[9]

166.     Exhibit A to the PBM Agreement contains the pricing schedule that establishes the amounts Anthem is required to pay for drugs and various services provided by ESI during each year of the contract.  The pricing schedule was specifically designed based upon Anthem's decision to take $4.675 billion in cash upfront.

### C. The PBM Agreement Provides For A Periodic Pricing Review Every ▮▮▮▮

167.     Section 5.6 of the PBM Agreement establishes a "periodic pricing review" procedure under which Anthem may, ▮▮▮▮▮▮▮, propose adjustments to the pricing schedule:

> [Anthem] or a third party consultant retained by [Anthem] will conduct a market analysis every ▮▮▮▮▮ during the Term of this Agreement to ensure that [Anthem] is receiving competitive benchmark pricing.  In the event [Anthem] or its third party consultant determines that such pricing terms are not competitive, [Anthem] shall have the ability to propose renegotiated pricing terms to [ESI] and [Anthem] and [ESI] agrees to negotiate in good faith over the proposed new pricing terms.  Notwithstanding the foregoing, to be effective any new pricing terms must be agreed to by [ESI] in writing.

PBM Agreement, Section 5.6.

168.     Section 5.6 plainly provides that Anthem has, at most, a contractual right, every ▮▮▮▮, to *propose* new pricing terms to ESI.  Once such a proposal is submitted, ESI's sole obligation is to negotiate over those proposed new pricing terms in good faith.  Moreover, as the final sentence of Section 5.6 makes clear, ESI has no obligation to agree to Anthem's proposed new pricing terms.  Nor does ESI otherwise have an obligation to ensure that Anthem is receiving "competitive benchmark pricing."

---

[9]   Jeffries Global Healthcare Conference Tr., June 4, 2014, at 6.

169.    The limited nature of ESI's obligations under Section 5.6 is further reinforced by the broader context of the PBM Agreement.  For example, numerous other provisions concerning potential disputes or disagreements between the parties expressly state that the parties are required to work together in good faith to reach an agreement, and that neither party shall "unreasonably withhold" their agreement.  *See*, *e.g.*, PBM Agreement §§ 5.8(a), 5.8(e)(iii).  This demonstrates that, when the parties intended to impose an obligation to reach agreement on a given point, they included specific language to that effect.  Such language is conspicuously absent, however, from Section 5.6 of the PBM Agreement.  Far from stating that the parties are required to work together in good faith to reach an *agreement*, and that such agreement may not be "unreasonably withheld," Section 5.6 merely imposes an obligation to *negotiate* in good faith, and explicitly states that any new pricing terms must be agreed to by ESI in writing.

170.    Due to the time and expense involved in undertaking good faith negotiations, the parties also agreed that Anthem could only propose pricing revisions under Section 5.6 "every ███████████."  Given that the Effective Date of the PBM Agreement is December 1, 2009, Anthem was therefore permitted to invoke Section 5.6 on ████████████████████████ ████, and will again be permitted to invoke Section 5.6 on █████████████████.

### D.  During The ██████████ Periodic Pricing Review, Anthem Demonstrated Good Faith In Its Negotiations But Is Now Behaving Very Differently

171.    Consistent with the terms of Section 5.6 of the PBM Agreement, ██████████ Anthem retained two well-known third party consultants, Truveris and Milliman, to perform a market analysis to determine what Anthem's competitors were paying for PBM services.  Following the completion of that analysis, Anthem proposed new pricing terms to ESI ██ ████████████.  Consistent with its good faith obligations, Anthem identified the consultants who contributed to the analysis, specified the methods used to review each area, and provided

charts and tables to illustrate the sources of Anthem's figures and calculations.  It is standard industry practice to make disclosures of this nature in the context of pricing negotiations, because it is important for each party to understand what assumptions—including market information and market comparables—have been used to generate the proposed pricing.

172.   The pricing proposal submitted by Anthem as part of the first periodic pricing review made no reference to ESI having an obligation to provide Anthem with competitive benchmark pricing.  Nor did Anthem make any such claim during the negotiation process.  On the contrary, Anthem's pricing proposal expressly stated that ESI's sole obligation was to consider the proposal in good faith:  "ESI must display a good faith effort in attaining the requests outlined in this document and *at no time shall this document be considered a contractual obligation*, *other than what is required in the existing Amended Restated Contract Agreement* [*i.e.* PBM Agreement]."[10]

173.   ESI responded by complying with its contractual obligation to engage in good faith negotiations over Anthem's revised pricing proposal, which sought only a small rate reduction for Anthem's Medicare and Medicaid business.  After several months of good faith negotiations between the parties, ESI and Anthem ultimately reached agreement, and the parties' agreement was memorialized in Amendment 4 to the PBM Agreement, effective November 1, 2013.  As a result of the ███████ periodic pricing review, the parties established a course of dealing for their good faith negotiations.  But Anthem's new management team has now departed from this successful model in favor of improper negotiating tactics that are anything but good faith.

