G639ANTC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ANTHEM, INC.,

4                    Plaintiff,

5              v.                            16 CV 2048 (ER)

6    EXPRESS SCRIPTS, INC.,

7                    Defendant.

8    ------------------------------x
                                        New York, N.Y.
9                                       June 3, 2016
                                        10:33 a.m.
10
     Before:
11
                         HON. EDGARDO RAMOS
12
                                             District Judge
13
                              APPEARANCES
14
     WHITE & CASE LLP
15        Attorneys for Plaintiff
     BY:  GLENN KURTZ
16          CLAUDINE COLUMBRES

17   QUINN EMANUEL
          Attorneys for Defendant
18   BY:  MICHAEL B. CARLINSKY
            MICHAEL J. LYLE
19          ANDREW S. CORKHILL
            JACOB J. WALDMAN
20

21

22

23

24

25

G639ANTC

1          (In open court; case called)

2          MR. KURTZ:  Good morning.  Glenn Kurtz of White & Case

3     on behalf of the plaintiff.

4          If I may, I'm joined here today by my partner Claudine

5     Columbres and a summer clerk Ivan Navedo.

6          MR. CARLINSKY:  Good morning.  Michael Carlinsky from

7     Quinn Emanuel for Express Scripts.  I'm joined by my partner

8     Mike Lyle, and Andrew Corkhill, and our associate Jake Waldman.

9     And in the courtroom also is Mr. Christopher Kelly of the

10    Holland & Knight firm.  We also have some summer interns in the

11    back.  They didn't wear ties so I made them sit as far away

12    from the court as possible.

13         THE COURT:  That was a good move.

14         Good morning to you all.  I believe this is the first

15    time the parties have appeared before me, correct?

16         MR. KURTZ:  That is correct, your Honor.

17         THE COURT:  So Mr. Kurtz or Ms. Columbres, let me

18    begin with you.  Why don't you give me, in a nutshell, if you

19    can about what this case is.  You can remain seated.  Just

20    speak directly into the microphone.

21         MR. KURTZ:  Thank you, your Honor.

22         It is the first time we're here so let me maybe just

23    give a little bit of background on the case and the parties.

24    Anthem is one of the country's largest health benefit

25    providers.  It serves, through its affiliated health plans,

G639ANTC

1    about 38 million lives, a little more than 38 million lives in

2    this country.

3            And as a health benefit provider Anthem contracted

4    with the defendant in this case, Express Scripts, often called

5    ESI, to be the exclusive provider of pharmacy benefit services,

6    which is typically called in the industry a PBM and the way

7    I'll refer to it today.

8            A PBM actually contracts for and sells the drugs to

9    the end-user.  So it's a key player in the goal of providing

10   affordable medicines to citizens.

11           Anthem's contract with ESI is for ten years and it

12   sets out the initial pricing.  Given the volatility of drug

13   pricing, however, and the length of the agreement, there's also

14   a periodic repricing provision which is commonplace in all of

15   these types of contracts.  And specifically it's section 5.6 of

16   the agreement.  And it provides for Anthem to hire a health

17   expert consultant to analyze the marketplace and to determine

18   whether or not Anthem is continuing to receive a competitive

19   benchmark price, and the precise language is, quote, to ensure,

20   really WellPoint but now Anthem, is receiving competitive

21   benchmark pricing.

22           THE COURT:  Define that for me.

23           MR. KURTZ:  That is pricing that is competitive in the

24   marketplace.  That's market pricing.  Competitive benchmark

25   pricing.  Whatever benchmark is in the marketplace.

G639ANTC

1          The procedure is after determining what the market is

2     for competitive benchmark pricing is Anthem then proposes those

3     terms and ESI is obligated in good faith to negotiate to

4     achieve them.

5          And, as expected, drug prices have changed pretty

6     substantially.  And, in fact, at this point Express Scripts is

7     overcharging Anthem and its members an aggregate more than 14

8     billion dollars through the remaining life of the agreement and

9     then through the posttermination transition period to a new

10    PBM.

11         THE COURT:  I'm sorry.  14 million or 14 billion?

12         MR. KURTZ:  Billion.  Over 14 billion.  That's through

13    2019 and then through some period of 2020, as the program would

14    be transitioned to somebody providing competitive benchmark

15    pricing.  ESI has utterly refused to negotiate at all in good

16    faith or otherwise for competitive benchmark pricing.  In fact,

17    it's repudiated its obligation outright.  And ESI hasn't

18    reduced pricing by a dime.

