UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANTHEM, INC.,

                              Plaintiff,

                – against –

EXPRESS SCRIPTS, INC.,

                              Defendant.

**OPINION & ORDER**

16 Civ. 2048 (ER)

RAMOS, D.J.:

## I.    Background

Anthem, Inc. brought this action against Express Scripts, Inc. in March of 2016 for breach of contract and declaratory judgment related to a deal whereby Express Scripts acquired NextRx and contractually agreed to serve as the pharmacy benefit manager ("PBM") for Anthem.  Doc. 3.  Express Scripts brought counterclaims for breach of contract, breach of implied covenant of good faith and fair dealing, declaratory judgment, and unjust enrichment. Doc. 33.  Express Scripts now moves for summary judgment to (1) dismiss Counts I and II of the complaint; (2) grant declaratory judgment as to Express Scripts' third cause of action on its counterclaim; and (3) dismiss parts of Count III of the complaint.  For the reasons set forth below, Express Scripts' partial motion for summary judgment is GRANTED in part and DENIED in part.

## II.   Statement of Facts

Anthem is a health care plan provider.  Doc. 355 at 11.  Express Scripts provides the PBM services by serving as an intermediary between health plans and pharmacies.  *Id.* at 12. Once a plan member fills a prescription at a pharmacy and pays a copay, the PBM reimburses the

pharmacy for the remaining cost of the prescription.  *Id.*  The health plan, or Anthem in this case,

then reimburses the PBM at a contractually agreed amount, which may exceed the PBM's

payment to a pharmacy, generating profit for the PBM.  *Id.*

     In 2008, Anthem retained Bank of America to advise it on how to address NextRx,

Anthem's then-PBM ███████████████████████████████████████████

██████████████  Doc. 357 ¶¶ 10–11.  One of the options Bank of America presented to

Anthem was to enter into a long-term contract with a new PBM who would also buy NextRx.  *Id.*

¶ 14.  Anthem saw it as a positive that this plan would allow it to receive a large upfront payment

"to reinvest or buyback stock."  *Id.* ¶ 15.  Anthem thus began to solicit bids from PBMs in

December 2008 and specifically requested that bids include (1) an upfront payment, and (2)

prescription drug prices under a long-term contract.  *Id.* ¶¶ 21–22.  In January 2009, four PBMs,

including Express Scripts, ██████████████████████, submitted bids that included both an

upfront payment amount for NextRx as well as the prices Anthem would pay the PBM for

prescription drugs under a "long-term commercial contract."  Doc. 355 at 13; Doc. 358-20 at 2.

Express Scripts' bid included two options:  one offer of a higher upfront payment of $4 billion

and lower discounts on prescription-drug prices, and one offer of a lower upfront payment of

$500 million and higher discounts on prescription-drug prices.  Doc. 357 ¶ 25.  Bank of America

noted during the bid evaluation process that "[a]ll bidders have highlighted the interplay between

the terms of the commercial contract (especially duration and pricing) and the upfront purchase

price."  *Id.* ¶ 34.

     In April of 2009, after further negotiations, Anthem selected Express Scripts as the

winning bid.  *Id.* ¶ 59.  The parties entered into a deal compromised of two contracts whereby

Express Scripts purchased NextRx and became Anthem's exclusive PBM for 10 years (2009–

2019).  Doc. 355 at 12; Doc. 381-225.  As the winning bid, Express Scripts ultimately paid

Anthem $4.675 billion upfront and agreed to pricing terms for prescriptions over ten years.  Doc.

365-6 at 29; Doc. 359-3 at 62.  In light of the large $4.675 billion upfront payment, Anthem

agreed to prescription pricing terms that were ███████████████████████████████████,

but "█████████████████████████."  Doc. 365-14 at 2.  Anthem did so ██████████

███████████████████████████████████"  *Id.*  The parties eventually signed the two

contracts on the same day, December 1, 2009.  Doc. 357 ¶¶ 60–61.  Thus, the purchase of

NextRx and the discounts on prescription prices were jointly discussed during the bid

solicitation, negotiation, and contract execution processes.  Accordingly, it appears clear that the

two contracts were conceived as being interconnected.

### A.  **Pricing Review**

The PBM contract included a provision, Section 5.6, titled "Periodic Pricing Review."

Section 5.6 reads:

> [Anthem] . . . will conduct a market analysis every three (3) years during the Term of this
> Agreement to ensure that [Anthem] is receiving competitive benchmark pricing.[1]  In the
> event [Anthem] . . . determines that such pricing terms are not competitive, [Anthem]
> shall have the ability to propose renegotiated pricing terms to [Express Scripts] and
> [Anthem] and [Express Scripts] agree[ ] to negotiate in good faith over the proposed new
> pricing terms.  Notwithstanding the foregoing, to be effective any new pricing terms must
> be agreed to by [Express Scripts] in writing.

---

[1] While the parties dispute the definition of "competitive benchmark pricing," for the purposes of this motion,
Express Scripts has adopted Anthem's definition as articulated in its sworn interrogatory responses:



Doc. 359-5 at 6.

3

Doc. 381-4 at 40.  Negotiations for the first pricing review took place in 2013 for terms that were

effective December 2012.  Doc. 385 at 67.  Negotiations for the second pricing review, the

precipitating cause of this lawsuit, took place up until March 21, 2016, when Anthem ended

negotiations by filing this lawsuit four days after Express Scripts sent its fifth pricing proposal.

*Id.* at 176.

### B. <u>Operational Claims</u>

Anthem also provides services through Medicare, called Medicare Part D services.