---

[10]   Letter from Matthew Gibbs, VP Pharmacy Services at WellPoint, to Matthew Totterdale, VP/GM for the WellPoint Account, dated ████████████, at 1 (emphasis added).

**E. Anthem's New Management Team Is Improperly Attempting To Obtain Billions Of Dollars In Additional Pricing Concessions From ESI To Which Anthem Is Not Entitled**

174.    On or about April 2014, Brian Griffin—briefly an employee at ESI—was appointed as President of Anthem's pharmacy division.[11]  In this capacity, Griffin is responsible for, among other things, overseeing Anthem's business relationship with ESI.  From the outset, Anthem's approach to the periodic pricing review process under Griffin was fundamentally at odds with both the terms of the PBM Agreement and the approach taken by Anthem during the first periodic pricing review ███████.

       a.   <u>Anthem Has Consistently Sought to Improperly Accelerate the Periodic Pricing Review Process</u>

175.    Griffin initially took the position that the periodic pricing review process—also sometimes referred to colloquially as a "market check"—needed to be completed by the end of 2014, so that new pricing would be effective ██████████.  For example, on August 15, 2014, Griffin sent an email to Matt Totterdale, the Vice President and General Manager of ESI's Anthem division, stating:

> First, it is our expectation that the Market Check will become effective ██████, consistent with the contract.  I've discussed this timing with you and Tim [Wentworth, ESI's President].  We have already done a quick cycle Market Check analysis and, consistent with my discussion with Tim, we would expect to begin discussing new Market Check pricing during my meeting with Tim on 8/27.

176.    As a thresholder matter, the notion that the periodic pricing review process needed to be completed by ██████████, was belied by the plain terms of Section 5.6 of the PBM Agreement, which states that Anthem may conduct a periodic review "every ████

---

[11]    Griffin had been employed by Medco Health Solutions prior to its acquisition by ESI in May 2012.  Following the acquisition, Griffin worked for ESI for less than two months, before leaving in June 2012.

 during the Term of [the PBM] Agreement."[12]   Anthem therefore had a right to initiate a

pricing review on ███████████████████████████████████████████

██████████ , and then again on ██████████████████████████████████████

███████████████ .  Moreover, Griffin's position was also squarely at odds with the position

previously taken by Anthem, which had not commenced the first periodic pricing review process

until ███████████ .

177.    By early 2015, Anthem abandoned its obviously erroneous claim that new pricing

terms had to be effective as of ██████████████ .  Anthem's new position—that new pricing terms

had to be effective as of ████████████████—was, however, equally unreasonable.   Under the

plain terms of Section 5.6 of the PBM Agreement, ███████████████████ represented the date upon

which Anthem was permitted to *commence* the periodic pricing review process, not the date by

which that process needed to be *concluded*, and any agreed upon pricing put into effect.

Anthem's own conduct during the first periodic pricing review process further belied Anthem's

new position.

178.    On March 2, 2015, Anthem's Chief Financial Officer, Wayne DeVeydt, was

asked about the timing of any changes to Anthem's PBM pricing during a health care

conference:[13]

> **Analyst:**   Okay.   How do we think about potential?   You had a built-in
> market check for your [PBM].   How do I think about the potential
> for that in terms of timing and eventuality?
>
> **DeVeydt:**   So relative to timing, what we've always said it's our preference
> not to negotiate in a public environment. … So more to come.   ***I***
> ***wouldn't expect much in 2015.   I think 2015 is a year where***

---

[12]   Capitalized terms used but not defined herein have the meanings given to them in the
PBM Agreement.

[13]   March 2, 2015, WellPoint, Inc. at Cowan Health Care Conference (Thomson Reuters
StreetEvents Transcript) (emphasis added).

*pricing's baked.*  We're moving down the path.  But it's something that we plan to have good dialog with our partner [ESI] on.

**Analyst:**    *So that could be something that affects 2016?*

**DeVeydt:**    *Could be.*

179.    DeVeydt's public acknowledgement that Anthem was not expecting any changes to its PBM pricing during 2015—and possibly even 2016—demonstrates that both of the aforementioned positions taken by Anthem in its negotiations with ESI were not taken in good faith, but were rather an attempt to improperly accelerate the periodic pricing review process. Anthem knew changes to its PBM pricing in 2015, and potentially 2016, were highly improbable because the periodic pricing review process did not commence until ▮▮▮▮▮▮▮, and it had previously taken almost a year to negotiate and finalize new pricing terms.