19         THE COURT:  So it's repudiated its obligation by

20    refusing to engage in this --

21         MR. KURTZ:  By saying it's not obligated to provide

22    competitive benchmark pricing and by refusing to provide

23    anything even remotely close to competitive benchmark pricing.

24         THE COURT:  How is that repricing provision

25    mechanically to work?  Did Anthem on its own determine the

G639ANTC

1    expert to come up with these benchmarks or was it an individual

2    or group or entity that the parties jointly identified?

3              MR. KURTZ:  No.  The contract provides for Anthem to

4    either do it itself or hire a market consultant.  Anthem hired

5    an entity called Health Strategies.  They are the leading PBM

6    benefit consultants in the marketplace.  They have access to

7    effectively every PBM agreement in the marketplace.  And they

8    perform, they model and look through databases, and they

9    performed the analysis and determined what competitive

10   benchmark pricing was, which was then later confirmed by other

11   evidence including a market offer by another PBM entity.

12             THE COURT:  Pursuant to the agreement between the

13   parties, ESI was required to accept whatever determination that

14   individual came up.

15             MR. KURTZ:  ESI was required to negotiate in good

16   faith to achieve the objective which was stated as insuring,

17   not talking about, but insuring that Anthem receives

18   competitive benchmark pricing.

19             THE COURT:  Okay.

20             MR. KURTZ:  So it went through that process it.  It

21   went nowhere.  As I mentioned, ESI hasn't reduced pricing by a

22   dime even though I think it regrettably acknowledged, it has to

23   acknowledge how pricing has moved.

24             We've been asking for the better part of a year, maybe

25   a little more than a year, what ESI's pricing is to other

G639ANTC

1   customers that will demonstrate their view of competitive

2   benchmark price.  And they have declined to offer us any

3   information.  But we think that their pitches to customers in

4   their recent contracts is also going to demonstrate that

5   they're overstated by more than $14 billion through the period

6   that I indicated.

7            So we brought the lawsuit.  We bought two basic

8   buckets of claims.  The first relates to the pricing breaches

9   which I've just addressed.  The other relates to a series of

10  operational breaches, reporting and administrative type

11  matters.  That's not relevant for today's purposes but it's

12  important.

13           There are breaches that expose Anthem to enforcement

14  actions by CMS and have resulted in certain members not getting

15  approved for drugs they needed and also resulted in approval

16  for drugs that shouldn't have been approved for use.

17           THE COURT:  These are CMS enforcement actions against

18  ESI?

19           MR. KURTZ:  They would be against -- yes.

20           THE COURT:  What was their obligation under the

21  agreement concerning those enforcements?

22           MR. KURTZ:  It's to comply with law in an expert

23  fashion.  And I don't think there's really a lot of dispute.

24  What happened basically is Express Scripts migrated over to a

25  new system without any adequate testing and there was all kinds

G639ANTC

```
 1    of problems.  They acknowledged throughout the period the
 2    problems they had.  They'll argue they're not material enough
 3    to justify a termination.  That will be a question for the
 4    court.  But they've been asking for calculations on damages.
 5              THE COURT:  Asking who for calculations on damages?
 6              MR. KURTZ:  Anthem for a calculation on damages, which
 7    is a pretty rigorous exercise given that the number of
 8    transaction that are impacted and how they've -- and there's
 9    some contingency left including whether or not there will be
10    enforcement actions and the like.
11              It's a bunch of highly technical reporting and
12    approval and notice type breaches that are pretty well
13    documented and amount to -- at this point I think the count is
14    about $150 million but that's not even close to having
15    completed all the problems.  So that's where we are standing
16    today.
17              THE COURT:  The change that ESI implemented concerned
18    their computer systems?
19              MR. KURTZ:  Yes.  Primarily we think the results were
20    a bad migration to a computer system that hadn't been properly
21    tested.
22              They also have an awful lot of turnover and a lack of
23    expertise in certain areas based on turnover.  Apparently it's
24    not always the most pleasant place to work.  So we've had some
25    issues relating to human resources as well.
```

G639ANTC

1          But we think the problems were primarily derived from

2     a bad migration of a computer system prematurely and without

3     adequate testing.