Sections 3.2(a)(ii), 3.21, and Exhibit I Section 4.0 of the Agreement require Express Scripts to

perform the Medicare Part D functions in accordance with the Centers for Medicare & Medicaid

Services (CMS) regulations.  Section 3.2(a)(i) states:  "During the Term of this Agreement,

[Express Scripts] shall . . . obtain and maintain all federal, state, and local licenses, permits,

certificates, and other regulatory approvals that are necessary for [Express Scripts] to perform its

obligations under this Agreement."  Doc. 359-1 at 24 § 3.2(a)(i).  Section 3.21 states:

> "[Express Scripts] agrees to . . . provide [Anthem] any information and services provided
> for under this Agreement necessary to support [Anthem]'s continued participation and
> future applications to participate as a sponsor of drug benefits for Medicare and
> Medicaid. . . . All services performed by PBM for [Anthem] under this Section 3.21 shall
> be in accordance with those requirements adopted by the Centers for Medicare &
> Medicaid Services ("CMS") and any other Law."

*Id.* at 47 § 3.21.  Exhibit I Section 4.0 states:  "[Express Scripts] agrees to provide the delegated

activities and reporting responsibilities listed below . . . in accordance with . . . the Part D and

Medicare Advantage regulations . . . ."  Doc. 381-2 at 206 § 4.0.  Lastly, Section 4.1 requires,

among other things, that Express Scripts "perform the Claims administration services . . . in

accordance with the requirements and time frames required by CMS and the Part D regulations."

Doc. 381-2 at 206 § 4.1.

### 1.   **Prescription Drug Event (PDE) Data**

Sponsors of Medicare Part D prescription drug plans such as Anthem are required to submit "prescription drug event" data ("PDE data") to the CMS.  Doc. 3 ¶ 60.  PDE data contains information regarding each claim for a prescription drug paid by the sponsor under a given plan.  *Id.*  Failure to submit PDE data can result in financial losses to the sponsor as part of CMS's financial reconciliation with sponsors as well as CMS compliance actions.  *Id.*

Section 4.11 states that Express Scripts is "responsible for collecting, creating and submitting [PDE] files to CMS containing claims data as required by CMS in the format and time frame specified by CMS" and spelling out additional PDE responsibilities.  Doc. 381-2 at 212–215 § 4.11.

### 2.   **Prior Authorization Turnaround Times ("TATs")**

CMS requires coverage determinations for Medicare Part D to be processed within certain timeframes.  Doc. 3 ¶ 71.  If an entity fails to process determinations within the specified timeframes, it must forward the applicable case to a CMS-designated Independent Review Entity for a determination.  *Id.*  Noncompliance places the entity at risk of enforcement actions by CMS and can delay plan members from receiving medications on a timely basis.  *Id.* ¶ 73.

### 3.   **WRIT Log**

As part of the agreement, the parties established a joint database called WellPoint[2] Rx Issues Tracking System ("WRIT Log") to track issues that arose during Express Scripts' performance of PBM services, including its performance of Medicare Part D Services.  *Id.* ¶ 80. Anthem would submit issues to Express Scripts, and Express Scripts was required to research and resolve those issues in a timely manner.  *Id.* ¶ 80–81.

---

[2] Anthem was previously known as WellPoint.

### C.  **Prior Authorization Performance Guarantees**

Health plans sometimes require members or their doctors to submit requests for prior authorization for certain drug costs to be covered by the plan.  Doc. 355 at 28.  As part of the contract, Express Scripts agreed to process Anthem's prior authorization requests.  *Id.*  The contract specified "performance guarantees" that Express Scripts was required to meet in delivering this service.  These performance guarantees set required percentages for issuing correct determinations and contain corresponding monetary penalties if the percentage is not reached.  Doc. 359-1 at 136, 184.  There are separate performance guarantees for different categories of prior authorizations, including for ███████████████████████ ███████████████████████, with each requiring 98% accuracy in making determinations on prior authorization requests.  *Id.*  The contract reads in relevant part as follows:  "PBM agrees that the performance standards and guarantees are a contractual obligation of PBM and PBM shall meet or exceed the performance standards and guarantees as set forth in Exhibit D and, if it fails to do so, shall pay to [Anthem] the penalty amount . . . ."  *Id.* at 84 § 8.1.



*Id.* at 136.[3]

---

[3] The chart has not been copied in its entirety.  Only the relevant portions are included here.

7



*Id.* at 184.[4]

The contract also required Express Scripts to "provide the administrative services . . . in a prudent and expert manner in accordance with this Agreement and all Laws." Doc. 381-2 at 24 § 3.1(a). Further, the contract makes clear that the monetary penalties for non-compliance with the performance guarantees are "in addition to any other remedies available to [Anthem] and shall in no way limit [Anthem's] ability to seek damages, remedies, or payments to make [Anthem] whole for losses for failure by PBM to fulfill its obligations under this Agreement." *Id.* at 84 § 8.2.

As relevant to this motion, several other provisions also generally reference performance guarantees and responsibilities regarding incorrect determinations. Sections 3.7(f)–(g), in a section titled Claims Processing Services, state:

> (f) [Express Scripts] will perform electronic, telephone, and on-site audits of Network Pharmacies to determine compliance with their pharmacy agreements. [Express Scripts] will attempt recovery of identified overpayments to Network Pharmacies through offset, demand or other reasonable means; provided that [Express Scripts] will not be required to institute litigation. Recovered overpayments shall be credited to [Anthem].

---

[4] The chart has not been copied in its entirety. Only the relevant portions are included here.

> (g) . . .  If [Express Scripts] determines that, through its error, it has overpaid any Network Pharmacy or paid benefits not covered under the terms of a Coverage Document, [Express Scripts] shall, at its own expense, recover the overpayment or incorrect payment and credit [Anthem] accordingly. . . .  One hundred percent (100%) of recovered overpayments for [Anthem]'s Commercial, Medicaid, and Medicare Advantage/Medicare Part D business shall be credited to [Anthem] and fees in the amount of 20% of such recoveries will be billed for [Anthem]'s Commercial and Medicaid business; however, [Anthem] shall not be billed for any fees for its Medicare Advantage and Medicare Part D business.