> b.    <u>Anthem Initially Recognized that It has No Right to New Pricing Concessions Under the PBM Agreement, Before Changing Its Tune</u>

180.    As explained above, the plain terms of Section 5.6 of the PBM Agreement obligate ESI to negotiate in good faith, but do not require ESI to provide Anthem with specific pricing adjustments or "competitive benchmark pricing."  Anthem's General Counsel, Tom Zielinski, conceded this fact during a meeting with ESI in New York on November 25, 2014, acknowledging that ESI has the ultimate right under the PBM Agreement not to agree to any alternative pricing proposed by Anthem.  That is why, during initial negotiations with ESI in August 2014, Anthem said it wanted to amend Section 5.6—commonly referred to as the "market check" provision—so that price changes would no longer be subject to ESI approval. For example, in an August 29, 2014 email to ESI President Tim Wentworth, Griffin demanded the following changes to Section 5.6:

- Market Check Language
    - Annual Market Check
    - Defined process

    ‑  ***Based on external validation not ESI approval***

(Emphasis added)

181.    In light of Griffin's email—and Zielinski's concession—it is clear that Anthem understood that ESI was not required to agree to any pricing changes proposed by Anthem, and that Anthem wanted to modify the PBM Agreement so that ESI would be required to accept pricing changes determined by a third party.

182.    In late December 2014, ESI told Anthem that it was willing to consider changes to the market check process in Section 5.6 in the context of negotiations over an extension of the PBM Agreement.  Rather than pursue the changes it sought through negotiation, however, Anthem instead simply changed its position and began to declare that Section 5.6 imposed an affirmative obligation on ESI to provide Anthem with "competitive benchmark pricing."  This position is inconsistent with the plain terms of the PBM Agreement, as well as the positions taken by Anthem during the first periodic pricing review █████, and during negotiations with ESI in 2014.

        c.   <u>Anthem Demanded Astronomic Pricing Concessions from ESI While Refusing to Produce the Market Information and Data that Allegedly Supported Its Claim</u>

183.    On October 17, 2014, Anthem sent ESI a proposal for new pricing terms in which Anthem demanded a total of approximately ***$13 billion*** in additional pricing concessions over the remaining four years of the PBM Agreement.  Anthem included the same proposed pricing terms in its subsequent March 18, 2015 proposal to ESI, and has taken the position throughout its negotiations with ESI that the $13 billion figure reflects "competitive benchmark pricing" to which Anthem is entitled under Section 5.6 of the PBM Agreement.

184.    There have not been any fundamental, systemic changes to the pharmacy benefit management industry since the conclusion of the first periodic pricing review in November 2013

that would justify price changes of more than *$3 billion per year*.

185.    Anthem informed ESI that the $13 billion figure had been developed by Anthem's little-known third-party consultant, Health Strategy, LLC ("Health Strategy"), which had determined that it represented "competitive benchmark pricing."   Anthem has consistently refused, however, to provide ESI with Health Strategy's analysis, or with any of the market information or data that allegedly supports Health Strategy's conclusion.

186.    It is standard industry practice to provide information of this type in the context of a market check process, and Anthem in fact produced similar information to ESI as part of the first periodic pricing review.   This information is critical, because it permits a PBM service provider to understand what market comparables are being used to develop an allegedly "competitive" pricing proposal.   The mere fact that another insurer purports to have better pricing does not necessarily mean that the pricing offered by a PBM is "uncompetitive."   There are numerous factors that influence pricing.   For example, the other insurer may be able to obtain better pricing because it has a more modern plan design.   Plans that utilize a narrower pharmacy network or a more restrictive formulary will generally be able to realize better pricing than plans with broader pharmacy networks and less restrictive formularies, because they are able to capture bigger rebates from pharmaceutical companies and receive more discounted product pricing from pharmacies.

187.    Understanding what market comparables were used to develop an allegedly "competitive" pricing proposal is especially important in the case of Anthem, because its plan design—which includes more than 50,000 individual plan types—is both broader and much more complicated than that of other insurers.   Consequently, it costs more to administer Anthem's plans than it would cost to administer more modern plan designs.

188.    Anthem's persistent refusal to produce this information is inconsistent with Anthem's obligation to negotiate in good faith.

        d.   <u>Anthem Repeatedly Told the Market that It Expected to Receive Only a Small Fraction of the Pricing Concessions It was Demanding From ESI</u>

189.    From October 2014 through the present, Anthem's position in its negotiations with ESI has always been that Anthem is entitled to pricing concessions in the amount of $13 billion over the remaining life of the PBM Agreement.  Publicly, however, Anthem has been telling a very different story.

190.    For example, on September 30, 2014, Ken Goulet—then Executive Vice President of Anthem's Commercial & Specialty Division—was asked about the status of Anthem's negotiations with ESI during an investor round table.  Goulet replied:[14]

> Since the contract was in place the market shifted quite a bit.  There was consolidation in the industry, and in general pricing got better.  ***We've had numbers identified to us externally that there's probably savings in the $500 million to $700 million annual range.  And I would say that's probably reasonable*** at the end of the contract, meaning the market has shifted enough that there is pricing advantages.