4          THE COURT:  Let me turn to Mr. Carlinsky.  Just your

5     view of this case.

6          MR. CARLINSKY:  I'll be very brief, your Honor.  Thank

7     you.

8          In 2009 Express Scripts, and then it was called

9     something else, but Anthem, the plaintiff in this case, entered

10    into an negotiation.  At the time Anthem wanted to sell.  It

11    had its own PBM, pharmaceutical benefit manager, in house.  It

12    was a failing PBM.  And at the time it wanted to sell that PBM.

13    There was a negotiation pursuant to which we would acquire

14    Anthem's failing PBM and we would enter into the agreement

15    which is before the court today, the PBM agreement to provide

16    these services for a ten-year period of time.

17         As part of the negotiation Anthem was offered two

18    options.  Behind door number one in essence, your Honor, was a

19    much smaller upfront payment.  So, ESI would buy this failing

20    PBM for a much smaller upfront amount but in return the pricing

21    that Anthem would receive over the duration of the agreement

22    would be lower; or alternatively, as we like to refer to it

23    behind door number two, was:  Anthem you can choose to take a

24    much, much higher upfront payment which exposes us, Express

25    Scripts, to much great risk over the duration because we're

G639ANTC

1    paying -- there's much greater upfront amount, but in return

2    the pricing over the duration of the contract will be higher.

3    And Anthem chose in essence door number two.  It took the deal

4    to accept upfront $4.675 billion as opposed to, I think, door

5    number one was roughly 500 million, just so the court can

6    appreciate the difference.

7         As a result of that deal, which was Anthem's choice,

8    there was an agreement.  It has in a schedule A which has

9    specific pricing terms, and they are higher pricing terms than

10   what would have been had they chosen the other option.

11        What's important here is the language of 5.6 that

12   Mr. Kurtz is referring to, which is really the centerpiece of

13   this dispute, is not what is typically found in these types of

14   agreements.  So it's not what's called a market check standard

15   type of industry provision.  Rather, this was a bespoke

16   provision, bespoke because it recognized what had been the deal

17   at inception, the larger upfront payment.

18        And what's most important, your Honor, because

19   Mr. Kurtz didn't actually read to the court the language of

20   this paragraph.  Fortunately it's -- I think it's four

21   sentences.

22        So the first sentence is:  Anthem or a consultant will

23   conduct a market analysis every three years to ensure that

24   Anthem is receiving competitive benchmark pricing.

25        That's an undefined term.  Your Honor asked the

G639ANTC

1   question.  It's an undefined term.

2          But more importantly, here's what it says about what

3   Express Scripts' obligations, if any, are.  "In the event

4   Anthem determines that such pricing terms are not competitive,

5   Anthem shall have the ability to propose renegotiated pricing

6   terms to Express Scripts."  So "ability to propose."

7          And then what is Express Scripts' obligation?

8          "Express Scripts agrees to negotiate in good faith

9   over the proposed new pricing terms."

10          And then most importantly is the last sentence which

11   makes clear, "Other than a good faith negotiation obligation,"

12   that's the extent of our obligation.  Because it provides,

13   "Notwithstanding the foregoing, to be effective any new pricing

14   terms must be agreed by Express Scripts in writing."

15          That was a bespoke provision, again, to recognize that

16   there was a lot of money paid upfront and as a result the

17   pricing set forth in Exhibit A will be higher for the duration

18   of the contract.  You, Anthem, have a right to seek a

19   negotiation and we have an obligation to negotiate in good

20   faith.

21          But as the law, we think, is clear, beyond the

22   obligation to negotiate in good faith we don't have to agree to

23   their terms.  And in this case not only did Anthem come forward

24   with proposing pricing terms that we think were just not made

25   in good faith.

G639ANTC

1          As Mr. Kurtz has said, they've demanded $14 billion.

2     Now, our client and Anthem have engaged in a year's worth of

3     negotiations.  Anthem's position is you either agree to this

4     amount or, I'm sorry, you're in breach.  And our position is,

5     No, that's not our obligation.

6          Now we have offered concessions throughout this period

7     that amount to three plus billion dollars in savings to Anthem.