*Id.* at 38–39 § 3.7(f)–(g).  "Claim" is defined in the agreement as "an electronic or paper request for reimbursement as a result of a Pharmacy dispensing a Covered Prescription to a Covered Individual."  Doc. 359-1 at 4 § 1.14.  Section 3.11 requires Express Scripts to conduct prior authorizations "in accordance with this Agreement[] . . . [and] in accordance with [Anthem]'s Defined Criteria . . . within the turnaround timeframes set forth in Schedule G-2."  *Id.* at 41 § 3.11.  Defined Criteria is elsewhere defined as "the entire set of formulary criteria (which includes non formulary exception criteria, quantity limit criteria, dose and formulation optimization criteria, prior authorization criteria . . . ) and all benefit components and attributes as specified and communicated by [Anthem] to [Express Scripts] in the benefit build process and the clinical edit implementation process."  Doc. 381-2 at 17 § 1.95.  Exhibit B requires Express Scripts to provide, among other things, an audit report of performance guarantees.  *Id.* at 116–17.

In its motion for partial summary judgment, Express Scripts argues that (1) Counts I and II of the complaint should be dismissed under the plain language of the PBM agreement and New York law; (2) Count III of the complaint should be partially dismissed due to abandonment of several claims and the plain language of the PBM agreement; and (3) Express Scripts is entitled to summary judgment on its third counterclaim which seeks a declaration that Section 5.6 only requires it to negotiate in good faith over any proposed new pricing terms.  Doc. 353; Doc. 355 at 7.

### III.    Legal Standard for Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id.* (citation omitted).  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture, or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).

IV.     **Breach of Contract and Declaratory Judgment for Competitive Benchmark Pricing**

In Counts I and II of the complaint, Anthem alleges that Express Scripts breached Section 5.6 of the agreement

> by expressly repudiating its obligations under Section 5.6 of the Agreement, by delaying for months, by refusing to meet with Anthem to negotiate over Anthem's proposed pricing terms or for competitive benchmark pricing, by refusing to negotiate in good faith or at all over Anthem's proposed pricing terms or for competitive benchmark pricing, by failing to make any proposal for competitive benchmark pricing, by failing to agree in writing to new pricing terms, and by failing to provide competitive benchmark pricing . . . .

Doc. 3 ¶ 94.  Count I seeks a total of $14.8 billion in damages from the breach, *id.* ¶ 97, and Count II seeks a declaration that Express Scripts:

> (i) . . . breached its obligation to negotiate in good faith and to agree to new pricing terms in writing under Section 5.6 of the Agreement, (ii) . . . is required to provide competitive benchmark pricing to Anthem . . ., and (iii) Anthem is entitled to damages measured as the difference between [Express Scripts'] pricing and competitive benchmark pricing, plus all other damages caused by [Express Scripts'] breaches . . . .

*Id.* ¶ 100.  Express Scripts moves for summary judgment to dismiss Counts I and II of the complaint in its entirety as well as summary judgment on its third counterclaim, seeking a declaration that Section 5.6 only requires it to negotiate in good faith.  Doc. 353.

A.  **Legal Standard**

"Under New York law, the initial interpretation of a contract is a matter of law for the court to decide.  Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous."  *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998) (internal quotation marks and citations omitted).  "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent, and that the best evidence of what parties to a written agreement intend is what they say in their writing."  *Kasowitz, Benson, Torres & Friedman, LLP*

11

*v. Reade*, 950 N.Y.S.2d 8, 11 (N.Y. App. Div. 2012) (cleaned up) (internal quotation marks and citation omitted), *aff'd*, 987 N.E.2d 631 (N.Y. 2013).  Words and phrases are to be given their plain and ordinary meaning, and New York courts will commonly refer to dictionary definitions to determine that meaning.  *Mazzola v. Cnty. of Suffolk*, 533 N.Y.S.2d 297, 297 (N.Y. App. Div. 1988); *see also 10 Ellicott Square Ct. Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 120 (2d Cir. 2011).

Consistent with the focus on a contract's language, "[a]mbiguity is determined by looking within the four corners of the document, not to outside sources[.]" *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) (quoting *Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998)).  Further, "[l]anguage whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation, unless each is a reasonable interpretation."  *L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (internal quotations marks and citation omitted).  As such, a court should not find ambiguity where "the interpretation urged by one party would 'strain the contract language beyond its reasonable and ordinary meaning.'"  *Id.* (alteration omitted) (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 141 N.E.2d 590, 593 (N.Y. 1957)).  If a contract is ambiguous, and determination of the intent of the parties then "depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence, then such a determination is to be made by the jury," and the Court cannot grant summary judgment.  *First Mercury Ins. Co. v. 613 N.Y. Inc.*, 609 F. App'x 664, 666 (2d Cir. 2015) (summary order) (quoting *Hartford Accident & Indem. Co. v. Wesolowski*, 305 N.E.2d 907, 909 (N.Y. 1973)).

### B.  <u>Section 5.6</u>

The plain language of Section 5.6 is not ambiguous.  It reads:

> [Anthem] . . . will conduct a market analysis every three (3) years during the Term of this Agreement to ensure that [Anthem] is receiving competitive benchmark pricing.  In the event [Anthem] . . . determines that such pricing terms are not competitive, [Anthem] shall have the ability to propose renegotiated pricing terms to [Express Scripts] and [Anthem] and [Express Scripts] agree[ ] to negotiate in good faith over the proposed new pricing terms.  Notwithstanding the foregoing, to be effective any new pricing terms must be agreed to by [Express Scripts] in writing.

Doc. 381-4 at 40.  The first sentence sets forth the frequency and purpose of Anthem's market analyses.  The second sentence obligates Express Scripts to negotiate in good faith over Anthem's proposed new pricing terms in the event that the market analysis shows that pricing is not competitive.  Lastly, the third sentence requires that new pricing terms be agreed to in writing by Express Scripts to take effect.  By its terms, Express Scripts' only obligation under this section is to negotiate in good faith over any new pricing terms Anthem may propose after it conducts a market analysis.