191.    DeVeydt, Anthem's CFO, reiterated that Anthem expected to realize annual savings in the $500 million to $700 million range during a conference call with market analysts on June 22, 2015.[15]

192.    On September 17, 2015, Anthem's CEO Joe Swedish again publicly confirmed that Anthem ultimately expected to receive between $500 million and $700 million in annual savings as a result of its pricing negotiations with ESI (*i.e.*, a total of $2 billion - $2.8 billion over the remaining life of the PBM Agreement).  Specifically, Swedish told investors at a health care

---

[14]    Sept. 30, 2014, WellPoint, Inc. at Leerink Partners Services Roundtable (Thomson Reuters StreetEvents Transcript) (emphasis added).

[15]    June 22, 2015, Anthem Inc. Reiterates Commitment to $184 Per Share Proposal for Cigna Corporation Conference Call (Thomson Reuters Street Events Transcript).

conference that:[16]

> [W]hat I've said repeatedly is that 2016 represents kind of [a] check-in point where **we're hoping to finalize negotiations and conclude in a way that captures, and we've made this public, something in the order of $500 million to $700 million in price adjustment value for us**, as well as service level adjustments.

193.    On November 10, 2015—the day after the parties concluded an unsuccessful mediation—during a healthcare conference question-and-answer session, Swedish and DeVeydt once again publicly reaffirmed Anthem's expectation that it would receive between $500 million and $700 million in annual savings as a result of its pricing negotiations with ESI.

194.    These repeated public statements were wholly inconsistent with Anthem's position—taken throughout 2015 in private negotiations with ESI—that Anthem was entitled to pricing concessions totaling more than **$3 billion** a year over the remaining four years of the PBM Agreement.  The massive disconnect between Anthem's public disclosures to investors— which presumably reflected an accurate view of Anthem's true expectations—and Anthem's private statements to ESI further reinforces the fact that Anthem has not been negotiating in good faith.

e.   Anthem Repeatedly Rejected Offers from ESI that were Well Within the Range of what Anthem was Telling the Market It Expected to Receive

195.    Notwithstanding the fact it is under no obligation to do so, in an effort to accommodate its largest commercial client, ESI has made five separate pricing proposals to Anthem between June 2015 and March 2016.  Each of these proposals has offered Anthem rate relief that was well within the range of value that Anthem has told the market it expects to receive, as well as billions of dollars in additional value by way of rebate guarantees and other

---

[16]    Sept. 17, 2015, WellPoint, Inc. at Morgan Stanley Global Health Care Conference (Bloomberg Transcript) (emphasis added).

value that Anthem could realize if it modernized its benefit designs.  In every case, Anthem has rejected these proposals out-of-hand.

196.    Additionally, Anthem has consistently maintained that any proposal that is based in part on suggestions regarding how to modernize Anthem's benefit design fails to comply with the requirements of Section 5.6.  This position is inconsistent with standard industry practice regarding market checks, and is not taken in good faith.  The pricing that ESI or any other PBM is able to offer its clients depends in part upon the way in which the client structures its benefit design.  Broader networks that permit members to obtain drugs from a wider array of pharmacies typically result in higher prices than narrower networks that limit the number of pharmacies from which members may obtain drugs.  Similarly, less restrictive formularies that give members access to a wider array of drugs typically result in higher prices than more restrictive formularies, which are clinically sound and cost competitive.  When ESI engages in market checks with its clients, the negotiations typically include suggested changes that the client could make to its benefit design in order to realize better prices.  It is Anthem's own choice to not keep pace with market modernization that is costing Anthem significant profits, not some perceived uncompetitive pricing from ESI.

> f.    Anthem Began Alleging Operational Breaches of the PBM Agreement as a Negotiating Tactic to Generate Leverage in Pricing Discussions With ESI

197.    In 2015, ESI adjudicated more than 175 million claims for Anthem across all lines of its various businesses.  Those businesses consist of more than 130,000 fully-insured and administrative services only groups, 490 Medicare groups, 1600 Medicaid groups and approximately 650 products in the newly created Public Exchanges.  ESI supports Anthem's business in over 24 states and services more than 15 million members.  In order to support an account of this size and complexity, ESI maintains sophisticated and intricate IT systems, along

with an enormous commercial operation and supporting workforce.

198.    As is to be expected with an operation of this size and complexity, isolated issues arise from time-to-time.  Historically, when such issues arose, ESI and Anthem worked together in a collaborative manner in order to address them, thereby allowing ESI to continue to provide an exceedingly high standard of service to one of its most important clients.

199.    However, in early 2015—when it was looking to generate leverage in its pricing negotiations with ESI—Anthem took a different approach.  Specifically, on February 16, 2015, Anthem sent ESI a 14 page single-spaced letter detailing what it claimed were numerous operational breaches of the PBM Agreement by ESI that would give Anthem the right to terminate the PBM Agreement if not cured within ███████.

200.    Although ESI disagreed with Anthem's claims that the isolated alleged operational issues cited by Anthem constituted material breaches of the PBM Agreement that could give rise to a right of termination on Anthem's part, ESI nevertheless devoted significant resources to resolving those issues as expeditiously as possible.  As a result of ESI's diligent efforts, Anthem's Chief Executive Officer Joe Swedish confirmed to ESI's Chief Executive Officer George Paz on March 1, 2016, that the alleged operational issues previously identified by Anthem were no longer a concern for Anthem.