8     What's interesting is Anthem's own CEO and CFO multiple times

9     throughout the course of 2015 publicly, in analyst conferences,

10    in shareholder releases, have stated that they believe they are

11    entitled to five hundred to seven hundred million -- this is

12    public statements -- five hundred to seven hundred million

13    dollars a year in concessions which, by the way, would actually

14    be less than the amounts that we have already offered as part

15    of our good faith negotiations.

16         Now we get a complaint that literally came -- was

17    filed in March that asserts $14 billion that it claims it's

18    entitled to in order to achieve competitive benchmark pricing.

19    And, of course, our obligation is we've negotiated in good

20    faith.  We believe we've satisfied our obligation.

21         So that's our view of the case, your Honor.  I can get

22    into the operational breaches.  I think, frankly, they were put

23    in there -- they're essentially the tail wagging the dog here.

24    I think they were asserted as leverage because what Anthem is

25    saying is these operational breaches -- by the way, all of

G639ANTC

1    which, I believe or -- there may be one or two issues that

2    still are being remediated.  But my understanding is all of

3    those issues have long been resolved.  Yet, they brought these

4    operational breach claims because they contend if they can

5    prove a breach, it gives them the right to terminate the

6    agreement even though the agreement is to continue until 2019.

7    So we view it as sort of a leverage type claim.

8            THE COURT:  Let me ask you this.

9            How long has the agreement been in place?

10           MR. CARLINSKY:  Since 2009.

11           THE COURT:  And over the life of the agreement has

12   there been any agreement to move the rate one way or the other?

13           MR. CARLINSKY:  Great question, your Honor.

14           In 2012 because, as the language says every three

15   years there is this ability to do a price review, in 2012 a

16   different management team, and that becomes important here, a

17   different management team at Anthem invoked that process.  The

18   parties went through the process as I've described it, which

19   was it was a good faith negotiation; not hey, here is our bill

20   you need to agree to this.  And the parties reached an

21   agreement.

22           And at the time, by the way, your Honor, various

23   officers of the company, of Anthem -- and I think in 2014, in a

24   reflection back, the general counsel of Anthem recognized that

25   the language of 5.6 doesn't impose an obligation on Express

G639ANTC

Scripts.  It gives Express Scripts discretion whether to accept

new terms.  It has to go through a good faith negotiation.  And

in 2012 that's exactly what the parties did.

        We now have a new management team that feigns that

they have amnesia as to what happened back in 2009 and what

happened in 2012.

        THE COURT:  Thank you.  Let's talk about the proposed

motion.

        Mr. Kurtz.

        MR. KURTZ:  Sure.

        I mean, your Honor, would it help if I took a minute

to correct some of that because it's not right.

        THE COURT:  In a minute.

        MR. KURTZ:  For the proposed motion, your Honor

we're -- there are two counterclaims at issue here:  One for

unjust enrichment and one for implied covenant of good faith

and fair dealing.

        We think the motion will be straightforward and quite

simple.  There are two claims that are covered by the expressed

subject matter of the contract.  All parties agree to that.

        ESI suggests that it's pleading in the alternative,

and you can do that, you can plead an alternative claim where

there's a claim that would fall outside the scope of an

agreement.  But there is no claim like that here.  There is no

alternative claim.

G639ANTC

1          Both parties agree that the subject matter is

2     addressed by the agreement, and they have to because the

3     repricing obligation is a contractual obligation.  It's not an

4     obligation that stands outside of the contract.

5          So, Anthem's position is that the dispute is covered

6     by the contract and that the contract requires ESI to provide

7     competitive benchmark pricing regardless of the fact that ESI

8     paid a purchase price to buy a subsidiary of Anthem back in

9     2009.

10          And ESI's position is that the contract covers the

11     subject matter of the claims and that it does not require that

12     they pay competitive benchmark pricing by reason of the

13     purchase price that they paid in 2009 for the PBM NextRx.

14          So, there is no scenario under which you could recover

15     outside the contract.  The contract governs.  Either you win

16     under the contract or you lose under the contract.

17          So, for instance, take the implied covenant claim.

18     The allegation by ESI is that Anthem breached section 5.6 by

19     not negotiating in good faith and primarily by failing to take

20     into account the purchase price paid for NextRx.  And then the

21     implied covenant claim is that Anthem breached the implied

22     covenant of good faith and fair dealing by, again, purportedly

23     not negotiating in good faith under section 5.6.  They are the

24     identical claims.  They seek the identical damages.  There's a

25     long line of uniform cases that says you can't do that.