Anthem's arguments to the contrary are unavailing.  Anthem argues that the above interpretation would render the provision meaningless, as it would allow Anthem to check whether it was receiving benchmark pricing but would not "require ESI to try to reach an actual agreement."  Doc. 387 at 22.  The Court disagrees.  The provision has a clear purpose – to require Express Scripts to negotiate in good faith.  Such a requirement has value and meaning, as it "bars a party from 'renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.'"  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011) (quoting *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987)).

Anthem also argues that the purpose of Section 5.6 is to *guarantee* competitive benchmark pricing, as the word "ensure" is defined by Merriam-Webster as "to make sure, certain, or safe:  GUARANTEE."  Doc. 387 at 24.  While this definition is correct, it is not the

only definition of ensure, and it does not change the fact that the sentence in which the word is used applies only to Anthem.  If the contract read "Express Scripts shall ensure competitive benchmark pricing," Anthem's arguments might have substantial force, but a plain four-corners reading does not support its interpretation.  Further, as Express Scripts points out by reference to the Oxford Dictionary and Thesaurus, 2d ed. 2007, the word ensure can mean "check" instead of "guarantee."  *See* Doc. 369-18 at 4.

Because the plain language does not require Express Scripts to guarantee competitive benchmark pricing but only to negotiate in good faith, the last sentence of Section 5.6 is not pertinent to this motion.  Anthem admits as much because it is not alleging failure to document a verbal agreement, but rather raises claims based on the lack of agreement due to Express Scripts' failure to negotiate in good faith.  Doc. 387 at 27.  As Section 5.6 is not ambiguous, the Court need not consider extrinsic evidence.

However, even if the extrinsic evidence were to be considered, the Court would reach the same conclusion.  The circumstances of the bid solicitation process, statements from Anthem's executives,[5] rejected draft language for this section,[6] and the parties' course of conduct regarding

---

[5] For example, Jeffery Turner, Anthem's then-Vice President for Sales and Marketing, wrote in 2009 that ███████████ ███████████████████████████████████████████████████████ ████████████████████████ "  Doc. 365-8 at 2.  Similarly, in March 2012, Anthem's then-President of Commercial Business wrote in March 2012 that ███████████████████████████████████ ███████████████████████████████████████████████████████████ █████████████████ Doc. 365-14 at 2.

[6] For example, an earlier version of the section stated that "[Anthem] shall have the ability to ████████ ██████████ "  Doc. 362-12 at 3 § 5.7.  Express Scripts objected to this language because "[m]arket checks every 3 years makes any pricing agreed to up-front short term and puts any return on up-front consideration at risk."  Doc. 362-16 at 2.  During a phone call with one of Anthem's lead negotiators, Express Scripts further " ████████████ " to the draft, stating that it " ██████████████████████████ " to which Anthem responded that this was a " ████████ "  Doc. 362-19 at 4.

14

the first market check in 2012,[7] all demonstrate that the provision at issue was not a requirement to provide competitive benchmark pricing.

Part (ii) of Count II of the complaint requests a declaration that Express Scripts "is required to provide competitive benchmark pricing to Anthem."   Doc. 3 ¶ 100.  Express Scripts' motion to dismiss this portion of Count II is thus granted.  Count II also seeks a declaration that Express Scripts "breached its obligation to negotiate in good faith and to agree to new pricing terms in writing under Section 5.6 of the Agreement" and "is entitled to damages measured as the difference between [Express Scripts'] pricing and competitive benchmark pricing, plus all other damages caused by [Express Scripts'] breaches."  *Id.*  The issue of whether Express Scripts did in fact breach its obligation to negotiate in good faith has not been explicitly addressed in Express Scripts' motion, but, even if Express Scripts did not negotiate in good faith, as discussed below, Anthem would be entitled only to "out-of-pocket costs incurred in the course of good faith partial performance."  *L-7 Designs*, 647 F.3d at 431.  Because Anthem has only sought expectancy damages and not out-of-pocket costs, it cannot sustain a claim for breach of contract for good faith negotiations.  *See Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996) (stating that damages are an element of a breach of contract claim).  Count II is thus dismissed in its entirety.

### C.  **Count I Damages**

Count I seeks $14.8 billion in damages for the alleged breaches.  Doc. 3 ¶ 97.  Anthem argues that expectation damages are the appropriate measure of damages for breach of contract,

---

[7] For example, after receiving pricing consultations concluding that the pricing terms were not competitive, Anthem sent a formal notice to Express Scripts in January 2013 in which it indicated that although it was a ███████████ that the rates were less competitive than comparators, Express Scripts could satisfy its contractual obligations by agreeing to continue to provide ███████████ for its commercial business.  Doc. 366-3 at 5.  Exception pricing is a process by which Anthem could request more favorable pricing for a particular client from Express Scripts on a one-off basis.  Doc. 357 ¶ 125.

and the "wrongdoer rule" requires that Express Scripts bear the risk of uncertainty as the

breaching party.  Doc. 387 at 40–42.  This is generally true.

> Where a party breaches a contract, that party is liable to the non-breaching party for
> damages and the amount of damages must put the non-breaching party in as a good a
> position as if the breach had not occurred. . . . Thus, a non-breaching party is entitled, as a
> matter of law, to recover market value damages to the extent that they can be proven with
> reasonable certainty. . . . [Additionally], where the existence of damage is certain, and the
> only uncertainty is as to its amount, the burden of uncertainty as to the amount of damage
> is upon the wrongdoer.

*Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 391 (2d Cir. 2006) (internal quotation marks

and citations omitted).  Reasonable certainty in amount does not require "scientific rigor" and

courts "will endeavor to make a reasonable estimate of damages." *Lexington Prod. Ltd. v. B. D.*

*Commc'ns, Inc.*, 677 F.2d 251, 253 (2d Cir. 1982).

Anthem cites *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89 (2d

Cir. 2007), a case in which the Second Circuit vacated the district court's judgment denying

damages pursuant to a contract.  *Tractebel* is arguably similar to the instant case in the sense that

it dealt with breach of a complex, long-term contract for energy supply, the profitability of which

was affected by numerous variables such as "fluctuating supply and demand, changes in

operating costs, increased competition from alternatives, alterations to the relevant regulatory

regime, population increases or decreases in the targeted market, or technological advances."