201.    Notwithstanding this admission by Anthem's CEO, now that Anthem is seeking to litigate its claimed entitlement to $13 billion in pricing concessions, it has resurrected its old allegations regarding operational issues, and is once again claiming that they constitute material breaches of the PBM Agreement giving rise to a termination right.  The fact that Anthem raises these alleged operational issues only when it is seeking to extract pricing concessions from ESI is not a coincidence.  Rather, it demonstrates the lack of good faith that has typified Anthem's

pricing negotiations over the past two years.

## FIRST CAUSE OF ACTION
### (Breach of Contract – Failure to Negotiate Proposed New Pricing Terms in Good Faith)

202.    ESI repeats and realleges the allegations set forth above as though fully set forth herein.

203.    The PBM Agreement is a valid and enforceable contract.

204.    ESI and Anthem are each party to, and bound by the terms and provisions of, the PBM Agreement.

205.    Under Section 5.6 of the PBM Agreement, Anthem is permitted to conduct a market analysis every ██████████ to evaluate whether Anthem believes it is receiving competitive benchmark pricing.  Anthem then has the right to propose renegotiated pricing terms to ESI, and Anthem and ESI are required to negotiate in good faith over the proposed new pricing terms.  Notwithstanding the foregoing, no proposed new pricing terms will be effective unless agreed to by ESI in writing.

206.    ESI has complied with its obligations under Section 5.6 of the PBM Agreement by negotiating in good faith with Anthem regarding Anthem's proposed new pricing terms. Furthermore, ESI has performed all of the material conditions, covenants, and promises required to be performed in accordance with the terms and conditions of the PBM Agreement.

207.    Anthem has breached its obligations under Section 5.6 of the PBM Agreement by failing to negotiate in good faith with ESI regarding Anthem's proposed new pricing terms.  For example:

> a.   Anthem's current positions with respect to both the timing of the pricing negotiations and ESI's obligations under Section 5.6 of the PBM Agreement are inconsistent with the positions taken by Anthem during the first periodic

pricing review ███████;

b.  Anthem's proposed new pricing terms would require ESI to make additional pricing concessions of $13 billion over the remaining four years of the PBM Agreement, an exorbitant number that cannot in good faith be justified by reference to any reasonable notion of competitive pricing;

c.  Anthem has refused to provide ESI with any of the market data or methodologies that allegedly support its proposed new pricing terms;

d.  Anthem has taken the position that ESI was required to engage in negotiations regarding Anthem's proposed new pricing terms as early as August 2014, notwithstanding the fact that, under Section 5.6 of the PBM Agreement, negotiations were not meant to commence until after ████████████ ████████████████████████████████████;

e.  Anthem demanded that ESI either agree to its proposed new pricing terms or propose alternative new pricing terms, notwithstanding the fact that ESI is required to do no such thing under Section 5.6 of the PBM Agreement;

f.  Anthem has repeatedly stated, in public, that it actually expects to receive between $2 billion to $2.8 billion in new pricing concessions over the remaining four-year term of the PBM Agreement, which is less than one quarter of the $13 billion in pricing concessions sought under Anthem's proposed new pricing terms, demonstrating that Anthem knows its demand is fundamentally unreasonable;

g.  Anthem has made misleading and inaccurate public disclosures regarding Anthem's rights and ESI's obligations under the PBM Agreement;

h.   Anthem has rejected five counter-proposals from ESI, each of which provides pricing concessions that were well within the range of the concessions Anthem has publicly stated it actually expects to receive; and

i.   Anthem has improperly sought to use isolated operational issues to force ESI to agree to Anthem's exorbitant proposed new pricing concessions.

208.   ESI has suffered financial harm as a result of Anthem's breach, including but not limited to the costs associated with engaging in negotiations pursuant to Section 5.6 of the PBM Agreement; the costs associated with engaging in the dispute resolution process pursuant to Section 16.5 of the PBM Agreement; the costs associated with this litigation; and the commercial damage caused by Anthem's misleading and inaccurate public disclosures regarding ESI's compliance with its obligations under the PBM Agreement.  ESI is entitled to damages.

## SECOND CAUSE OF ACTION
(Breach of Implied Covenant of Good Faith and Fair Dealing – PBM Agreement)

209.   ESI repeats and realleges the allegations set forth above as though fully set forth herein.

210.   There is implied in every contract a covenant of good faith and fair dealing such that no party to such contract may act to deprive the other of the benefits and bargains of the agreement.

211.   Anthem was thus bound by an implied-in-law covenant under the PBM Agreement to perform its obligations in good faith and not take any action that might deprive ESI of the benefits of its bargain under the PBM Agreement.