G639ANTC

1    There's a recent case by the Commercial Part in New York

2    Supreme.  It's *DOLP 1133 Properties v. Amazon*.  It was decided

3    in August of 2015.  It looked at exactly the same circumstances

4    in that we have an expressed provision, it actually uses the

5    language "good faith."  So we have a textual identity here as

6    well.  And said you can't pursue an implied covenant case based

7    on a lack of good faith because that's a contract obligation.

8    It's the same exact claims.

9          The unjust enrichment even goes further because the

10   unjust enrichment claim is actually premised on a governing

11   contract.  The unjust enrichment claim is that if ESI loses on

12   its interpretation of the agreement, meaning that ESI is

13   required to provide competitive benchmark pricing regardless of

14   the purchase price for RX, then Anthem will be unjustly

15   enriched.  Once you have a governing contract, you can't

16   contradict it through an unjust enrichment claim as a matter of

17   law.

18         I think your Honor's recent decision in *Worldwide*

19   *Services Limited v. Bombardier Aerospace Corporation* is

20   instructive.  There your Honor granted a motion to dismiss

21   because the contract claim depended on, and therefore was

22   duplicative, of a breach of contract claim.  And here, too,

23   obviously the unjust enrichment claim depends on the contract.

24         In short, if ESI is correct about the contract, then

25   it prevails under the contract.  If ESI is incorrect about the

G639ANTC

1  contract, then it loses under the contract.

2           But under no scenario can it go outside the contract

3  and bring some sort of quasi contract claim.  Either the

4  contract gives us competitive benchmark pricing, and it does,

5  in which case you can't have a quasi contract claim undermining

6  that, contradicting it; or the contract, as they read it,

7  allows you to not provide competitive benchmark pricing, in

8  which case they went out of the contract.

9           THE COURT:  Thank you.

10          Mr. Carlinsky.

11          MR. CARLINSKY:  Thank you, your Honor.

12          First, just on a practical level.  We as the

13 defendant -- as a defendant we could have been defending --

14 what a typical defendant does, file a motion to dismiss, delay

15 the case from moving forward.  We answered the complaint so

16 that we can get this case moving forward.  And we filed

17 counterclaims.  Mr. Kurtz now seeks to move to dismiss or

18 permission to file a motion with respect to two of the

19 counterclaims.

20          Now, on the most practical level, your Honor, your

21 Honor's decision disposes of this motion.  Your Honor in the

22 *Growblox* case from last year held very specifically in this

23 exact context.  Quote, "At the pleading stage a party is not

24 required to guess whether it will be successful on its

25 contract, tort or quasi contract claims."  Your Honor cited to

G639ANTC

1    Rule 8 of the federal rules which, frankly, governs the issue.

2    And your Honor went on to hold that:  A party at the pleading

3    stage could plead both a breach of express contract claim as

4    well as unjust enrichment and quantum meruit claims in the

5    alternative, recognizing that Rule 8 allows alternative

6    pleading.  And Rule 8 even goes so far to say even if haven't

7    specifically denominated a claim as one in the alternative it

8    is to be read as such.  Now in this case we clearly denominated

9    our unjust enrichment claim as one in the alternative.  And

10   under Rule 8 I think the implied covenant claim can be read

11   both as pled in the alternative, but it also has been pled as a

12   separate standalone claim.

13        So, from your Honor's prior holdings and under Rule 8

14   we think it disposes of the issue, and at the pleading stage

15   these claims should be permitted to go forward.

16        THE COURT:  Let me ask Mr. Kurtz.  At an even more

17   practical level, would discovery at all be affected by getting

18   rid of these two claims?

19        MR. KURTZ:  It would, your Honor.  And let me -- let

20   me answer that first, which is that the idea of litigating the

21   entirety of a 2009 4.675 billion dollar M&A transaction extends

22   and expands discovery far beyond what would be appropriate in

23   this case.  So there could be a pretty substantial change in

24   how discovery proceeds in the event that those allegations are

25   eliminated at the outset.  And I think we'd in the first

G639ANTC

1    instance object and then try to negotiate some proper limited

2    scope of discovery to the extent there's anything relating to

3    the 2009 transaction that has anything to do with the fully

4    integrated document that we're suing on here today.