*Tractebel*, 487 F.3d at 112.  Despite the fact that damages were incurred over a twenty-year

period, the Second Circuit stated:

> New York courts have significant flexibility in estimating general damages once the fact
> of liability is established. . . . To the extent certain variables must be assumed in order to
> arrive at a reasonable estimate, the district court may do so, unless evidence is presented
> that undermines the basis for the assumption. . . . The risk that the future might reveal the
> district court's assumptions to be false is appropriately borne by . . . the breaching party.

*Id.*

Anthem thus argues that it only needs to provide a reasonable way to estimate its damages from breach for its claim for damages to survive.  Anthem therefore asserts that it is entitled to expectation damages of the difference between competitive benchmark pricing and the price Express Scripts charged Anthem and provides several methods by which to reach an estimate of those damages, including Express Scripts' ████████████, Express Scripts' ████████████████████████████████, and offers made to Anthem from both ████ and ██████ for competitive pricing in 2016, among other evidence.  Doc. 387 at 41, 45; Doc. 381-185; Doc. 381-186.

Express Scripts, however, argues that *Tractebel* and other cases Anthem cites in its memo are inapplicable, because they do not involve breach of a requirement to negotiate in good faith.  Doc. 392 at 21.  It argues that expectancy damages are barred by New York law as unduly speculative where damages are based on a hypothetical contract reached after good-faith negotiations.  Doc. 355 at 40.  In support, it cites *Goodstein Constr. Corp. v. City of New York*, 604 N.E.2d 1356 (N.Y. 1992), a case in which the city of New York breached a contract to negotiate in good faith with a developer.  The Court of Appeals of New York held that expectancy damages were precluded because

> [t]o allow the profits that plaintiff might have made under the prospective [agreement] as the damages for breach of the . . . negotiating agreement[] would be basing damages not on the [agreement] but on the prospective terms of a nonexistent contract which the City was fully at liberty to reject.  It would, in effect, be transforming an agreement to negotiate for a contract into the contract itself.

*Goodstein*, 604 N.E.2d at 1360–61.  The court further noted that

> a party's alleged failure to bargain in good faith is not a but-for cause of plaintiff's lost profits, since even with the best faith on both sides the deal might not have been closed and attributing plaintiff's lost profits to defendant's bad faith may be speculative at best . . . [I]f no agreement was reached and it cannot even be known what agreement would have been reached, there is no way to measure the lost expectation . . . .

*Id.* (internal edits, quotation marks, and citations omitted).

This Court has previously explained that, although the Second Circuit has found that lost profits are not available where no agreement is reached, *see L-7 Designs*, 547 F.3d at 431; *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 74 n.2 (2d Cir. 1989), it is not clear whether "lost profits may *never* be recovered for a party's failure to negotiate in good faith." *Worldwide Servs., Ltd. v. Bombardier Aerospace Corp.*, No. 14 Civ. 7343 (ER), 2015 WL 5671724, at *20 (S.D.N.Y. Sept. 22, 2015) (emphasis in original) (citing *Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc.*, 519 F.3d 421, 429 (8th Cir. 2008) ("We are not as confident as the district court that *Goodstein II* should be read as categorically precluding benefit-of-the-bargain damages for all breaches of binding preliminary agreements to negotiate a final agreement in good faith.  This is a difficult, largely unsettled question of remedies.") (applying New York law)).

Express Scripts argues that these cases and others make clear that lost profits are categorically unavailable.  Doc. 355 at 42 n.4.  In addition to the cases cited above, it cites *Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc.*, 765 F. Supp. 403, 417 (S.D.N.Y. 2011) ("lost profits are generally not available where no agreement is reached"), *Re-Source Am., Inc. v. Corning Inc.*, No. 7 Civ. 6048 (CJS), 2009 WL 2179254, at *9 (W.D.N.Y. July 22, 2009) ("Plaintiff cannot recover 'lost profits' that it might have earned if the parties had actually negotiated a new agreement"), and *Gorodensky v. Mitsubishi Pulp Sales (MC), Inc.*, 92 F. Supp. 2d 249, 255 n.2 (S.D.N.Y.) (lost profits are "unavailable for breach of a duty to negotiate in good faith"), *aff'd*, 242 F.3d 365 (2d Cir. 2000).  A more recent similar case, *ICBC (London) PLC v. Blacksands Pac. Grp., Inc.*, No. 15 Civ. 70 (LAK), 2015 WL 5710947, at *9 n.94 (S.D.N.Y. Sept. 29, 2015), *aff'd*, 662 F. App'x 19 (2d Cir. 2016), plainly stated that "lost profits are not

available as a remedy . . . recovery is limited to out-of-pocket costs incurred in partial performance of good faith negotiations."

Express Scripts argues that the only possible exception to this rule is "if it can be discerned what agreement would have been reached." Doc. 355 at 42 n.4 (quoting *Fairbrook*, 519 F.3d at 429). Thus, Express Scripts argues that the exception would not apply here because it is impossible to discern not only the prices in the agreement but also whether an agreement ultimately would have been reached. *Id.* It points to the fact that the parties disagreed on many complex and fundamental issues and were billions of dollars apart when negotiations ended due to Anthem's initiation of this lawsuit. *Id.* at 43. In particular, the parties could not agree on whether the $4.675 billion Express Scripts paid up front as part of the initial agreement could be considered in negotiating its new pricing terms. Doc. 357 ¶¶ 177–90; Doc. 385 ¶¶ 177–90. According to Express Scripts, the parties also could not agree on the meaning of "competitive benchmark pricing," whether Express Scripts was required to accept unprofitable pricing demands in order to grant Anthem competitive benchmark pricing, the relevance of the first pricing review,[8] and more. Doc. 355 at 43. It believes that the most probable outcome of continued hypothetical good faith negotiations would have been an impasse, but that in any event a hypothetical agreement is too speculative for Anthem to prove. *Id.* at 45.