212.   Anthem breached its duty to act in good faith and deal fairly with ESI through its deliberate efforts to deprive ESI of the benefit of its bargain.  Specifically, Anthem has repeatedly taken the position that ESI's $4.675 billion upfront payment to Anthem in 2009 has

no bearing upon the pricing to which Anthem is entitled under the PBM Agreement, notwithstanding the fact that Anthem willingly and knowingly accepted the upfront payment on the condition that it would be required to pay higher prices for ESI's services during the life of the PBM Agreement.

213.    Anthem's bad faith conduct and continuing refusal to recognize the tradeoff that Anthem accepted in 2009 between upfront cash and pricing for ESI's services over the life of the PBM Agreement violated the implied covenant of good faith and fair dealing.

214.    Anthem's actions substantially and directly impaired the value of the PBM Agreement to ESI and are inconsistent with the intent of the parties to the PBM Agreement.

215.    Anthem's material breaches of this implied covenant were and continue to be intentional, knowing and in willful and reckless disregard of the rights and interests of ESI.

216.    ESI has suffered and will continue to suffer harm as a result of Anthem's breach of the implied covenant of good faith and fair dealing.

217.    ESI has suffered damages as a direct and proximate result of Anthem's breaches of the PBM Agreement in an amount to be proved at trial, including but not limited to the costs associated with engaging in negotiations pursuant to Section 5.6 of the PBM Agreement; the costs associated with engaging in the dispute resolution process pursuant to Section 16.5 of the PBM Agreement; the costs associated with this litigation; and the commercial damage caused by Anthem's misleading and inaccurate public disclosures regarding ESI's compliance with its obligations under the PBM Agreement.

### THIRD CAUSE OF ACTION
(Declaratory Judgment – Anthem Does Not Have a Contractual Right to Any New Pricing Concessions)

218.    ESI repeats and realleges the allegations set forth above as though fully set forth

herein.

219.    The PBM Agreement is a valid and enforceable contract.

220.    ESI and Anthem are each party to, and bound by the terms and provisions of, the PBM Agreement.

221.    ESI performed all of the material conditions, covenants and promises required to be performed in accordance with the terms and conditions of the PBM Agreement.

222.    Section 5.6 of the PBM Agreement states that Anthem or a consultant retained by Anthem "will conduct a market analysis every ▬▬▬▬▬ during the Term of [the PBM] Agreement to ensure [Anthem] is receiving competitive benchmark pricing."  "In the event [Anthem] or its third party consultant determines that such pricing terms are not competitive, [Anthem] shall have the ability to propose renegotiated pricing terms to" ESI.  ESI and Anthem are then required to "negotiate in good faith over the proposed new pricing terms."  However, ultimately, "[n]otwithstanding the foregoing, to be effective any new pricing terms must be agreed to by [ESI] in writing."

223.    Anthem has taken the erroneous position, based on the first sentence of Section 5.6—which relates exclusively to the market analysis to be conducted by Anthem or its consultant—that Anthem has a contractual right to "competitive benchmark pricing."

224.    ESI's position, based on the totality of Section 5.6, is that Anthem has, at most, a contractual right to propose new pricing terms every ▬▬▬▬, and that the parties thereafter have an obligation to negotiate over those proposed new pricing terms in good faith.  However, ESI has no obligation to agree to Anthem's proposed new pricing terms, or to otherwise ensure that Anthem is receiving competitive benchmark pricing.

225.    An actual justiciable and substantial controversy exists between ESI and Anthem

concerning Anthem's rights and ESI's obligations under Section 5.6 of the PBM Agreement.

226.   A declaratory judgment would serve the useful purpose of clarifying and settling the legal relations of the parties under the PBM Agreement.

227.   A declaratory judgment would finalize the controversy and offer relief from uncertainty.  The substantial controversy between the parties is of sufficient immediacy and reality to warrant issuance of a declaratory judgment.

228.   ESI is entitled to a declaration that (i) ESI has no obligation to agree to any new pricing terms proposed by Anthem under Section 5.6 of the PBM Agreement; (ii) ESI has no obligation under Section 5.6 of the PBM Agreement to ensure that Anthem is receiving competitive benchmark pricing; and (iii) ESI's sole obligation under Section 5.6 is to negotiate in good faith over any proposed new pricing terms submitted by Anthem pursuant to that provision.

### FOURTH CAUSE OF ACTION
#### (Declaratory Judgment – Timing of Periodic Pricing Reviews)

229.   ESI repeats and realleges the allegations set forth above as though fully set forth herein.

230.   The PBM Agreement is a valid and enforceable contract.

231.   ESI and Anthem are each party to, and bound by the terms and provisions of, the PBM Agreement.

232.   ESI performed all of the material conditions, covenants and promises required to be performed in accordance with the terms and conditions of the PBM Agreement.

233.   Under Section 5.6 of the PBM Agreement, Anthem is permitted to "conduct a market analysis every ██████████ during the Term of [the PBM] Agreement."  Once Anthem has completed this market analysis, it is permitted to propose renegotiated pricing terms to ESI,

after which the parties are required to negotiate in good faith over those terms.