5         As a related point, ESI accuses us in the papers of a

6    strategic ploy here today of trying to delay discovery.  That's

7    a little bit ironic.  One, what ESI doesn't mention is that two

8    days before submitting their preconference opposition letter to

9    your Honor they served requests for production for 246

10   different categories of documents.  They've had no problem

11   whatsoever preparing their discovery requests.  They have

12   alleged and requested documents relating to all the subjects

13   relating to the merger in 2009 and elsewhere.

14        And in terms of how fast they want to move, that's a

15   little ironic because they were actually looking to extend

16   discovery and delay it.  And the only reason we have the

17   schedule we have is based on our insistence.

18        So the way ESI wanted to proceed was that documents

19   would begin to be produced no later than September of 2016 and

20   they wanted to prevent even an exchange of a request for

21   production of documents.  We told them we'd give them about a

22   week to catch up to us but we were getting our document

23   requests out and we exchanged mutually a couple days -- on the

24   25th, a couple days before they submitted their letter.

25        ESI suggested a schedule where discovery where

G639ANTC

1    continue until June 29, 2018.  We thought that was way too long

2    and although we tried to get a more aggressive schedule, we

3    ultimately made some accommodations and some compromises to get

4    us to where we are now which I think is September 2017, about

5    nine months earlier.

6            THE COURT:  I guess neither party proposes that

7    discovery stop.

8            MR. KURTZ:  Not even close.  We've insisted that it go

9    forward.  And we've prompted them to give us the document

10   requests.  And as I said it was served 246, two days before

11   writing your Honor saying they were not in a position to

12   propound discovery without having an answer.  So that's just

13   not right.

14           And then the next issue I'd raise, your Honor, on

15   this.  I think all of this works better on a full record.  But

16   this is a 4.675, rounded up to 4.7 billion dollar counterclaim

17   against a public company.  It's totally legally deficient.  We

18   don't think a public company -- and this gets media attention,

19   this case, it will get media attention -- should have to defend

20   against a legally deficient claim until you get to summary

21   judgment when ESI will doubtlessly say let it go to trial at

22   the next premotion conference.  It's disruptive of the way the

23   parties have to deal with each other going forward.  We won't

24   credit in any way, shape or form that there is any way to go

25   forward on this.  It doesn't even make sense.

G639ANTC

1          I mean their claim, by the way, is if they have to

2    provide competitive benchmark pricing in accordance with the

3    terms of the contract then they've been damaged doesn't make

4    any sense.  And their notion that they're damaged because the

5    negotiation didn't result in their giving us price

6    concessions -- they're right now $14 billion ahead of the

7    game -- doesn't make sense either.  But what it does do is it

8    makes it more difficult to get a consensual resolution as they

9    are holding over us a pretty -- in any other case, a pretty

10   sizeable counterclaim, $4.7 billion.

11         So we think it's a pretty straightforward motion.

12   Especially on a full record.  We don't see any conceivable way

13   you could go forward -- your Honor, *Growblox* your Honor went

14   out of his way to point out the differences in legal theories

15   and claims that supported the unjust enrichment in that case.

16   And they weren't duplicative, in any way, of contract.

17         In this case there is just -- there is no way to

18   proceed on a quasi -- the only reason that we have a pricing

19   case is under the contract.  Either we're right and they owe

20   competitive benchmark pricing and there is no way they can

21   undermine that through an implied claim or an unjust enrichment

22   claim, or they're right -- and they're not -- that they don't

23   have to provide a competitive benchmark in which case they too

24   are relying on the terms of the contract.

25         I don't see this as a difficult issue but it has a

G639ANTC

1    pretty significant impact on how the parties deal with each

2    other going forward.

3            THE COURT:  Mr. Carlinsky, I will give you a minute to

4    respond.

5            MR. CARLINSKY:  Thank you, your Honor.  Let me answer

6    your Honor's question because I'm not sure it was answered.

7            Will discovery be any different with or without these

8    claims?  The answer I think is clearly no.  It will be the same

9    scope of discovery.

10           I understand why Mr. Kurtz would prefer to keep the

11   4.675 out of the case, because it's not helpful.  But it is the

12   most central fact of the case.  And discovery will not change

13   regardless.