Anthem responds by arguing that the caselaw Express Scripts cites deals with Type II preliminary agreements and not binding contracts such as the one at hand. Doc. 387 at 47. Type

---

[8] For example, Turner noted in a 2011 email leading up to the first 2013 market check that ███████████████████████████████████████████████████████████████████████████████
███████████████████████████████ Doc. 365-13 at 3. Further, Matt Totterdale, Express Scripts' then-Vice President and General Manager of the Anthem Division, ███████ told Anthem that ███████████████████████████████████████████ Doc. 359-22 at 85. Lastly, Anthem has conceded that the pricing in the first market check was not competitive benchmark pricing. Doc. 357 ¶ 136. Whether Anthem could take a different position in regard to the second market check was a matter of dispute between the parties.

II agreements are preliminary agreements that do not "commit the parties to their ultimate

contractual objective but rather to the obligation to negotiate the open issues in good faith."

*Tractebel*, 487 F.3d at 98 n.4 (citation omitted).  "A party to such a binding preliminary

commitment has no right to demand performance of the transaction."  *Adjustire Sys., Inc. v.*

*GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998).  As the Court explained above, Section

5.6 only requires good faith negotiation – it does not require that the parties reach ultimate

agreement.  While the provision is situated within a fully binding service contract, this provision

in particular does act as a Type II agreement to renegotiate new pricing terms every three years.

Therefore, cases discussing Type II agreements are applicable to this provision and expectancy

damages are unavailable.

Anthem's final argument is that it is entitled to restitution damages for "return of the

overpayments," which it claims it can prove at trial at an amount of up to $10 billion.  Doc. 387

at 50.  Express Scripts argues first that restitution damages are procedurally barred, as Anthem

has not plead a claim for restitution damages nor mentioned restitution throughout discovery,

either in response to interrogatories requesting its bases for damages nor in its expert reports and

other disclosures.  Doc. 392 at 25.  Rule 26(a) of the Federal Rules of Civil Procedure requires

parties to provide "a computation of each category of damages claimed by the disclosing party."

As discovery has closed without discovery on Anthem's restitution theory and Anthem has not

properly claimed restitution damages, it would be prejudicial to Express Scripts for the Court to

allow Anthem to seek a new theory of damages after five years of litigation.  *See Summit*

*Properties Int'l, LLC v. Ladies Pro. Golf Ass'n*, No. 7 Civ. 10407 (LBS), 2010 WL 4983179, at

*3 (S.D.N.Y. Dec. 6, 2010) ("When a party in a contract dispute fails to raise a new theory of

damages until after the close of discovery, the prejudice that results to the adversary can be

sufficient to preclude that theory from presentation at trial"); *see also Point Prods. A.G. v. Sony Music Ent., Inc*., No. 93 Civ. 4001 (NRB), 2002 WL 31856951, at *5 (S.D.N.Y. Dec. 19, 2002) ("[T]he degree of the delay and prejudice [such as the additional discovery that would be needed] . . . is sufficient to preclude [the Plaintiff] from changing its damage theory [] years into this litigation after [the Plaintiff] adopted another theory that it could not support in fact."). Therefore, Anthem's claim for restitution damages is barred.

Ultimately, the Court agrees with Express Scripts.  Although, as a general matter, expectancy damages are available for a breach of contract, the law is clear that where the breach is for failure to negotiate in good faith, expectancy damages are not available unless the ultimate agreement that would have been reached at the end of those negotiations is reasonably discernable.  Negotiations "can come to an end without a breach by either party.  There is such a thing as a good faith impasse; not every good faith negotiation bears fruit." *IDT Corp. v. Tyco Grp., S.A.R.L.*, 15 N.E.3d 329, 332 (N.Y. 2014).  While a factfinder could parse Anthem's various suggested methods for calculating damages and arrive at a number, the facts do not suggest that an agreement ultimately would have been reached.  Therefore, as a matter of law, Anthem cannot recover the $14.8 billion in expectancy damages, and the motion to dismiss Count I is granted.

## V.   Declaratory Judgment Against Anthem

Express Scripts' third counterclaim against Anthem seeks a declaration that:

(i) [Express Scripts] has no obligation to agree to any new pricing terms proposed by Anthem under Section 5.6 of the PBM Agreement; (ii) [Express Scripts] has no obligation under Section 5.6 of the PBM Agreement to ensure that Anthem is receiving competitive benchmark pricing; and (iii) [Express Scripts'] sole obligation under Section 5.6 is to negotiate in good faith over any proposed new pricing terms submitted by Anthem pursuant to that provision.

Doc. 33 ¶ 229.  Express Scripts moves for summary judgment on its third counterclaim.  Doc. 353.

As explained above, Section 5.6 does not obligate Express Scripts to provide competitive benchmark pricing, but merely to negotiate in good faith in the event that Anthem's market analysis shows non-competitive pricing.  Because Express Scripts' third counterclaim is the opposite side of the same coin, its motion for summary judgment on the third counterclaim is granted.

## VI.   <u>Count III of the Complaint</u>

In Count III of the complaint, Anthem alleges breach of contract for operational breaches of several terms of the agreement, including failure to:

> (i) apply correct criteria in processing requests for prior authorization, (ii) satisfy its obligations concerning PDE file submission, processing, management, and reporting and member cost share reconciliation, (iii) satisfy its obligations concerning TATs for processing Medicare Part D Prior Authorization Requests and the associated submission of cases to the Medicare Part D IDE, (iv) timely correct the Super [prior authorization] defects in its claims processing system and reimburse Anthem for claims incorrectly approved by ESI, and (v) address and correct the WRIT Log issues in a timely manner.

Doc. 3 ¶ 105.  Express Scripts moves for summary judgment to dismiss the parts of Count III of the complaint alleging claims involving (1) PDE Data, TATs, and the WRIT Log; and (2) prior authorization requests.  Doc. 353.  The Court will address each issue in turn.