234.   The Term of the PBM Agreement commenced on December 1, 2009.

235.   Following the 

▮▮▮▮▮▮▮▮, Anthem proposed renegotiated pricing terms to ESI ▮

▮▮▮▮▮▮.

236.   Notwithstanding the plain language of Section 5.6 of the PBM Agreement and its

prior conduct in relation to the first periodic pricing review, Anthem now takes the position that

periodic pricing reviews must take place *before* the relevant ▮▮▮▮ anniversary date, so that

any new pricing terms can go into effect on the anniversary date itself.

237.   ESI's position—consistent with the plain language of Section 5.6 of the PBM

Agreement and the parties' prior conduct in relation to the first periodic pricing review—is that

the periodic pricing review process *begins*, rather than *ends*, on the relevant ▮▮▮▮

anniversary date.

238.   An actual justiciable and substantial controversy exists between ESI and Anthem

concerning the timing of any further pricing proposals Anthem may make under Section 5.6 of

the PBM Agreement.

239.   A declaratory judgment would serve the useful purpose of clarifying and settling

the legal relations of the parties under the PBM Agreement.

240.   A declaratory judgment would finalize the controversy and offer relief from

uncertainty.   The substantial controversy between the parties is of sufficient immediacy and

reality to warrant issuance of a declaratory judgment.

241.   ESI is entitled to a declaration that (i) under Section 5.6 of the PBM Agreement,

the periodic pricing review process begins on the relevant ▮▮▮▮ anniversary date, and

consequently (ii) absent an agreement by the parties to extend the term of the PBM Agreement, Anthem's next (and final) opportunity to propose renegotiated pricing terms to ESI will not arise until ▐▐▐▐▐▐▐▐▐.

**FIFTH CAUSE OF ACTION**

(Declaratory Judgment – Anthem Does Not Have the Right to Terminate the PBM Agreement)

242.    ESI repeats and realleges the allegations set forth above as though fully set forth herein.

243.    The PBM Agreement is a valid and enforceable contract.

244.    ESI and Anthem are each party to, and bound by the terms and provisions of, the PBM Agreement.

245.    ESI performed all of the material conditions, covenants and promises required to be performed in accordance with the terms and conditions of the PBM Agreement.

246.    Under Section 16.5 of the PBM Agreement, in the event of a material dispute regarding the PBM Agreement, Anthem is not permitted to terminate the PBM Agreement unless it has complied with each of the three steps of the dispute resolution process set forth therein. First, the material dispute must be referred to the Joint Operating Pharmacy Committee ("JOPC"), which has 15 days to meet in person and make a good faith effort to resolve the dispute to the satisfaction of the parties.  Second, if not resolved by the JOPC, the dispute must be referred to the President of ESI and President of Anthem, who are required to meet within 15 days and make a good faith effort to resolve the dispute to the satisfaction of the parties.  Third, if the Presidents are unable to resolve the dispute, the parties are required to refer the dispute to non-binding mediation.  Anthem is permitted to exercise any right of termination it may have under Section 6.2(a) of the PBM Agreement only once a material dispute has been properly subject to each of these three phases of the dispute resolution process.

247.    With respect to the alleged material disputes set forth in the Complaint, Anthem has failed to comply with the dispute resolution process set forth in Section 16.5 of the PBM Agreement in a number of key respects.

248.    *First*, with respect to the alleged material dispute concerning the parties' rights and obligations in relation to the second periodic pricing review (the "Pricing Dispute"), Anthem has failed to comply with all three stages of the dispute resolution process.  Anthem erroneously claims that it satisfied all three stages of the dispute resolution process with respect to the Pricing Dispute by November 9, 2015.  However, Anthem's right to commence the second periodic pricing review under Section 5.6 of the PBM Agreement did not even ripen until ███████████ ████.  Accordingly, Anthem has failed to comply with the requirements of Section 16.5 as it pertains to the Pricing Dispute, and therefore has no right to terminate the PBM Agreement.

249.    *Second*, with respect to the alleged material dispute concerning ESI's operational performance (the "Operational Dispute"), Anthem has also failed to comply with all three stages of the dispute resolution process.  Although the JOPC met on March 6, 2015, Anthem failed to make a good faith effort to resolve the Operational Dispute during that meeting.  Similarly, although the parties' Presidents met on May 27, 2015, Anthem's President did not make a good faith effort to resolve the Operational Dispute during that meeting.  Finally, while the parties conducted a mediation on November 9, 2015, the Operational Dispute was not actually mediated on that day.  Accordingly, Anthem has failed to comply with the requirements of Section 16.5 as it pertains to the Operational Dispute, and therefore has no right to terminate the PBM Agreement.

250.    An actual justiciable and substantial controversy exists between ESI and Anthem concerning whether Anthem has complied with the dispute resolution process set forth in Section

16.5 of the PBM Agreement.

251.    A declaratory judgment would serve the useful purpose of clarifying and settling the legal relations of the parties under the PBM Agreement.