14           Our suggestion is the most efficient way to handle

15   this is -- I heard him mention on a full record.  If this claim

16   is defective, let's deal with it at summary judgment.  Don't

17   deprive a party of the ability to plead as the rules and as

18   your Honor has held in the alternative, first of all.

19           By the way, I have their document requests and their

20   document requests, meaning Anthem's, to be clear asks for

21   documents regarding the purchase of the Anthem PBM for 4.675.

22           So the scope of discovery is going to be the same.

23   There is nothing to be gained or saved by dealing with these

24   two out of six or seven counterclaims at a motion to dismiss

25   stage and we submit it would be wrong.

G639ANTC

1            But I also understand that they have essentially a

2      God-given right to file a motion to dismiss.  If they're going

3      to file the motion, discovery obviously will go forward.  We

4      would ask that at a minimum they be required to answer the

5      counterclaims irrespective of the fact that they may be

6      permitted by the court or by the federal rules to move with

7      respect to those two counterclaims.

8            And if there's anything else I'm happy to answer the

9      court.

10           THE COURT:  No.  I think I have my arms around the

11     basic issues although I understand there's a lot of complexity

12     to these agreements.  And you're right, Mr. Carlinsky, they

13     have virtually a God-given right to make the motion.  So I'm

14     going to let them make the motion.

15           Mr. Kurtz, how much time do you want?

16           MR. KURTZ:  We'd like to file -- I don't have a

17     calendar in front of me.  June 24 is a weekday?

18           THE DEPUTY CLERK:  It's a Friday.

19           MR. KURTZ:  We would file on the 24th.

20           THE COURT:  Mr. Carlinsky, to respond.

21           MR. CARLINSKY:  30 days please, your Honor.

22           THE COURT:  30 days.  And two weeks to reply.

23           MR. KURTZ:  Thank you, your Honor.  And we'll get

24     those dates in a second.

25           THE DEPUTY CLERK:  The motion is due June 24, 2016.

G639ANTC

1    The response is due July 25, 2016.  And the reply is due

2    August 5, 2016.

3              MR. CARLINSKY:  Thank you.

4              THE COURT:  Okay.  Is there anything else?

5              MR. CARLINSKY:  Your Honor, may I raise one issue?

6              THE COURT:  Sure.

7              MR. CARLINSKY:  My partner just reminded me.

8              In the event that Mr. Kurtz is going to move to

9    dismiss, which obviously is clear now, could we have an

10   opportunity to let Mr. Kurtz know within, and the court, within

11   five days whether we seek to amend any of our counterclaims.

12   Because, obviously, if we're going to amend, then I would

13   rather have Mr. Kurtz, and I'm sure the court would prefer that

14   the motion be directed at an amended counterclaim.  We've

15   thought about it in light of the premotion letters.

16             Could I ask that the schedule be adjusted by a week or

17   that we be given five days to file an amended counterclaim?

18             THE COURT:  That makes sense to me, Mr. Kurtz.

19             MR. KURTZ:  Yes.  I have no objection at all as long

20   as we have an opportunity to review it.

21             THE COURT:  Absolutely.

22             MR. KURTZ:  Because now we're sort of working on the

23   existing counterclaim.  So maybe we would take 30 at that

24   point -- if they're not going to change, I think the three

25   weeks you provided for would be adequate; if they are going to

G639ANTC

1   redo their counterclaims, maybe we'd ask for 30 days.

2          THE COURT:  So why don't you -- why don't we do this.

3   Why don't Mr. Carlinsky and Mr. Kurtz you two talk.  Let me

4   know what you decide and submit a proposed motion schedule.

5   Okay.

6          MR. KURTZ:  Thank you.

7          THE COURT:  So why don't you do that by next Friday.

8          MR. CARLINSKY:  Yes, your Honor.

9          THE COURT:  Yes.

10          MR. CARLINSKY:  Then on the last question with regard

11   to the answer.  I don't know what Mr. Kurtz -- I haven't had a

12   chance to ask Mr. Kurtz what his intention was in that regard

13   so perhaps I should confer with him first.

14          THE COURT:  Okay.  Very well.

15          Let me know that as well by next week.

16          MR. CARLINSKY:  Thank you.

17          THE COURT:  Okay.  Unless there's anything else we're

18   adjourned.

19          (Adjourned)

20

21

22

23

24

25