### A.   <u>PDE Data, TATs, and the WRIT Log</u>

Anthem brings a variety of breach of contract claims regarding Express Scripts' Medicare Part D obligations.  Anthem claims that Express Scripts breached Exhibit I Section 4.11 of the agreement "by failing to comply with contractual obligations and CMS requirements concerning the submission, processing, management, and reporting of PDE files, as well as those relating to member cost share reconciliation."  Doc. 3 ¶ 62.  Anthem also claims that Express Scripts has

failed to adhere to the required TATs for Medicare Part D and to cure the breaches of its

obligation to forward cases to a CMS-designated Independent Review Entity ("IRE") within 24

hours.  *Id.* ¶¶ 71, 76.  Anthem also alleges that it submitted numerous issues regarding Express

Scripts' failure to perform Medicare Part D obligations to the WRIT Log and that Express

Scripts failed to resolve the issues in a timely manner.  *Id.* ¶¶ 80–81.

Express Scripts argues that Anthem has abandoned its claims involving PDE data, TATs,

and the WRIT Log by not putting forward any evidence of damages.  Doc. 355 at 46.  According

to Express Scripts, Anthem did not claim any damages from TATs or the WRIT Log in response

to an interrogatory, Anthem's employees conceded in a deposition that there were ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮, its six expert reports do not identify damages, Anthem did not rebut

Express Scripts' expert report that Anthem suffered no damages, and Anthem's counsel told this

Court that Express Scripts' expert report only addressed "issues that are not a part of Anthem's

damages calculation at all."  *Id.*  Accordingly, it argues that the claims should be dismissed due

to failure to demonstrate evidence of damages, citing *Christina Condo. v. Lerner*, 953 N.Y.S.2d

548 (N.Y. Sup. Ct. 2012) (granting motion for summary judgment dismissing breach of contract

claim because plaintiffs failed to provide evidence of damages).

In response, Anthem argues that it sustained injury in the form of "member-abrasion" and

risk of regulatory censure which it spent time and effort to avert.  Doc. 387 at 51.  It argues that

Brit Pim, former president of Express Scripts' Government Programs, admitted in a deposition

that Anthem faced such risks.  *See* Doc. 381-159 at 5, 211:24–212:10 (testifying that Express

Scripts' "TAT misses" would result in Anthem receiving "one star" in relation to turnaround

times from CMS).  Anthem's responses to Express Scripts' Rule 56.1(b) Statement also dispute

Express Scripts' characterization of the damages evidence, as Anthem's prior discovery

responses regarding monetary damages stated that the calculations were not complete.   Doc. 385 at 167.   Anthem further cites cases holding that even where "damages are uncertain, or may not even exist, [that] is an insufficient reason under New York law to grant Defendant's motion for summary judgment.   It is a well-settled tenet of contract law that even if the breach of contract caused no loss or if the amount of loss cannot be proved with sufficient certainty, the injured party is entitled to recover as nominal damages a small sum fixed without regard to the amount of the loss, if any."   *Acumen Re Mgmt. Corp. v. Gen. Sec. Nat. Ins. Co.*, No. 9 Civ. 1796 (GBD), 2012 WL 3890128, at *11 (S.D.N.Y. Sept. 7, 2012) (internal quotation marks omitted) (collecting cases).

Express Scripts responds that Anthem's 56.1(b) statement is an admission that it has not identified damages, and it cannot avoid dismissal at the summary judgment stage by pointing to non-monetary injuries such as "member abrasion" or "risk of regulatory censure."   Doc. 392 at 28.   Express Scripts cites cases explicitly finding that "at the summary judgment stage, listing 'categories' of damages is not enough; evidence of the *amount* of such damages (or at least a fair estimation of same) is necessary."   *New Paradigm Software Corp. v. New Era of Networks, Inc.*, No. 99 Civ. 12409 (RMB) (AJP), 2002 WL 31749396, at *16 (S.D.N.Y. Dec. 9, 2002) (citations omitted) (collecting cases).   Express Scripts also notes that *Acumen*, the case Anthem cites to argue that its claim cannot be dismissed because it can receive nominal damages, is distinguishable, because in the instant case, Anthem has not plead nominal damages.   *See* Doc. 3 ¶ 107 ("As a direct and proximate result of ESI's Operational Breaches, Anthem has been damaged in an amount to be proven at trial, but not less than $150 million.").   It argues that Anthem cannot now seek nominal damages to avoid summary judgment.   *See Hammond v. The Bank of New York Mellon Corp.*, No. 8 Civ. 6060 (RMB) (RLE), 2010 WL 2643307, at *11

(S.D.N.Y. June 25, 2010) (granting motion for summary judgment dismissing claim because plaintiffs did not provide evidence of damages and did not plead nominal damages).

The Court agrees with Express Scripts.  Anthem has not proffered any evidence to support its claim for $150 million in damages and cannot now plead nominal damages.  For this reason, Express Scripts' motion to dismiss parts of Count III involving PDE Data, TATs, and the WRIT Log is granted.

### B.  <u>Prior Authorization Request Performance Guarantees</u>

Count III of Anthem's complaint also seeks damages for improperly approved prior authorization requests.  Doc. 3 ¶¶ 101–07  Specifically, Anthem alleges that Express Scripts failed to reimburse Anthem for claims Express Scripts incorrectly approved.  *Id.* ¶ 105.

Express Scripts moves to dismiss the part of Count III concerning reimbursements for incorrectly approved prior authorizations.  Doc. 355 at 51.  It argues that it does not owe Anthem reimbursements for any errors because it satisfied the 98% accuracy rate for correct prior authorization determinations that the parties agreed to in the contract.  Doc. 355 at 47; Doc. 359-1 at 136, 184.  It argues that the chart of performance standards are contractual obligations, and nothing in the contract obligates it to exceed those guarantees.  Doc. 359-1 at 84 § 8.1.