252.    A declaratory judgment would finalize the controversy and offer relief from uncertainty.  The substantial controversy between the parties is of sufficient immediacy and reality to warrant issuance of a declaratory judgment.

253.    ESI is entitled to a declaration that Anthem has not satisfied the dispute resolution requirements set forth in Section 16.5 of the PBM Agreement with respect to either the Pricing Dispute or the Operational Dispute, and therefore does not have the right to terminate the PBM Agreement.

## SIXTH CAUSE OF ACTION
(Unjust Enrichment)

254.    ESI repeats and realleges the allegations set forth above as though fully set forth herein.

255.    In executing the PBM Agreement, Anthem accepted an upfront payment of $4.675 billion for itself and at the direct expense of ESI.

256.    ESI made, and Anthem accepted, that upfront payment with the understanding that Anthem would receive the pricing set forth in Exhibit A to the PBM Agreement, and that Anthem would abide by its obligations under that PBM Agreement, including provisions enabling ESI to derive 10 years of value from the PBM Agreement commensurate with the high upfront payment made by ESI to Anthem at Anthem's behest.

257.    Having obtained the benefit of the $4.675 billion upfront payment, Anthem now demands to terminate the PBM Agreement, or otherwise reduce the revenue ESI can receive under the PBM Agreement in order to recoup its upfront payment.  Anthem's economic benefit

is therefore a direct and proximate result of Anthem's unjust and unconscionable conduct.  As a result of its own misconduct, Anthem has been, and will continue to be, unjustly enriched at ESI's expense, and under the circumstances it would be unjust and inequitable for Anthem to retain the $4.675 billion payment.

258.    Accordingly, the circumstances are such that in equity and good conscience restitution should be made by Anthem to ESI in an amount to be proved at trial, but no less than $4.675 billion plus appropriate interest thereon dating from December 2009 to the conclusion of this dispute.

## PRAYER FOR RELIEF

WHEREFORE, ESI respectfully requests that this Court enter judgment in favor of ESI:

A.    On Count I, finding Anthem in breach of the good faith negotiation requirement in Section 5.6 of the PBM Agreement and awarding damages in an amount to be proven at trial.

B.    On Count II, finding Anthem in breach of the implied covenant of good faith and fair dealing and awarding damages in an amount to be proven at trial.

C.    On Count III, declaring that (i) ESI has no obligation to agree to any new pricing terms proposed by Anthem under Section 5.6 of the PBM Agreement; (ii) ESI has no obligation under Section 5.6 of the PBM Agreement to ensure that Anthem is receiving competitive benchmark pricing; and (iii) ESI's sole obligation under Section 5.6 is to negotiate in good faith over any proposed new pricing terms submitted by Anthem pursuant to that provision.

259.    On Count IV, declaring that (i) under Section 5.6 of the PBM Agreement, the periodic pricing review process begins on the relevant ██████r anniversary date of the PBM Agreement, and consequently (ii) absent an agreement by the parties to extend the term of the PBM Agreement, Anthem's next (and final) opportunity to propose renegotiated pricing terms to ESI will not arise until ████████████

260.     On Count V, declaring that Anthem has not satisfied the dispute resolution requirements set forth in Section 16.5 of the PBM Agreement with respect to either the Pricing Dispute or the Operational Dispute, and therefore does not have the right to terminate the PBM Agreement.

261.     On Count VI, finding against Anthem on the unjust enrichment claim and awarding damages in an amount to be proven at trial, but no less than $4.675 billion with interest accruing at the statutory rate from December 2009 until the dispute is resolved.

262.     Awarding ESI their attorney fees and any and all other fees and expenses incurred in bringing this action;

263.     Awarding ESI prejudgment interest at the maximum legal rates allowed by law; and

264.     Such other and further relief as this Court may deem just and proper.

265.     ESI reserves the right to seek all remedies available at law and equity.

DATED:    New York, New York
          April 19, 2016

                          QUINN EMANUEL URQUHART &
                          SULLIVAN, LLP


                   By: _____
                          Michael B. Carlinsky
                          Robert C. Juman
                          Andrew S. Corkhill
                          51 Madison Avenue, 22nd Floor
                          New York, New York 10010-1601
                          (212) 849-7000
                          michaelcarlinsky@quinnemanuel.com
                          robertjuman@quinnemanuel.com
                          andrewcorkhill@quinnemanuel.com


                          – and –

                          Michael J. Lyle
                          QUINN EMANUEL URQUHART &
                          SULLIVAN, LLP
                          777 6th Street, NW
                          11th Floor
                          Washington, DC 20001
                          Tel: (202) 538-8000
                          mikelyle@quinnemanuel.com

                          Christopher G. Kelly
                          HOLLAND & KNIGHT LLP
                          31 West 52nd Street
                          New York, NY 10019
                          Tel: (212) 513-3200
                          christopher.kelly@hklaw.com

                          *Attorneys for Defendant and Counter-
                          Plaintiff Express Scripts, Inc.*