Anthem argues that the 98% performance guarantees do not state the extent of Express Scripts' obligations regarding prior authorizations, but rather simply provide .  Doc. 387 at 52.  Instead, Anthem argues that Express Scripts' responsibilities regarding prior authorizations are contained in Section 3.7(f)–(g), Section 3.11, and Exhibit B of the contract.  Section 3.7(f)–(g) requires .  Doc. 381-2 at 38–39 § 3.7(f)–(g).  Section 3.11 is a general

provision requiring ███████████████████████████████████████████████████

███████████████████████████. *Id.* at 40 § 3.11.  Exhibit B requires ████████████

███████████████████████████████████████████████████████████ *Id.* at

116–17.  Anthem also cites to Section 3.1(a) of the contract, which requires █████████

███████████████████████████████████████████████████████████████████

█████████████████████.  Lastly, Anthem points to Section 8.2 which notes that the █████████

████████████████████████████████████████████████████████████

████████████████████████ *Id.* at 84 § 8.2.  Anthem argues that the foregoing provisions

are relevant to its damages calculation because a contract must be read as a whole, with specific

clauses to be read consistently with the overall purpose of the agreement to give meaning to all

of its terms.  *See, e.g.*, *Spanski Enterprises, Inc. v. Telewizja Polska, S.A.*, No. 12 Civ. 2897

(ALC) (GWG), 2013 WL 5366068, at *6 (S.D.N.Y. Sept. 25, 2013), *aff'd*, 581 F. App'x 72 (2d

Cir. 2014).

Express Scripts argues that Section 3.1 is not applicable because it is a general provision

that is not triggered when a more specific provision supplies a more precise standard.  Doc. 355

at 50 (citing *Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Cap., Inc.*,

92 N.E.3d 743, 751 (N.Y. 2017) (A "specific provision will not be set aside in favor of a catchall

clause.")).  It argues that reading Section 3.1 to require 100% accuracy would contravene the rule

of construction that "a court should not adopt an interpretation which will operate to leave a

provision of a contract without force and effect."  *Corhill Corp. v. S. D. Plants, Inc.*, 176 N.E.2d

37, 38 (N.Y. 1961) (cleaned up).  Even if Section 3.1 applies, Express Scripts argues that the

"prudent and expert" standard only requires reasonable expectations, not perfect results.  *See Milau*

*Assocs. v. N. Ave. Dev. Corp.*, 368 N.E.2d 1247, 1250 (N.Y. 1977) (finding an ordinary negligence

standard applies to the performance of experts absent an agreement of a higher standard of

performance).  The Court agrees.  In light of the performance standards charts, Doc. 359-1 at 136,

184, which expressly speak to the standards of performance Express Scripts is contractually

obligated to meet with respect to the different types of prior authorizations, Section 3.1 is not

sufficiently specific to impose an obligation relevant to this claim.

Express Scripts also argues that Section 3.11 does not create liability regarding prior

authorizations, as it simply ███████████████████████████████████████████

████████████████████, Doc. 381-2 at 41 § 3.11, while the performance guarantees more

specifically require a specific accuracy rate for ███████████████████████████████████

███████████████ Doc. 359-1 at 136, 184.  It also argues that Exhibit B is irrelevant, as it

does not address the standard for prior authorization determinations but rather requires █████████

███████████████████████████████████████████████████████████████████

██████████████████████  Doc. 392 at 31.  The Court agrees that neither of these provisions alter

the specific performance guarantees and associated penalties.

Express Scripts also argues that Section 8.2 does not support Anthem's claim.  Doc. 355 at

50.  It argues that Section 8.2 only concerns remedies and actually incorporates the 98% performance

guarantees, as evidenced by its placement right after Section 8.1, which provides that the

performance guarantees are a "contractual obligation."  *Id.* at 50–51.  Thus, it argues that the 98%

accuracy rate is not altered by Section 8.2, which simply ████████████████████████████████

██████████████████████████████████  The Court agrees that only 98% accuracy

in prior authorizations would be required to avoid monetary penalties.  However, this is beside the

point and does not negate Anthem's claim, which does not seek recovery of monetary penalties

associated with the performance guarantees, but rather claims reimbursement of incorrectly approved

prior authorizations.  These obligations arise under Section 3.7(g).

Express Scripts argues that Section 3.7(g) does not relate to prior authorization determinations at all and instead speaks only to "Claims Processing Services," the title of Section 3.7.  *See* Doc. 381-2 at 38 § 3.7(g).  However, the plain language of this Section clearly ██████ ███████████████████████████████████████████ *Id.* ██████████████████ ████████████████████████████████).  This is squarely what Count III seeks—"reimburse[ments] . . . for claims incorrectly approved by [Express Scripts]."  Doc. 3 ¶ 105.  Indeed, Count III does not even mention performance guarantees, as those contractual requirements are separate from the claim at hand.  *See id.* ¶¶ 101–06.  Section 3.7(g) can be read independently of the 98% accuracy performance guarantees to ██████████████████████████ ████████████████████████████████████.  Sections 3.7 and the performance guarantees do not conflict – it is possible for Express Scripts to both be bound to 98% performance guarantees to avoid monetary penalties and also ████████████ ████████████████████.  Therefore, Anthem is contractually entitled to recovered overpayments regardless of whether Express Scripts satisfied the 98% performance guarantees.

However, at this time Anthem has not shown any entitlement to *unrecovered* overpayments. Therefore, its claim would appear to be limited to credit for overpayments that Express Scripts ████████████████████████████████████████████.

For these reasons, Express Scripts' motion to dismiss this portion of Count III is denied.

**VII.**   **Conclusion**

For all these reasons, Express Scripts' partial motion for summary judgment is

GRANTED in part as to Count I, Count II, Count III's claims involving PDE Data, TATs, and

the WRIT Log, and its third counterclaim, and DENIED in part as to Count III's claim for

reimbursements for improperly approved prior authorizations.

The Clerk of Court is respectfully directed to terminate the motion, Doc. 353.

SO ORDERED.

Dated:   March 31, 2022
         New York, New York

_____
    Edgardo Ramos, U.S.D.J.